# EXHIBIT 1

**General Civil and Domestic Relations Case Filing Information Form**

☙ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1693-2**

Judge David L. Dickinson

SEP 21, 2025 12:36 PM

☑ **Superior** or ☐ **State Court of** Forsyth _____ County

Greg G. Allen, Clerk
Forsyth County, Georgia

| For Clerk Use Only | |
|---|---|
| Date Filed 09-21-2025 | Case Number 25CV-1693-2 |
| **MM-DD-YYYY** | |

| Plaintiff(s) | | | | | Defendant(s) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Dogwood Bluff Partners, LLC | | | | | Fidelis Underwriting Limited | | | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |
| Dogwood Bluff, LLC | | | | | Volante Specialty Risk, LLC | | | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |
| | | | | | | | | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |
| | | | | | | | | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |

**Plaintiff's Attorney** Bersinger, D. Austin          **Bar Number** 144792          **Self-Represented** ☐

**Check one case type and, if applicable, one sub-type in one box.**

| General Civil Cases | Domestic Relations Cases |
|---|---|
| ☐ Automobile Tort | ☐ Adoption |
| ☐ Civil Appeal | ☐ Contempt |
| ☑ Contract | ☐ Non-payment of child support, medical support, or alimony |
| ☐ Contempt/Modification/Other Post-Judgment | ☐ Dissolution/Divorce/Separate Maintenance/Alimony |
| ☐ Garnishment | ☐ Family Violence Petition |
| ☐ General Tort | ☐ Modification |
| ☐ Habeas Corpus | ☐ Custody/Parenting Time/Visitation |
| ☐ Injunction/Mandamus/Other Writ | ☐ Paternity/Legitimation |
| ☐ Landlord/Tenant | ☐ Support – IV-D |
| ☐ Medical Malpractice Tort | ☐ Support – Private (non-IV-D) |
| ☐ Product Liability Tort | ☐ Other Domestic Relations |
| ☐ Real Property | |
| ☐ Restraining Petition | |
| ☐ Other General Civil | |

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____          _____
**Case Number**                    **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____
_____

Version 1.1.20

⚖ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1693-2**
**Judge David L. Dickinson**
SEP 21, 2025 12:36 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

## IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| DOGWOOD BLUFF PARTNERS, LLC and DOGWOOD BLUFF, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. |
| FIDELIS UNDERWRITING LIMITED and VOLANTE SPECIALTY RISK, LLC, | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Dogwood Bluff Partners, LLC ("Dogwood Partners") and Dogwood Bluff, LLC ("Dogwood Bluff") (collectively "Plaintiffs") file this Complaint against Defendants Fidelis Underwriting Limited ("Fidelis" or the "Insurer") and Volante Specialty Risk, LLC ("Volante Specialty"), and allege as follows:

### SUMMARY OF ACTION

This case involves the Insurer's breach of its contractual obligations under a 170(h) Liability Insurance Policy (No. VFP/FL/20627/2021/1) (the "Policy"). The Policy serves one purpose—insuring losses resulting from adjustments to the tax deduction that Dogwood Bluff claimed for the donation of a conservation easement over certain real property. The Insurer understood the transaction at issue, was provided relevant due diligence documents during the underwriting process, knew the asserted value of the conservation easement, and understood how the appraiser reached that value. The Insurer fully understood the risk that it insured, including the risk that the IRS might attempt to reduce or disallow the claimed deduction, and took handsome premiums in excess of $700,000 from the partnership, reflective of the risk it agreed to insure.

Now that this precise risk is coming to pass, the Insurer is refusing to either allow Dogwood Bluff to accept a reasonable, in-limits settlement offer from the IRS or to indemnify the partnership and its investors for the insured loss resulting from the settlement.

For more than a year, the Plaintiffs have sought in good faith to obtain the Insurer's consent to accept the IRS's reasonable settlement offer and to secure a clear coverage position under the Policy. Despite repeated requests, the Insurer has refused to consent (or, alternatively, to waive the consent requirement) and, even more fundamentally, has refused to provide any formal coverage determination at all. This refusal appears calculated: by declining to either consent or deny coverage, the Insurer is engaging in delay and strategic ambiguity designed to manufacture policy defenses that would otherwise be unavailable had it acted in good faith. The Insurer's prolonged inaction has left the Plaintiffs with no choice but to file this lawsuit—one of at least nineteen lawsuits necessitated by similar conduct—in order to protect their rights under the Policy and ensure that the coverage for which they paid substantial premiums is honored.

As explained below, the Insurer has breached its contractual obligations by unreasonably withholding its consent to accept the IRS's settlement offer, delaying payment under the Policy, failing to timely or adequately respond to Plaintiffs' claims, refusing to provide substantive coverage positions or adequately investigate the claims, and deliberately interfering with Plaintiffs' efforts to recover losses under the Policy. The Plaintiffs are entitled to damages from the Insurer as a result of these breaches.

## PARTIES, JURISDICTION, VENUE

1.    Plaintiff Dogwood Partners is a Delaware limited liability company with its principal place of business located at 2207 2nd Ave N., Birmingham, Alabama 35203. Dogwood Partners is the Named Insured under the Policy. Dogwood Partners' investors are citizens of

multiple states throughout the country, including Georgia. The investors in Dogwood Partners are also insured under the Policy.

2.      Plaintiff Dogwood Bluff is a Georgia limited liability company with its principal place of business located at 2207 2nd Ave N., Birmingham, Alabama 35203. Dogwood Bluff is also an insured under the Policy.

3.      Fidelis is a foreign surplus lines insurer registered in the United Kingdom with its principal place of business in London, England. Fidelis continuously and systematically transacted the business of insurance in Georgia through Volante Specialty. Fidelis insures risks in the United States through its managing general agent, Volante Specialty, which is domiciled in Georgia. Volante Specialty had authority (actual or apparent) to bind Fidelis to contracts in the United States and executed the Policy in this action on behalf of Fidelis. Fidelis is subject to personal jurisdiction in Georgia, where its managing general agent is domiciled and operates to bind coverage for risks in the United States.

4.      Finally, Fidelis, as a non-admitted insurer offering surplus lines coverage through Volante Specialty in Georgia, is subject to jurisdiction under O.C.G.A. § 33-5-34, or, in any event, plainly understood that it could be sued in Georgia based on the surplus lines coverage it sold in the United States through its Georgia agent. Therefore, pursuant to O.C.G.A. § 33-5-34, Fidelis may be served with process through the Georgia Commissioner of Insurance, John King, c/o Jeremy Betts, 2 Martin Luther King Jr. Dr. SE, Suite 704 West Tower, Atlanta, Georgia 30334, with a copy to Fidelis c/o Locke Lord LLP, 200 Vesey Street, Brookfield Place, New York, New York 10281.

5.      Volante Specialty is a limited liability company organized under the laws of the state of Delaware with a principal place of business at 1595 Peachtree Parkway, Suite 204-376,

Cumming, Georgia, 30041. Volante Specialty possesses an active Georgia Principal Agency license (License Number 208812). Volante Specialty may be served through its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

6.    While the Policy contains a provision related to the arbitration of disputes arising under the Policy, such provision is unenforceable under O.C.G.A. § 9-9-2(c)(3).

7.    Venue is proper in this Court pursuant to GA. CONST. Art. 6, s. 2, para. IV, O.C.G.A. §§ 14-2-510(b)(1) & (4), O.C.G.A. § 33-47-6, and O.C.G.A. § 33-5-34. Volante Specialty maintains its principal office in Forsyth County, and, as alleged above, Fidelis has insured surplus lines coverages in the United States through its managing general agent, Volante Specialty, which is domiciled in Georgia, and maintains its registered office in this county. Venue in this action is proper in the county where the Fidelis' managing general agent is present, and where the policy was written, sold, paid for, and notice of loss was provided.

## FACTUAL ALLEGATIONS

### I.    *Conservation Easements*

8.    A conservation easement is a nonpossessory interest in real property that restricts the use of the subject property to preserve the conservation values of the property.

9.    In 1980, Congress codified taxpayers' ability to claim a federal tax deduction for the donation of a conservation easement at 26 U.S.C. § 170(h).

10.    Under 26 U.S.C. § 170(h), if a taxpayer donates a conservation easement to a qualified organization exclusively for conservation purposes, the taxpayer may claim a deduction equal to the fair market value ("FMV") of a donated conservation easement.

11.    The FMV of a conservation easement generally is determined using the "before-and-after" valuation method.

4

12.     The "before-and-after" valuation method requires an appraiser to determine (i) the FMV of the subject property before the donation, and (ii) the FMV of the subject property after the donation. The difference between these two values is the FMV of the donated conservation easement. *See* Treas. Reg. § 1.170A-14(h)(3).

## II.     *The Underlying Conservation Easement Donation*

13.     Dogwood Bluff acquired 255.31 acres of primarily unimproved real property in Oglethorpe County, Georgia (the "Property") through a capital contribution in connection with its analysis of the Property's mineral resources for potential development or conservation.

14.     Dogwood Partners was created in December 2021 to raise funds from investors to purchase an interest in Dogwood Bluff.

15.     After assessment of the Property's mineral reserves, the investors in Dogwood Partners were given three options with respect to the Property: (i) develop a granite mining operation on the Property, (ii) donate a conservation easement over the Property, or (iii) hold the Property for long-term appreciation.

16.     As part of this purpose, the Plaintiffs retained independent experts to determine the Property's highest and best use ("HBU") and FMV.

17.     The due diligence performed by these experts indicated the Property's HBU was the development of a granite mining operation due to the Property's significant mineral reserves.

18.     An independent appraiser valued the Property at its HBU using the discounted cash flow ("DCF")/income valuation methodology.

19.     Using the DCF/income valuation methodology, the appraiser determined the FMV of the Property was approximately $55,550,000.

20.    The appraiser further determined that, if Dogwood Bluff donated a conservation easement over the Property that prohibited mining, the FMV of the Property would be $360,000.

21.    Using the "before-and-after" valuation methodology for conservation easements, the appraiser accordingly determined that the FMV of the conservation easement would be worth approximately $55,190,000.

22.    To participate in the transaction, the investors of Dogwood Partners contributed, in aggregate, $10,700,100 for interests in Dogwood Partners through a private placement.

23.    Dogwood Partners purchased a 98% interest in Dogwood pursuant to an agreement dated December 17, 2021.

24.    The investors in Dogwood Partners voted to donate a conservation easement under 26 U.S.C. § 170(h) over the Property, which Dogwood Bluff donated to the Natural Resources Conservancy, Inc., by deed dated December 29, 2021.

25.    Following the donation of the conservation easement, the appraiser prepared a qualified appraisal dated February 1, 2022, for tax purposes to substantiate the FMV of the donated conservation easement.

26.    The appraiser concluded in the qualified appraisal that the FMV of the donation conservation easement was $55,190,000.

27.    Dogwood Bluff reported a $55,190,000 noncash charitable deduction on its 2021 Form 1065 for the donation of the conservation easement based on the appraisal.

28.    Because Dogwood Partners is a partnership for federal tax purposes, 98% of the reported deduction, or $54,086,200, was reported on Dogwood Partners' 2021 Form 1065.

29.     Because Dogwood Partners is also a partnership for federal tax purposes, the investors in Dogwood Partners claimed the full deduction reported by Dogwood Partners on their respective tax returns in 2021 and later years.

### III.     The Policy

30.     In connection with the conservation easement donation, the investors in Dogwood Partners were presented with the opportunity to purchase a specialized insurance policy that serves one fundamental purpose—to protect and indemnify Dogwood Partners and its investors if the IRS rejected or reduced the amount of the tax deduction claimed by Dogwood Bluff for its donated conservation easement.

31.     Volante Specialty was formed in November 2019 for the primary purpose of placing 170(h) policies with partnerships that had donated conservation easements.

32.     Volante Specialty was at all relevant times acting as an agent of Volante Global Limited.

33.     When the investors in Dogwood Partners voted to conserve the Dogwood Bluff property, they further voted to require Dogwood Partners to use partnership funds to acquire the Policy to insure the claimed deduction for Dogwood Bluff's donated conservation easement.

34.     On December 30, 2021, Dogwood Partners informed Volante Specialty that the private placement had closed and that the majority of Dogwood Partners' investors had voted to obtain a 170(h) insurance policy.

35.     In connection with the underwriting process for the requested policy, Volante Specialty was provided with significant due diligence and background materials regarding Dogwood Bluff's conservation easement donation, including the corporate documents of

7

Dogwood Partners and Dogwood Bluff, the private placement memorandum explaining the transaction and identifying its risks, and the appraisal used to determine the value of the deduction.

36.     On December 30, 2021, Volante Specialty issued an Investor 170(h) Liability Quote and an invoice for the required premiums for the requested 170(h) policy.

37.     On December 30, 2021, Volante Specialty received the executed Quote to bind coverage as outlined in the Quote. A copy of the executed Quote and Invoice is attached as **Exhibit A.**

38.     On December 31, 2021, Dogwood Partners paid the full premium pursuant to the invoice.

39.     Also on December 31, 2021, Volante Specialty confirmed that the Policy had been bound.

40.     In return for the payment of a $749,800 premium, Fidelis issued the Policy (No. VFP/FL/20627/2021/1). The Policy is attached as **Exhibit B.** (Policy at p. 1.)

41.     David Hamilton of Volante Specialty is listed in the Policy declarations as the authorized representative of Fidelis.

42.     The policy period is from December 31, 2021 through October 15, 2022, with an extended reporting period to October 15, 2025. (*Id.* at p. 1.)

43.     The "**Named Insured**" on the Policy is Dogwood Partners. (*Id.*)

44.     Dogwood Bluff and the investors in Dogwood Bluff and Dogwood Partners are insureds under the Policy. (*Id.* at p. 1, 4-5.)

45.     The Policy's Insuring Agreement provides:

> **We** will indemnify you for **loss** in excess of any applicable **retention** resulting from any **proceeding** against **you** seeking to hold you liable for a **wrongful act**, provided the **loss** results from a

**proceeding** first initiated against **you** and reported to **us** during the **policy period**.

1. On behalf of an **insured person**, **we** will pay **loss** that the **insured person** becomes legally obligated to pay and that is not indemnified by an **insured organization**.

2. On behalf of an **insured organization**, **we** will pay **loss** that the **insured organization** pays as indemnification to an **insured person** to the extent permitted or required by law or the applicable operating agreement.

(*Id.* at p. 4.)

46.　"**Loss**" means "damages, judgments and settlements incurred by an **insured** as a result of a **wrongful act** by such **insured** causing a reduction in tax savings to an **investor** by reason of an **adjustment**." (*Id.* at p. 5.)

47.　"**Insured**" means "each **insured person** and each **insured organization**." (*Id.* at p. 4.)

48.　"**Insured person**" means "a person or entity who, at any time during the **policy period**, is: 1. an **investor**; or 2. a **member** in a **company**." (*Id.*)

49.　"**Insured organization**" means "at any time during the **policy period**: 1. the **named insured**; 2. any **company**; and 3. any **controlled entity**." (*Id.* at p. 5.)

50.　"**Wrongful act**" means "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by an **insured** or third party retained by an **insured** for whose conduct the **insured** can be held legally liable concerning a report or filing with a **taxing authority** with respect to the purpose, value, partnership tax treatment, or any other aspect of the **named insured's** conservation easement or fee simple donation of real property." (*Id.* at p. 6.)

51.　"**Company**" means "any entities or partnerships as stated in Item 1 of Declarations page or identified as such by endorsement to this policy." (*Id.* at p. 4.)

9

52.    "**Investor**" means "an individual or entity that is a **member** of at least one **controlled entity** or **company** at any time during the **policy period**." (*Id.*)

53.    "**Member**" means "the individuals or entities identified as such for any **insured organization** by the articles of incorporation, bylaws, operating agreement, or partnership agreement of such **insured organization** at any time during the **policy period**." (*Id.* at p. 5.)

54.    "**Controlled entity**" means "any entity which: 1. the **named insured** controls or otherwise has the ability to direct the managerial decisions of such entity at any time during the performance of the business operations giving rise to the **proceeding**; and 2. is created for the purpose of owning and controlling a specific property from which a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170 is made." (*Id.* at p. 4.)

55.    "**Proceeding**" means "an investigation, audit, administrative action, or judicial action against **you**, initiated or brought by any **taxing authority**, concerning the tax treatment of a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170. A mere inquiry by a **taxing authority** is not a **proceeding**. An inquiry will become a **proceeding** only after **you** have received a "Notice of Beginning of Administrative Proceedings" or equivalent notice." (*Id.* at p. 5.)

56.    Through its agent Volante Specialty, the Insurer was provided due diligence related to the purchase of the Dogwood Bluff interest, the donation of the conservation easement, and the valuation of that donation.

57.    At the time of binding, the Insurer was aware of the risks associated with transactions involving conservation easement donations, including IRS scrutiny of transactions identified as Syndicated Conservation Easement Transactions ("SCETs"), which were identified

as listed transactions by the IRS in its Notice 2017-10, 2017-4 I.R.B. 544 issued on December 23, 2016, and the IRS's coordinated compliance campaign focused on SCETs.

### IV.    The IRS Audit

58.    Dogwood Bluff received notice that the IRS selected its 2021 tax return for examination on or about September 28, 2023.

59.    Between October 1, 2023 and October 1, 2024, the United States Tax Court ("Tax Court") issued seven opinions resolving twelve cases that involved the valuation of conservation easements.

60.    In each of these seven opinions, the Tax Court (i) found in favor of the IRS on the valuation of the subject conservation easement, allowing the taxpayer to claim no more than 10.07% of the reported deduction, (ii) rejected the taxpayer's use of the DCF/income valuation methodology to value the subject easement, and (iii) imposed a 40% strict liability penalty on the taxpayer.

61.    By notice IR-2024-174 dated June 26, 2024, the IRS announced a time-limited settlement offer for certain taxpayers under examination who participated in SCETs ("Nondocketed Settlement Program").

62.    The IRS issued a letter to Dogwood Bluff dated July 11, 2024, inviting it to resolve its tax dispute in full through participation in the Nondocketed Settlement Program ("Election Letter"). The Election Letter is attached as **Exhibit C**.

63.    Under the terms of the Nondocketed Settlement Program, the IRS proposed to (i) disallow the $55,190,000 noncash charitable deduction for the conservation easement donation; (ii) instead, allow an "other deduction" of $10,700,100; (iii) set the applicable tax rate for

establishing the liability to 21%, (iv) reduce the applicable tax penalty from 40% to 5%, and (v) require statutory interest to continue to accrue until the liability is paid in full ("IRS Settlement").

64.     The Plaintiffs provided the Insurer with notice of the proposal outlined in the IRS Settlement by email on July 22, 2024, and requested that the Insurer consent to the acceptance of the offer.

65.     The IRS Settlement guarantees Dogwood Bluff a deduction of $10,700,100, or 19.39% of Dogwood Bluff's reported deduction (a higher percentage of deduction than allowed in any of the recently decided Tax Court cases), and a reduced penalty rate of 5% (a lower penalty rate than the rate imposed in any of the recently decided Tax Court cases).

66.     Based on the terms of the IRS Settlement and the current status of case law regarding the valuation of conservation easements, including the recent Tax Court decisions adopting the IRS's valuation methodology for similarly situated conservation easement cases, the investors in Dogwood Partners voted to elect into the Nondocketed Settlement Program.

67.     Since October 1, 2024, the Tax Court has issued eight additional opinions resolving fourteen additional cases that involved the valuation of conservation easements.

68.     In each of these eight opinions, the Tax Court once again (i) found in favor of the IRS on the valuation of the subject conservation easement, allowing the taxpayer to claim no more than 13.36% of the reported deduction, (ii) rejected the taxpayer's use of the DCF/income valuation methodology to value the subject easement, and (iii) imposed a 40% strict liability penalty on the taxpayer.

## V.     *The Claim and Claim Communications*

69.     Plaintiffs notified the Insurer of the start of the IRS examination on November 3, 2024, by email and provided the Insurer with regular updates regarding the IRS examination throughout the examination process.

70.     At the end of the examination, Plaintiffs were provided with the IRS Settlement, which, as stated, offered to resolve the examination by fixing Dogwood Bluff's allowable deduction at $10,700,100, applying a reduced 5% penalty, and otherwise establishing Plaintiffs' tax liability on terms significantly more favorable than those imposed in recent Tax Court decisions.

71.     The Plaintiffs provided the Insurer with notice of the proposal outlined in the IRS Settlement by email on July 22, 2024, and requested that the Insurer consent to the acceptance of the settlement offer as soon as possible.

72.     Plaintiffs reiterated their request that the Insurer consent to the IRS Settlement on August 29, 2024, and detailed the reasons that the IRS Settlement is reasonable. Plaintiffs requested that the Insurer consent to the acceptance of the settlement offer by September 5, 2024. A copy of the correspondence is attached as **Exhibit D**.

73.     Plaintiffs responded to requests for information from the counsel for Insurer regarding the IRS Settlement on September 11, 2024, and November 11, 2024. Copies of the correspondence are attached as **Exhibits E** and **F**, respectively.

74.     Plaintiffs communicated the investors' vote to elect into the Nondocketed Settlement Program to the Insurer on September 13, 2024, based on the Insurer's position that such an election was not a settlement that required Insurer consent under the Policy. A copy of the correspondence is attached as **Exhibit G**.

75.    By email dated October 29, 2024, the Insurer confirmed to Dogwood Partners that the Insurer did not view election into the Nondocketed Settlement Program to be a settlement that required Insurer consent under the Policy. A copy of the correspondence is attached as **Exhibit H**.

76.    Based on the Insurer's position that the Nondocketed Settlement Program was not a settlement, Dogwood Bluff elected into the Nondocketed Settlement Program.

77.    On June 24, 2025, Dogwood Bluff received the Form 906 (Closing Agreement on Final Determination Covering Specific Matters) for the final resolution of the IRS Settlement ("Form 906").

78.    By letter dated July 11, 2025, Dogwood Partners provided the Insurer with a copy of the Form 906. The letter demanded that, within 30 days, the Insurer (i) provide either consent to the IRS Settlement or agree to waive the consent requirement for the IRS Settlement, (ii) agree to fund the amounts that would be due under the Policy as a result of the IRS Settlement, (iii) provide its coverage position with respect to the IRS Settlement, and (iv) provide copies of any policy for this matter that purports to affect the rights of any insurer under the Policy ("Demand Letter"). A copy of the Demand Letter is attached as **Exhibit I**.

79.    The Insurer never responded to the Demand Letter.

80.    Counsel for Insurer further discussed the IRS Settlement with tax counsel for Dogwood Bluff and other partnerships on July 22 and 23, 2025, who unanimously confirmed the reasonableness of the IRS Settlement in light of the state of the law in the Tax Court regarding the valuation of conservation easements.

81.    Based on the unanimous determination of various tax counsel regarding the reasonableness of the IRS Settlement, Plaintiffs' counsel asked Insurer by letter dated August 8, 2025 to provide any authority or realistic theory that contradicts the opinions given by Plaintiffs'

14

tax counsel and the identity of any tax expert or practitioner who would support Insurer's determination to withhold consent based on the reasonableness of the proposed IRS settlement. A copy of the correspondence is attached as **Exhibit J**.

82.     The Insurer has not responded to the August 8, 2025 letter or been able to articulate a reasonable theory of success in this case or identify an expert who will opine on the reasonableness of the Insurer's position.

83.     Since receiving the Election Letter, Plaintiffs have consistently communicated with the Insurer regarding relevant IRS deadlines related to the settlement offer. The current deadline for accepting the IRS Settlement and paying the liability owed is October 31, 2025.

84.     The amount due to accept the IRS Settlement exceeds the aggregate limits of the Policy.

85.     Plaintiffs have sufficient funds to pay the $321,000 retention under the Policy and the difference between the aggregate limits payable under the Policy and the liability due under the IRS Settlement.

86.     In light of the plain reasonableness of the IRS Settlement, the Insurer has violated its obligations under the Policy by baselessly refusing to provide the coverage Plaintiffs purchased. The Insurer was aware of the risks associated with conservation easement donations when it issued the Policy and accepted over half a million dollars in premiums. Having assumed that risk, the Insurer must be held accountable to honor its bargain and indemnify Plaintiffs under the clear terms of the Policy.

## COUNT I – BREACH OF CONTRACT
(Against Fidelis)

87.     The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 86 of this Complaint as if fully restated herein.

88.     The insuring provision of the Investor 170(h) Liability Form obligates Fidelis to indemnify Plaintiffs' loss resulting from a proceeding, as defined in the policy, that was reported to the Insurer during the policy period, so long as the loss is determined by either a final, non-appealable order or "the settlement of a proceeding with [the Insurer] prior written consent."

89.     Under the Policy, the Insurer promised as follows with respect to its consideration of any settlement offer:

> You agree not to undertake settlement negotiations or enter into any settlement agreements that would result in a loss without our prior written consent, *which we agree not to withhold unreasonably*.

(Policy at p. 9) (emphasis added).

90.     The IRS Settlement is clearly reasonable as a potential resolution and should have been consented to by the Insurer. That reasonableness is blatantly obvious because the IRS Settlement provides Dogwood Bluff with a larger percentage of its previously reported deduction than the Tax Court has allowed in any case since October 2023.

91.     Additionally, the IRS Settlement (i) reduces the applicable penalty percentage from the 40% strict liability penalty that the Tax Court has applied in every decided case since October 2023 to 5%, (ii) caps the effective tax rate for any tax liability to 21%, and (iii) allows Dogwood Bluff to avoid the cost to litigate this matter and the continued accrual of interest on any potential liability.

92.     Tax counsel for Dogwood Bluff has advised the Insurer that the IRS Settlement is reasonable. Tax counsel for other similarly situated taxpayers have likewise advised the Insurer of the reasonableness of the IRS Settlement. To date, the Insurer and its counsel have not identified any authority suggesting that the IRS Settlement is somehow unreasonable.

93.    In the fifteen opinions that the Tax Court has issued since October 2023, the best outcome that any taxpayer received was *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6, where the taxpayer was allowed a deduction of 13.36% of its reported deduction, assessed a 40% strict liability penalty, and subjected to a 39.6% maximum tax rate. By contrast, the IRS Settlement offered to Dogwood Bluff secures a larger deduction of 19.39% of Dogwood Bluff's reported deduction, imposes only a 5% penalty, and caps the applicable tax rate to 21%. This outcome is materially more favorable than even the most taxpayer-friendly Tax Court decision issued in nearly 2 years, further confirming the reasonableness of the IRS Settlement, as illustrated in the chart below.

| Case Name | Percentage of Deduction Allowed | Penalty Percentage Applied | Maximum Potential Tax Rate |
|---|---|---|---|
| IRS Settlement Offer for Dogwood Bluff | 19.39% | 5% | 21% |
| *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6 | 13.36% | 40% | 39.6% |

94.    The Insurer has failed to provide any rational basis, let alone the required reasonable basis, for withholding its consent to allow Dogwood Bluff to settle this case.

95.    Dogwood Bluff's deadline for accepting the IRS Settlement is October 31, 2025.

96.    The Insurer has the duty to perform its obligations under the Policy with good faith and fair dealing and has the express obligation to consent to a reasonable settlement agreement between Dogwood Bluff and the IRS.

97.    The Insurer breached this duty to the Plaintiffs by withholding consent for Dogwood Bluff's acceptance of the IRS Settlement when such a withholding of consent is unreasonable considering the circumstances, particularly since the Insurer's actions appear calculated in hope of causing Dogwood Bluff to lose the opportunity to accept the IRS Settlement.

98.     Plaintiffs suffered damages as a direct and proximate result of Insurer's breach, including but not limited to incurring additional defense costs and fees related to their negotiations with the IRS and the failure to receive the benefit of its bargain, including the insurance policy limits that were purchased by payment of the policy premiums.

## COUNT II – DECLARATORY JUDGMENT
(Against Fidelis)

99.     The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 98 of this Complaint as if fully restated herein.

100.    This Court is authorized to grant declaratory judgment relief under the Georgia Declaratory Judgment Act, O.C.G.A. § 9-4-2 *et seq.*

101.    In Georgia, insurance contracts are liberally construed in favor of coverage, and conditions and provisions of insurance contracts are strictly construed against the insurer.

102.    Under the Policy, the Insurer promised as follows:

> We will indemnify you for loss in excess of any applicable retention resulting from any proceeding against you seeking to hold you liable for a wrongful act, provided the loss results from a proceeding first initiated against you and reported to us during the policy period.

(Policy at p. 4.)

103.    Dogwood Bluff's acceptance of the IRS Settlement would trigger a covered "Loss" under the Policy, as the definition of "Loss" includes "damages, judgments and settlements incurred by an insured as a result of a wrongful act by such insured causing a reduction in tax savings to an investor by reason of an adjustment." (*Id.* at p. 5.)

104.    A "wrongful act" is

> any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by an insured or third party retained by an insured for whose conduct the insured can be held legally liable concerning a report or filing

18

with a taxing authority with respect to the purpose, value, partnership tax treatment, or any other aspect of the . . . conservation easement.

(*Id.* at p. 6.)

105.    An "adjustment" is:

a reduction in the allowable tax deduction ordered by a taxing authority claimed by an insured that causes the actual tax deduction allowed by such taxing authority multiplied by 41% to be less than the sum of (a) such insured's original contribution to a company or the controlled entity that granted the conservation easement or fee simple donation of real property pursuant to 26 U.S.C. § 170 upon which such tax deduction was based, and (b) penalties and interest where insurable by law imposed by any taxing authority due to such a covered reduction in tax savings.

(*Id.* at p. 4.)

106.    The losses are due to alleged errors related to the valuation of the donated conservation easement and in the reporting of the Dogwood Bluff deduction.

107.    Acceptance of the IRS Settlement would result in a reduction in the investors' tax savings from the conservation easement donation by reason of an "adjustment." The allowed deduction under the IRS Settlement of $10,700,100, multiplied by 41%, is $4,387,041. This is less than $13,914,109, which represents the investors' original capital contribution, plus any penalties and interest resulting from the settlement.

108.    Despite the Policy's clear language, the Insurer has expressly not acknowledged that the liabilities resulting from an adjustment to Dogwood Bluff's reported deduction for the conservation easement, including the liability that would result from Dogwood Bluff's acceptance of the IRS Settlement, would trigger a covered "Loss" under the Policy.

109.    If such liabilities do not result in a covered Loss, the Policy could not bind the Insurer to any risk at all, transforming the parties' agreement into an improper, illusory insurance policy.

19

110.    By reason of the foregoing, an actual, justiciable, and substantial controversy exists between Plaintiffs and Insurer, and a declaratory judgment order pursuant to O.C.G.A. § 9-4-5 is warranted to declare liabilities resulting from an adjustment to Dogwood Bluff's reported deduction for the conservation easement, including the liability that would result from Dogwood Bluff's acceptance of the IRS Settlement, constitutes a covered "Loss" under the Policy.

## COUNT III – STATUTORY BAD FAITH
### (O.C.G.A. § 33-4-6)

111.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 110 of this Complaint as if fully restated herein.

112.    At all relevant times, a valid contract of insurance existed between Plaintiffs and Insurer, as set forth in the Policy.

113.    Plaintiffs suffered a loss which is covered under the Policy.

114.    Plaintiffs complied with all conditions precedent under the Policy and provided timely notice of their claim, including notice of the IRS Settlement, the investor vote to elect into the Nondocketed Settlement Program, and Closing Agreement to accept the IRS Settlement. Plaintiffs also responded in good faith to all requests for information from Insurer and its representatives, including providing relevant documentation and making tax counsel available to facilitate Insurer's evaluation of the claim.

115.    Plaintiffs made a demand for payment under the Policy.

116.    Insurer intentionally refused to pay Plaintiffs' claim under the Policy, despite receiving timely notice of the claim, access to all relevant information, and repeated requests for a coverage determination and consent to accept the IRS Settlement.

117.    At the time Insurer refused to pay, there was no reasonably legitimate or arguable basis for refusing to pay Plaintiffs' claim. The IRS Settlement substantially mitigates Plaintiffs'

exposure to losses and is objectively reasonable based on the available legal authority and factual developments.

118. Insurer knew, or acted in reckless disregard of the fact, that no legitimate or arguable basis existed to refuse to pay the claim and/or intentionally failed to determine whether any legitimate or arguable reason existed to refuse to pay the claim, including by (i) intentionally or recklessly failing to investigate Plaintiffs' claim; (ii) failing to subject the results of any investigation to a reasonable and good faith cognitive evaluation and review; (iii) manufacturing or clinging to a debatable reason for denial unsupported by the facts or the Policy; and/or (iv) relying, or preparing to rely, on ambiguous provisions of the Policy as a pretext to deny coverage. Insurer instead, in its own self-interest, engaged in a pattern of delay, non-responsiveness, and strategic ambiguity designed to preserve potential defenses and avoid a timely resolution of the claim at Plaintiffs' expense.

119. Insurer's conduct was malicious, willful, wanton, and in reckless disregard of Plaintiffs' rights under the Policy.

120. Plaintiffs suffered damages as a direct and proximate result of Insurer's bad faith conduct.

## COUNT IV – COMMON LAW BAD FAITH

121. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 120 of this Complaint as if fully restated herein.

122. At all relevant times, a valid contract of insurance existed between Plaintiffs and Insurer, as set forth in the Policy.

123.    At all relevant times, the Insurer owed Plaintiffs a duty to act reasonably and prudently when presented with an opportunity to settle, and to give Plaintiffs' interests the same faithful consideration it gives its own interests.

124.    The IRS Settlement constitutes a reasonable opportunity to resolve Plaintiffs' liability within the Policy's aggregate limits, as Plaintiffs have sufficient funds to satisfy the $321,000 retention under the Policy and to cover any liability above the Policy's aggregate limits.

125.    Plaintiffs repeatedly requested that the Insurer consent to the IRS Settlement or, alternatively, waive the consent requirement under the Policy so that Plaintiffs can protect themselves from further loss.

126.    Despite full knowledge of the relevant facts, and despite repeated requests by Plaintiffs, the Insurer has unreasonably refused to consent to the IRS Settlement (or, alternatively, waive the consent requirement), has deliberately withheld providing a formal coverage position, and has failed and refused to provide the contractual indemnity afforded by the Policy for the IRS Settlement.

127.    The Insurer's refusal to act reasonably and as an ordinarily prudent insurer would, under the circumstances—including its refusal to consent, refusal to provide a coverage position, and refusal to pay the covered loss—is a breach of its obligations of good faith and fair dealing under Georgia law.

128.    As a direct and proximate result of the Insurer's breaches, Plaintiffs have suffered damages.

## COUNT V – NEGLIGENT MISREPRESENTATION
(In the alternative)

129.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 128 of this Complaint as if fully restated herein.

130.    Volante Specialty served as the managing agent for the Insurer.

131.    Prior to the procurement of the Policy, Plaintiffs engaged in extensive conversations with Volante Specialty and its representatives as to the needs of the Plaintiffs, and the intended purpose of the Policy was specifically a policy that would provide insurance coverage for tax deductions claimed under 26 U.S.C. § 170(h) for its donation of the conservation easement for the Property in 2021.

132.    Volante Specialty procured the quote for the Policy, presented the quote to the Plaintiffs, and expressly represented that the quote would be for a policy that would provide the requested coverage.

133.    Based on the representations of Volante Specialty, Plaintiffs agreed to purchase the Policy.

134.    Plaintiffs' reliance on the representations of Volante Specialty and its agent was reasonable as Volante Specialty served as the managing agent for the Insurer (and David Hamilton would be identified as the "Authorised Representative" on the declarations page of the Policy).

135.    Volante Specialty knew or should have known that the Insurer would deny this type of claim, or alternatively, that the requested coverage was not available under the Policy.

136.    Plaintiffs would not have purchased the Policy if no coverage existed for tax deductions claimed due to the donation of a conservation easement under 26 U.S.C. § 170(h). Rather, Plaintiffs would have sought an alternative insurance policy to insure the specific risks related to coverage for tax deductions claimed under 26 U.S.C. § 170(h) for its donation of the conservation easement for the Property.

137.    As a direct and proximate result of Volante Specialty's negligent misrepresentation, Plaintiffs suffered damages, including and not limited to all potential benefits under the insurance

policy, plus any additional costs incurred by the Plaintiffs based on the Insurer's delay and failure to pay.

## COUNT VI – NEGLIGENT PROCUREMENT
### (In the alternative)

138.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 137 of this Complaint as if fully restated herein.

139.    Prior to the procurement of the Policy, Plaintiffs engaged in extensive conversations with Volante Specialty and its representatives regarding the needs of the Plaintiffs and the intended purpose of the Policy: to provide insurance coverage for tax deductions claimed under 26 U.S.C. § 170(h) for its donation of the conservation easement in 2021.

140.    Volante Specialty held itself out as an expert in the field of insurance, and with respect to the specific coverage that Plaintiffs requested with respect to their 2021 conservation easement donation.

141.    Volante Specialty procured the quote for the Policy, presented the quote to the Plaintiffs, expressly represented that the quote would be for a policy that would provide the requested coverage, and procured the Policy for Plaintiffs.

142.    If the Court finds that the Policy does not provide the requested coverage, then Volante Specialty is liable for negligent procurement of the Policy.

143.    Plaintiffs were damaged by Volante Specialty's negligent procurement in the amount of the policy limits, plus its attorneys' fees.

## COUNT VII – ATTORNEYS' FEES AND EXPENSES OF LITIGATION
### (In the alternative)

144.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 143 of this Complaint as if fully restated herein.

145.    As demonstrated above, the Insurer and Volante Specialty have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense, requiring the institution of this litigation.

146.    Pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recover their costs and expenses of litigation, including reasonable attorney's fees.

147.    Therefore, Plaintiffs request that this Court award attorney's fees, court costs, and any other expenses as permitted under Georgia law.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for relief as follows:

a.    The Plaintiffs request that this Court enter judgment in their favor and against the Defendants.

b.    The Plaintiffs request a declaration that the Plaintiffs' acceptance of the IRS Settlement would constitute a covered "Loss" under the Policy.

c.    The Plaintiffs request that this Court hold that the Insurer has breached its contractual obligations to the Plaintiffs by unreasonably withholding its consent to allow Dogwood Bluff to accept the IRS Settlement, unreasonably refusing to agree to not raise lack of consent as a basis for denying any claim under the Policy, and failing to indemnify Dogwood Bluff, and award the Plaintiffs all legally recoverable damages proximately caused by the Insurer's breach and bad faith conduct, to include compensatory and punitive damages, costs of the action, attorneys' fees, and pre- and post-judgment interest;

d.  The Plaintiffs request that this Court hold that the Insurer has acted in bad faith within
the meaning of O.C.G.A. § 33-4-6, and award Plaintiffs all statutory bad faith damages,
including an additional penalty of up to fifty percent (50%) of the insured loss, together
with reasonable attorneys' fees and expenses of litigation.

e.  The Plaintiffs request that this Court award all consequential damages caused by the
Insurer's bad faith conduct, including losses in excess of policy limits, interest accrual,
reasonable attorneys' fees, and other damages proximately resulting from the Insurer's
refusal to act reasonably in connection with the IRS Settlement.

f.  The Plaintiffs request, alternatively, that this Court hold that Volante Specialty
negligently misrepresented the coverage of the insurance policy to the detriment of the
Plaintiffs, and award Plaintiffs all legally recoverable resulting damages, to include
compensatory damages, costs of the action, attorneys' fees, and pre- and post-judgment
interest.

g.  The Plaintiffs request, alternatively, that this Court hold that Volante Specialty
negligently procured the requested insurance policy to the detriment of the Plaintiffs,
and award Plaintiffs all legally recoverable resulting damages, to include the entire
value of the claim, compensatory damages, costs of the action, attorneys' fees, and pre-
and post-judgment interest.

h.  The Plaintiffs further request an award of their costs and expenses of litigation,
including reasonable attorney's fees, pursuant to O.C.G.A. § 13-6-11.

i.  The Plaintiffs request such other and further relief as the Court deems proper.

Respectfully submitted this 21st day of September, 2025.

> /s/ D. Austin Bersinger
> D. Austin Bersinger
> Georgia Bar No. 144792
> Bradley Arant Boult Cummings LLP
> Promenade Tower
> 1230 Peachtree Street NE, Suite 2100
> Atlanta, Georgia 30309
> Tel. 404.868.2042
> ABersinger@bradley.com
>
> *Counsel for Plaintiffs*

# Exhibit A



**INVESTOR 170(h) LIABILITY QUOTE**

Please find below Investor 170(h) Liability Quote for Dogwood Bluff Partners, LLC. This is a summary of the terms and conditions:

NAMED INSURED:                  Dogwood Bluff Partners, LLC

MAILING ADDRESS:                2015 3rd Ave N, Birmingham, AL 35203

CARRIER:                        Fidelis Underwriting Limited

PROPOSED POLICY PERIOD:         12/31/2021 – 10/15/2022
                                12:01 A.M. Standard Time at the Mailing Address shown above
                                Policy periods are based on Insureds Federal Tax Return being
                                filed on an extension basis

EXTENDED REPORTING PERIOD:      10/15/2025

PRIOR ACTS DATE:                1/1/2021

POLICY LIMIT:                   $10,700,000

POLICY RETENTION:               $321,000

POLICY PREMIUM:                 $749,000 (Plus applicable taxes)

MINIMUM EARNED PREMIUM:         100%



**SURPLUS LINES DISCLOSURE**

_____

Alabama

"This contract is registered and delivered as a surplus line coverage under the Surplus Line Insurance Law, O.C.G.A. Chapter 33-5." [33-5-26]

## POLICY PREMIUM AND SURPLUS LINES TAXES SUMMARY

SURPLUS LINES TAX CALCULATION:

| Description | State | Taxable Premium | Stamping Fee | Rate | Tax |
|---|---|---|---|---|---|
| Surplus Lines Tax | Alabama | $749,000 | n/a | 6% | $44,940 |

Total Surplus Lines Taxes & Fees: $44,940

IMPORTANT NOTICE: THE NONADMITTED & REINSURANCE REFORM ACT (NRRA) WENT INTO EFFECT ON JULY 21, 2011. ACCORDINGLY, SURPLUS LINES TAX RATES AND REGULATIONS ARE SUBJECT TO CHANGE WHICH COULD RESULT IN AN INCREASE OR DECREASE OF THE TOTAL SURPLUS TAXES AND FEES OWED ON THIS PLACEMENT. IF A CHANGE IS REQUIRED, WE WILL PROMPTLY NOTIFY YOU. ANY ADDITIONAL TAXES OWED MUST BE PROMPTLY REMITTED TO VOLANTE.

# VOLANTE
### SPECIALTY RISK

# Request to Bind Coverage

**Dogwood Bluff Partners, LLC**

We have reviewed the proposal and agree to the terms and conditions of the coverages presented. We are requesting coverage to be bound as outlined by coverage line below:

Coverage:
Investor 170(h) Liability Policy    ☒

This Authorization to Bind Coverage also acknowledges receipt and review of all disclaimers and disclosures, including exposures used to develop insurance terms, contained within this proposal

_____
**Signature of Authorized Insurance Representative Date**

CEO
_____
**Title**

Chris Devine
_____
**Print Name**

12/30/21
_____
**Date**

**This proposal does not constitute a binder of insurance. Binding is subject to final carrier approval. The actual terms and conditions of the policy will prevail.**

Alabama License #3000731652



**GREEN ROCK**

To Underwriter:

Re: Warranty Statement for Tax Liability Coverage – Dogwood Bluff Partners, LLC

After inquiry, the Chief Executive, President and General Counsel has not had any claims or knowledge or information of any act, error or omission which might reasonably be expected to give rise to a claim. It is understood and agreed that if such knowledge or information exists any claim or action arising there from is excluded from this proposed coverage.

This warranty statement and all other information which is provided are incorporated into and form the basis of any contract of insurance.

I HEREBY DECLARE that the above statements and particulars are true and I have not suppressed or misstated any material fact and that I agree that this warranty statement shall be the basis of the contract with you, the Underwriters.

Signature:  _(signature)_

Date:    (12/30/21)

The signature must be of a person authorized to execute on behalf of the applicant. A copy of this should be retained for your records.

| 2015 3ᴿᴰ AVE N BIRMINGHAM, AL 35203 | 205-580-1180 |
|---|---|



1595 Peachtree Parkway
Ste 204-376
Cumming, GA 30041

Email: annie@vsrlondon.com

| | | | | |
|---|---|---|---|---|
| Sponsor: | **Green Rock** | | Invoice #: | **802234** |
| RE: | **Dogwood Bluff Partners, LLC** | | Invoice Date: | **12/31/2021** |
| Address: | **2015 3rd Ave N** | | Contact: | **Chris Devine** |
| | **Birmingham, AL 35203** | | | |

| Effective Date | Policy Type | Description | Total |
|---|---|---|---|
| 12/31/2021 | 170(h) Investor Liability | Premium | $749,000.00 |
| 12/31/2021 | 170(h) Investor Liability | Surplus Lines Taxes and Fees | $44,940.00 |
| | | **Total** | **$793,940.00** |

| | |
|---|---|
| Wiring Instructions: | (Include Invoice #) |
| | Volante Specialty Risk, LLC |
| | JP Morgan Chase Bank, N.A. |
| | Account # ███████ |
| | Routing # ███████ |

# Exhibit B

**Investor 170(h) Liability Insurance** 

# Declarations

|  |  |  |
|---|---|---|
| | **Policy Number:** | **VFP/FL/20627/2021/1** |
| | **THIS POLICY IS ISSUED BY:** | Fidelis Underwriting Limited |
| **Item 1:** | **Named Insured:** | Dogwood Bluff Partners, LLC |
| | **Address:** | 2015 3rd Ave N, Birmingham, AL 35203 |
| **Item 2:** | **Policy Period:** | From: 12/31/2021 |
| | | To:     10/15/2022 |
| | | Both days at 12.01 a.m. Local Standard Time at the Insured's Principal Address |
| **Item 3:** | **Extended Reporting Period:** | From: 10/15/2022 |
| | | To:     10/15/2025 |
| | | Both days at 12.01 a.m. Local Standard Time at the Insured's Principal Address |

At the expiration of the **Policy Period** you will have an automatic **Extended Reporting Period** in which to give us written notice of loss arising from **Proceedings** that:

- are first made against you and reported to us during the **Extended Reporting Period;** and

- arise from your **Wrongful Acts** performed on or after the **Prior Acts/notice/knowledge** date as specified in Item 8 of the Declarations, but prior to the expiration of the **Extended Reporting Period.**

The premium in respect of the **Extended Reporting Period** is included in the original policy premium as specified in Item 6 of the Declarations and is fully earned at the inception of the **Policy Period.**

The Limit of Liability applicable during the **Extended Reporting Period** will be the remaining available **Limit of Liability**. There will be no separate or additional **Limit of Liability** available for the **Extended Reporting Period**.

| **Item 4** | **Limit of Liability:** | USD 10,700,000 | Policy Aggregate Limit of Liability |
|---|---|---|---|
| | **Per Entity Limit of Liability:** | Not Applicable | |

| | | | |
|---|---|---|---|
| Item 5: | **Retention:** | USD 321,000 | Any one claim |
| Item 6: | **Premium:** | USD 749,000 | for the period |
| Item 7: | **Continuity Date:** | 1/1/2021 | |
| Item 8: | **Prior Acts/notice/knowledge:** | 1/1/2021 | |
| Item 9: | **Notice of Loss:** | To Underwriters via: claims@volanteglobal.com | |
| Item 10: | **Endorsements:** | Not applicable | |

---

**THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY**

---

**Investor 170(h) Liability Insurance**     VOLANTE
                                            GL🌐BAL

| | | |
|---|---|---|
| *[signature]* | 1/25/2022 | David Hamilton |
| **Signed** | **Date** | **Authorised Representative** |

# Investor 170(h) Liability Form

| | | |
|---|---|---|
| **I.** | **Insuring agreements** | **We** will indemnify you for **loss** in excess of any applicable **retention** resulting from any **proceeding** against **you** seeking to hold you liable for a **wrongful act**, provided the **loss** results from a **proceeding** first initiated against **you** and reported to **us** during the **policy period**. |

1. On behalf of an **insured person**, **we** will pay **loss** that the **insured person** becomes legally obligated to pay and that is not indemnified by an **insured organization**.

2. On behalf of an **insured organization**, **we** will pay **loss** that the **insured organization** pays as indemnification to an **insured person** to the extent permitted or required by law or the applicable operating agreement.

However, **we** will not pay any **loss** unless such **loss** is determined by the:

a. final, non-appealable adjudication of a **proceeding**; or

b. the settlement of a **proceeding** with **our** prior written consent.

## II. Definitions

**A. Adjustment** means a reduction in the allowable tax deduction ordered by a **taxing authority** claimed by an **insured** that causes the actual tax deduction allowed by such **taxing authority** multiplied by 41% to be less than the sum of (a) such **insured's** original contribution to a **company** or the **controlled entity** that granted the conservation easement or fee simple donation of real property pursuant to 26 U.S.C. § 170 upon which such tax deduction was based, and (b) penalties and interest where insurable by law imposed by any **taxing authority** due to such a covered reduction in tax savings.

**B. Company** any entities or partnerships as stated in Item 1 of Declarations page or identified as such by endorsement to this policy.

**C. Claim** Means **Proceeding**

**D. Controlled entity** means any entity which:

1. the **named insured** controls or otherwise has the ability to direct the managerial decisions of such entity at any time during the performance of the business operations giving rise to the **proceeding**; and

2. is created for the purpose of owning and controlling a specific property from which a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170 is made.

**E. Continuity date** means the date stated as such in Item 7 of the Declarations

**F. Extended Reporting Period** means the dates stated as such in Item 3 of the Declarations

**G. Insured** means each **insured person** and each **insured organization**.

**H. Insured person** means a person or entity who, at any time during the **policy period**, is:

1. an **investor**; or

2. a **member** in a **company**.

**I. Investor** means an individual or entity that is a **member** of at least one **controlled entity** or **company** at any time during the **policy period**.

# Investor 170(h) Liability Form

| | | |
|---|---|---|
| J. | **Insured organization** | means, at any time during the **policy period**: |

                1.    the **named insured**;

                2.    any **company**; and

                3.    any **controlled entity**.

| | | |
|---|---|---|
| K. | **Limit of Liability** | means the amount stated in Item 4 of the Declarations |
| L. | **Loss** | means damages, judgments and settlements incurred by an **insured** as a result of a **wrongful act** by such **insured** causing a reduction in tax savings to an **investor** by reason of an **adjustment**. |

                **Loss** does not include:

                1.    amounts for which **you** are not liable;

                2.    the cost of complying with injunctive relief or any other form of non-monetary relief, compensation, severance, salary, wages, fees, benefits, or overhead of any **insured**;

                3.    unjust enrichment or the return, restitution, or disgorgement of any fees, costs, expenses, or profit to which **you** are not legally entitled;

                4.    any reduction in disbursements from tax deductions, dividends, profits, or similar payments due to an **insured person** from an **insured organization**;

                5.    any amounts paid to an insured person or insured organization in excess of the original capital contribution of that insured person or organization;

                6.    Amounts associated with defending any proceeding.

                7.    Fines and Penalties associated with economic gain. As defined in **Penalties & interest**

| | | |
|---|---|---|
| M. | **Member** | means the individuals or entities identified as such for any **insured organization** by the articles of incorporation, bylaws, operating agreement, or partnership agreement of such **insured organization** at any time during the **policy period**. |
| N. | **Named insured** | means the entity identified in Item 1 of the Declarations. |
| O. | **Penalties & interest** | any penalties and interest, where insurable by law, levied upon an Insured by any authorized taxing authority and as determined by final non-appealable adjudication, for the understated amount of taxes which would have originally been owed on the investment amount prior to their investment. |
| P. | **Policy period** | means the period of time identified in Item 2 of the Declarations and any Extended Reporting Period identified in Item 3 of the Declarations. |
| Q. | **Pollutants** | means any solid, liquid, gaseous, biological, radiological, or thermal irritant or contaminant, including smoke, vapor, asbestos, silica, dust, nanoparticles, fibers, soot, fumes, acids, alkalis, chemicals, germs, and waste. Waste includes, but is not limited to, materials to be recycled, reconditioned, or reclaimed. |
| R. | **Prior Acts/notice/ knowledge** | Means the date shown in Item 8 of the Declarations. |
| S. | **Proceeding** | means an investigation, audit, administrative action, or judicial action against **you**, initiated or brought by any **taxing authority**, concerning the tax treatment of a conservation easement donation or a fee simple donation of real property pursuant to 26 U.S.C. § 170. A mere inquiry by a **taxing authority** is not a **proceeding**. An inquiry will become a **proceeding** only after **you** have received a "Notice of Beginning of Administrative Proceedings" or equivalent notice. |

# Investor 170(h) Liability Form

| | | |
|---|---|---|
| T. | **Related wrongful acts** | means **wrongful acts** that have as a common nexus of any fact, circumstance, event, situation, transaction, cause, or origin, or series of facts, circumstances, events, situations, transactions, causes, or origins. |
| U. | **Retention** | means the amount stated as such in Item 5 of the Declarations with respect to each Coverage Part **you** have purchased. |
| V. | **Taxing authority** | means the Internal Revenue Service (IRS), any State Department of Revenue (DOR), or any municipality or other local government agency. |
| W. | **We**, **us**, or **our** | means the Underwriters identified in the Declarations as issuing this policy. |
| X. | **Wrongful act** | means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by an **insured** or third party retained by an **insured** for whose conduct the **insured** can be held legally liable concerning a report or filing with a **taxing authority** with respect to the purpose, value, partnership tax treatment, or any other aspect of the **named insured's** conservation easement or fee simple donation of real property. |
| Y. | **You** or **your** | means each **insured**. |

## III.  Exclusions

**We** will have no obligation to pay any sums under this policy for **loss** incurred in connection with any **proceeding**:

A.  Antitrust/deceptive trade practices

based upon or arising out of any actual or alleged:

1. false, deceptive, or unfair trade practices;
2. unfair competition, impairment of competition, restraint of trade, or antitrust violations; or
3. violation of the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, all including as may be amended, or any similar federal, state, or local statutes, rules, or regulations in or outside the U.S.; or
4. deceptive or misleading advertising.

B.  Bodily injury/property damage/personal injury

for any actual or alleged:

1. bodily injury, sickness, disease, death, emotional distress, or mental anguish of any person;
2. physical damage to, destruction of, or loss of use of any tangible property; or
3. invasion of privacy, abuse of process, malicious prosecution, libel, slander, defamation, trespass, nuisance, wrongful entry or eviction, false arrest or imprisonment, assault, battery, or loss of consortium.

C.  Breach of contract

based upon or arising out of any actual or alleged breach of any contract or agreement, or any liability of others **you** assume under any contract or agreement; however, this exclusion will not apply to:

1. liability **you** would have in the absence of the contract or agreement; or
2. any actual or alleged breach of the articles of incorporation, by-laws, operating agreement, partnership agreement, or other agreement on which the formation and/or management of an **insured organization** is based.

# Investor 170(h) Liability Form

| | | | |
|---|---|---|---|
| D. | Controlled entity outside control of named insured | 1. | based upon or arising out of **wrongful acts** committed by a past or present **controlled entity** while the **named insured** does not have majority ownership or management control of it; or |
| | | 2. | made against a **controlled entity** or anyone acting on its behalf while the **named insured** does not ultimately have majority ownership or management control of it. |
| E. | Fraudulent/intentional acts | | based upon or arising out of any actual or alleged fraudulent, intentional, malicious, or knowingly wrongful acts or omissions, if a final, non-appealable adjudication establishes that such act or omission was committed. |

This exclusion will apply:

| | |
|---|---|
| 1. | to an **insured organization** only if the conduct was committed or known by the **manager**, General Partner, Chief Executive Officer, Chief Financial Officer, or General Counsel of the **insured organization**; and |
| 2. | separately to each **insured person** and will not apply to any **insured person** who did not commit or have knowledge of such conduct committed by another **insured person**. |

| | | |
|---|---|---|
| F. | Change in Law or Legislation | Any legislative changes in law or amended procedures and or guidance from any taxing authority that impacts the current, future or retroactive tax treatment of an insured person or insured organization |
| G. | Pollution | for any actual, alleged, or threatened existence, growth, release, discharge, dispersal, or escape of **pollutants**, including any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **pollutants**, |
| H. | Prior acts/notice/ knowledge | based upon or arising out of any **wrongful act** that: |

| | |
|---|---|
| 1. | was the subject of any notice given under any other policy of which this policy is a renewal or replacement; |
| 2. | was the subject of, or is related to, any prior or pending litigation, **proceeding,** written demand, administrative or regulatory proceeding or investigation, or licensing proceeding that was filed or commenced against **you** and of which **you** had notice prior to the **policy period**; or |
| 3. | you had knowledge of before the **Prior Acts/notice/knowledge date** as specified in Item 8 of the Declarations, and there was a reasonable basis to believe that the act, error, or omission could result in a **proceeding**. |

This exclusion also applies to any **loss** arising out of the same **wrongful acts** or **related wrongful acts** related to the matters in 1, 2, or 3 above.

# Investor 170(h) Liability Form

| | | |
|---|---|---|
| IV. | **Order of payments** | In the event **loss** resulting from any **proceeding** covered by this policy exceeds the remaining available **Limit of Liability**, **we** will: |

    A.    first pay **loss** covered under Insuring agreement 1. If the **loss** owed under this policy to the **investors** in any one **insured organization** exceeds the remaining **Limit of Liability** applicable to that **insured organization**, **we** will pay **loss** to each **investor** on a pro rata basis according to its equity participation in the **insured organization**.

    B.    then pay **loss** covered under Insuring agreement 2. If the **loss** owed under this policy to multiple **insured organizations** exceeds the remaining **Limit of Liability**, **we** will pay **loss** to each **insured organization** on a pro rata basis in proportion to the ratio of the **Limit of Liability** applicable to each **insured organization**.

**Your** bankruptcy or insolvency will not relieve **us** of any of **our** obligations to prioritize payments under this section of the policy.

| | | |
|---|---|---|
| V. | **Limits of liability** | The maximum **we** will pay for covered **loss** resulting from all **proceedings** first initiated against **you** during the **policy period** or **extended reporting period**, will be as follows: |
| A. | Aggregate limit | The Policy Aggregate **Limit of Liability** stated in Item 4 of the Declarations is the maximum amount **we** will pay for all covered **loss** under this policy. **Our** obligations under the policy will cease once the Policy Aggregate **Limit of Liability** is exhausted. |
| B. | Per-entity limit | Coverage for each **company** and each **controlled entity** will be subject to the Per-Entity **Limit of Liability** stated in Item 4 of the Declarations, which the maximum amount **we** will pay for all covered **loss** incurred by that **company** or **controlled entity** and the **members** of such **company** or **controlled entity** in their capacities as such. The Per-Entity **Limit of Liability** will be in excess of any applicable **retention** and will be a part of the Policy Aggregate **Limit of Liability**. Only one Per-Entity **Limit of Liability** will apply to an entity and its **members** even if such entity constitutes both a **company** and a **controlled entity**. |
| C. | Retention | **Our** obligation to pay **loss** under this policy is in excess of any applicable **retention**, as stated in Item 5 of the Declarations, which **you** must pay before **we** will make any payment. Each **insured organization** is responsible for any amount within the **retention** applicable to any **loss** or **proceeding** that affects such **insured organization**. Payments **you** make to avoid or mitigate **loss** under this policy will be credited towards the **retention**, if such payments are made from an escrow account maintained for the benefit of an **investor** or an **insured organization**. Notwithstanding the above, if an **insured organization** affected by any covered **loss** or **proceeding** is unable to pay any applicable **retention** because it is insolvent, an **investor** in such **insured organization** may pay its proportionate share, based on its membership interest in such **insured organization**, of the **retention**. The maximum **we** will pay to any such **investor** is that **investor's** proportionate share, based on its membership interest in such **insured organization**, of the applicable **Limit of Liability**. |
| D. | Related proceedings/wrongful acts | All **proceedings** based upon or arising out of the same **wrongful act** or **related wrongful acts** will be treated as a single **proceeding**, and will be deemed to have been made against **you** on the date the first such **proceeding** was initiated. If, by operation of this provision, the **proceeding** is deemed to have been brought during any period when **we** insured **you**, it will be subject to only one **retention** and one applicable **Limit of Liability**, regardless of the number of claimants, **insureds**, or **proceedings** involved. |

## Investor 170(h) Liability Form

| VI. | **Notice** | |
|---|---|---|

**We** must receive written notice of any **proceeding** or **loss** affecting an **insured organization** as soon as possible after that **insured organization's** Risk Manager, General Counsel, Chief Financial Officer, Managing Partner, or equivalent position, becomes aware of such **proceeding** or **loss**, but in any event, no later than 60 days after the end of the **extended reporting period**; provided.

All notices under this policy must be made in writing by one of the individuals identified above, include a copy of any documents provided to you with in connection with such **proceeding** or **loss**, and be submitted to **us** via the designated email address or mailing address identified in Item 9 of the Declarations.

| VII. | **Defense and settlement** | |
|---|---|---|
| A. | Defense | **We** will have no obligation to: defend any covered **proceedings**, even if such **proceeding** is groundless, false, or fraudulent, or to pay any costs associated with **your** defense, investigation, inquiry, or appeal as to any such **proceeding**. Each **insured** named in any **proceeding** shall undertake to defend such proceeding in good faith and shall not admit liability without Underwriters' prior written consent. |
| B. | Settlement | **You** agree not to undertake settlement negotiations or enter into any settlement agreements that would result in a **loss** without **our** prior written consent, which **we** agree not to withhold unreasonably. |

| VIII. | **Allocation** | |
|---|---|---|
| | | 1. **We** will not make any payments on account of any portion(s) of **loss** not covered by this policy. If **you** incur both covered **loss** and uncovered loss in connection with the same **proceeding**, whether due to the presence of covered and uncovered persons or matters, **we** and **you** agree to allocate such amounts between covered **loss** and uncovered loss based on **our** and **your** relative exposures. |
| | | 2. If **you** incur both covered **loss** and uncovered loss as a result of the same **proceeding**, **we** and **you** agree to use reasonable best efforts to agree on an allocation. If **we** and **you** cannot agree on a fair allocation, no presumption as to allocation will exist in any proceeding to determine such allocation. |

## Investor 170(h) Liability Form

| IX. | **Assistance and cooperation** | |
|---|---|---|
| A. | Named insured responsibilities | It will be the responsibility of the **named insured** to act on behalf of all **insureds** with respect to the following: |

1. timely giving and receiving notice of cancellation or non-renewal;

2. timely payment of premium;

3. receipt of return premiums;

4. timely acceptance of changes to this policy; and

5. the right to exercise the Extended Reporting Period.

Notwithstanding the above, an **investor** may exercise the Extended Reporting Period for its own benefit if the **named insured** is unable to meet that obligation.. The maximum **we** will pay to any such **investor** is that **investor's** proportionate share, based on its membership interest in the **insured organization** of which it is a **member**, of the applicable limit of liability.

| B. | Duty to cooperate | **You** agree to provide **us** with such information, assistance, and cooperation as **we** may reasonably require in connection with **our** performance under this policy. **You** also agree not to take any action that increases **our** exposure under this policy, prejudices **our** position, or prejudices **your** rights of recovery from others. |
|---|---|---|
| C. | No voluntary payments | Except as it relates to defense of any **proceeding, you** agree not to incur any expense, admit any liability, or assume any obligation without **our** prior written consent. If **you** do so, it will be at **your** own cost and expense. However, this condition does not apply to payments **you** make to avoid or mitigate **loss** under this policy, if such payments are made from an escrow account maintained for the benefit of an **investor** or an **insured organization**. |

| X. | **Other provisions affecting coverage** | |
|---|---|---|
| A. | Alteration and assignment | No change in, modification of, or assignment of interest under this policy will be effective unless made by written endorsement to this policy signed by **our** authorized representative. |
| B. | Bankruptcy or insolvency | **Your** bankruptcy or insolvency will not relieve **us** of any of **our** obligations under this policy. |
| C. | Cancellation | 1. This policy may be cancelled at any time by the **named insured** by giving written notice, which must include the date the cancellation will be effective, to **us** at the address stated in the Declarations. |

2. This policy may be cancelled by **us** by mailing to the **named insured** by registered, certified, or other first class mail, at the **named insured's** address stated in Item 1 of the Declarations, written notice which must include the date the cancellation will be effective. **We** will not cancel this policy for any reason other than non-payment of premium, and the effective date of the cancellation will be no less than ten days after the date of the notice of cancellation.

3.   The mailing of the notice will be sufficient proof of notice, and this policy will terminate at the date and hour specified in the notice.

## Investor 170(h) Liability Form

| | | |
|---|---|---|
| D. | Change in control | If, during the **policy period**, the **named insured** consolidates with, merges into, or sells all or substantially all of its assets to any other person or entity, or any other person or entity acquires ownership or control of the **named insured**, then the **named insured** will provide **us** written notice no later than 30 days after the effective date of such change in control, together with any other information **we** may require. |
| | | Unless **you** and **we** agree in writing otherwise, after the effective date of any change in control, this policy will cover only **loss** arising from **wrongful acts** that took place prior to the change in control. |
| E. | Coverage territory | This Policy applies to **wrongful acts** that take place anywhere in the world. |
| F. | Estates, heirs, legal representatives, spouses, and domestic partners | In the event of an **insured person's** death or disability, this policy will also apply to a **proceeding** brought against the **insured person**: |

    1.    heirs, executors, administrators, trustees in bankruptcy, assignees, and legal representatives; or

    2.    lawful spouse or lawful domestic partner,

but only:

    1.    for a covered **proceeding** arising from the **insured person's wrongful acts**; or

    2.    in connection with their ownership interest in property sought as recovery in a **covered proceeding** arising from the **insured person's** wrongful acts.

| | | |
|---|---|---|
| G. | Other insurance | Any payment due under this policy is specifically excess of and will not contribute with any other valid and collectible insurance, unless such other insurance is written specifically as excess insurance over this policy. |
| H. | Representations | **You** warrant that all representations made and all materials submitted by **you** or on **your** behalf in connection with the **application** for this policy are, to the best of **your** knowledge, true, accurate, and not misleading, and agree they were relied on by **us** and were material to **our** decision to issue this policy to **you**. If **you** were aware at the time they were submitted to **us** that any representations or materials were untrue, inaccurate, or misleading in any material respect, **we** are entitled to rescind this policy, but only as to persons or entities with actual knowledge, as follows: |

    1.    with respect to an **insured person**, **we** will not impute the knowledge of one **insured person** to any other **insured person**;

    2.    with respect to an **insured organization**, only knowledge possessed by the Manager, Chief Executive Officer, Chief Financial Officer, or General Counsel of an **insured organization** will be imputed to the **insured organization**; and

    3.    with respect to Insuring agreement 1 of the Investor 170(h) Liability Coverage Part only, **we** will not rescind the coverage otherwise available under that section except as to an **insured person** who had actual knowledge that the representations made or materials submitted were untrue, inaccurate, or misleading.

# Investor 170(h) Liability Form

I.   Subrogation    In the event of a payment by **us** under this policy, **we** will be subrogated to all of **your** rights of recovery to that payment. **We** will not, however, subrogate against any **insured**

You will do everything necessary to secure and preserve **our** subrogation rights, including but not limited to the execution of any documents necessary to allow **us** to bring suit in **your** name.

You will do nothing to prejudice **our** subrogation rights without **our** prior written consent.

J.   Titles    Titles of sections of and endorsements to this policy are inserted solely for convenience of reference and will not be deemed to limit, expand, or otherwise affect the provisions to which they relate.

K   Intended beneficiaries    Each **insured** is an intended beneficiary of this policy and has the right to enforce this policy with respect to his, her, or its own **Loss**.

## XI.  Service of Suit Clause (U.S.A.)

This service of suit clause will not be read to conflict with or override the obligations of the parties to arbitrate their disputes as provided for in the arbitration provision within this Policy. This clause is intended as an aid to compelling arbitration or enforcing such arbitration or arbitral award, not as an alternative to such arbitration provision for resolving disputes arising out of this contract of insurance (or reinsurance).

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon

California
Jonathan Bank
Locke Lord LLP
300 S. Grand Avenue, Suite 2600
Los Angeles, California 90071
Tel: 213-687-6700
Email: jbank@lockelord.com

Maine*
C T Corporation System

128 State Street, # 3
Augusta, Maine 04330
(*serves in the capacity of registered agent for service of process for Locke Lord)

All Other States
Locke Lord LLP
200 Vesey Street, Brookfield Place
New York, NY 10281

and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Named Insured to give a written undertaking to the Named Insured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this Polcy, and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XII. Arbitration Clause

In the event of a dispute in connection with this Policy, the insurers and the Named Insured shall, in the first instance, try to resolve such dispute through mediation. The mediation will be commenced by either party providing written notice to the other party requesting such mediation ("the Mediation Request"). The parties will select a mediator by their mutual agreement, within 30 days. If there can be no such agreement, each party will submit a list of five mediator choices to the other, rank ordered by preference. The mediator will then be selected based on a further discussion, unless an individual is on both lists and then that person would have preference. If the process does not result in the selection of the mediator, then the parties agree to let the American Arbitration Association select the mediator. Subject to mutual agreement of the parties, the mediation will be held in the State of Georgia, not later than 60 days after the date of the Mediation Request and shall last for at least a one-day session. Any settlement agreement reached at mediation and fully executed by all parties, however, will be binding on all parties. If the Mediation does not resolve the dispute within 60 days of the first mediation session or when the mediator declares an impasse, the parties agree that the dispute shall be resolved by final and binding arbitration in accordance with the Commercial Rules of the American Arbitration Association before a single Arbitrator, unless the amount of coverage in dispute exceeds five million dollars, in which case the parties may choose to have the arbitration before a panel of three arbitrators chosen pursuant to the rules of the AAA. The arbitration panel will all be neutral. The arbitration will be held within 100 miles of where the insured resides or at an agreed upon location in the United States. The arbitrator(s) may award the prevailing party costs and/or attorneys' fees for the Arbitration. Any State's law invalidating this paragraph shall not affect the validity of the first paragraph herein. The parties understand that arbitration is final and binding and that they are waiving their rights to other resolution processes (such as court action or administrative proceeding).

# Exhibit C

 **Department of the Treasury**
**Internal Revenue Service**
**Small Business Self Employed**
440 Roper Mountain Rd
Greenville, SC 29615

Date: July 11, 2024

Taxpayer ID number (last 4 digits): ▮▮▮▮

*DOGWOOD
BLUFF*

Tax years: 202112

Person to contact:
Name: Janice Fair
ID number: 1001353308
Telephone: 864-286-7029

Green Rock Management LLC
Attn: Brian Robbins, DI
2207 2nd Ave N
Birmingham, AL 35203-3805

Dear Green Rock Management LLC:

**Why you're receiving this letter**
This letter is a time-limited offer to resolve the tax consequences related to your syndicated conservation easement transaction. Our proposed resolution is based on the terms outlined in the enclosed Attachment 1, Syndicated Conservation Easement Resolution Terms and Election.

**Why we're proposing this resolution**
We've identified syndicated conservation easement transactions as a significant compliance concern. These transactions have appeared on the IRS "Dirty Dozen" list of tax scams several times.

We've litigated and won syndicated conservation easement cases for failures to meet the requirements of Internal Revenue Code (IRC) Section 170 and overvaluation of the conservation easement. Penalties asserted by the government have been sustained. The U.S. Tax Court and appellate courts have issued opinions favorable to the IRS in syndicated conservation easement cases where the true value of the easement was found to be a small fraction of the claimed value.

We expect we'll continue to prevail in syndicated conservation easement litigation. However, we're offering to resolve your transaction now in the interest of sound tax administration and considering recent legislation.

**What you need to do to accept our offer**
If you wish to accept the terms outlined in Attachment 1 and enter into a resolution for this transaction, please follow the steps outlined in Attachment 1, Section A. **You have 30 days from the date of this letter to confirm your acceptance and to provide the requested documents.**

**What will happen if you don't accept our offer**
We'll continue to examine and litigate the tax consequences of your transaction under our normal procedures.

Examination results may include:

- Full disallowance of your charitable contribution deduction, and
- Imposition of civil penalties, which could include the 40% gross valuation misstatement penalty under IRC Section 6662(h). Some cases may be subject to the 75% fraud penalty under IRC Section 6663.

You will have the right to petition the U.S. Tax Court or file an action in a U.S. District Court or the U.S. Court of Federal Claims if you disagree with the examination results.

**Letter 6532 (12-2023)**
Catalog Number 93125Q

We encourage you to speak with a qualified, independent advisor about this settlement offer.

If you have questions, you can call the contact person shown above.

Sincerely,

Stephanie Kratt
Acting Group Manager

Enclosure:
Attachment 1

Attachment 1
Dogwood Bluff, ▮▮▮▮▮▮
2207 2nd Ave N
Birmingham, AL 35203-3805

<div align="center">

**Syndicated Conservation Easement (Non-Docketed)
Resolution Terms and Election**
</div>

Below are the terms of the 2024 Syndicated Conservation Easement (Non-Docketed) Resolution. The Internal Revenue Service (IRS) will not entertain counteroffers to these terms.

This form provides Dogwood Bluff, ▮▮▮▮▮▮ (Partnership) an opportunity to elect to participate in a settlement initiative to resolve a transaction described in Section 2 of Notice 2017-10[28], 2017-4 I.R.B. 544, or a substantially similar transaction (collectively, SCE transactions).

This resolution is being offered to the entity listed above and is not available to partners on an individual basis. The terms of the resolution are outlined below.

## A. Election to Participate

1. The election to participate must be received by the IRS within **30 calendar days** of the date of the offer letter.

2. To elect into the resolution:

    a. An Authorized Signer[29] must initial each page and sign the last page of this form in the spaces provided.

    b. Partnership must provide its Form 1065 or, if applicable, the Form 1065 of the entity in which individual investors purchased their interest and from whom the individual investors received a Schedule K-1 (investment-tier partnership) reflecting the claimed charitable contribution deduction.

    c. A Partnership with less than one year remaining on the statute of limitation must sign a consent to extend the statute for no less than one year. A statute extension is enclosed with this letter, if needed, and must be signed and returned within 30 calendar days of this letter to participate in the settlement resolution.

---

[28] A Notice of Proposed Rulemaking (NPRM) was issued on December 8, 2022, providing that certain syndicated conservation easement transactions are listed transactions.

[29] For cases governed by Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982, the Authorized Signer is the Tax Matters Partners (TMP). For cases governed by the Bipartisan Budget Act of 2015 (BBA), the Authorized Signer is the Partnership Representative (PR) (or the Designated Individual of the PR, if the PR is an entity). For Non-TEFRA and BBA elect-out cases, the Authorized Signer is all partners. All partners must sign the supplemental signature page of the form to signal all partners wish to participate. They do not have to initial each page.

Initials _____

Attachment 1
Dogwood Bluff, ██████████
2207 2nd Ave N
Birmingham, AL 35203-3805

3. The items listed in A.2.a. through c. must be timely returned to the IRS by email[30] to sce.settlement@irs.gov or faxed to (855) 579-6647. A courtesy copy must be sent to the contact person listed on the offer letter.

4. Please refer any questions regarding the settlement to the contact person listed on the offer letter. Questions or other communications sent to the mailbox will not be addressed.

5. Failure to satisfy any portion of paragraphs A.1 through 3 will be treated as an invalid election.

6. The Authorized Signer's signature will be treated as a non-binding consent to participate in this resolution. Formal agreement will be memorialized as described in paragraph B.17.

## B. Resolution Terms

**Deduction, Tax, and Penalties**

1. <u>Charitable Contribution Deduction</u>: The Partnership is not entitled to a charitable contribution deduction claimed for a conservation easement, donation of a fee simple interest in real property, or other noncash charitable contributions.

2. <u>Allowable Deduction (estimated out-of-pocket costs)</u>: The Partnership is entitled to a deduction for estimated out-of-pocket costs (i.e., the estimated amount the investors paid to either the Partnership or an investment-tier entity for an interest in the SCE transaction) allocable to the SCE transaction being settled. The IRS will calculate this amount. In general, the allowable deduction will be the amount reported on the Partnership's (or investment-tier partnership's) Schedule M-2, Capital Contributed (Cash).

3. <u>Tax Rate:</u> The IRS will calculate the tax due at the partnership level using a tax rate of 21%.

4. <u>Penalties</u>: An accuracy-related penalty for a gross valuation misstatement under section 6662(h) applies at a rate of 5%.

5. <u>Amount Due</u>: Once an election to participate is received, the IRS will provide the Authorized Signer with the necessary computational information, including the disallowed charitable contribution deduction, the estimated out-of-pocket costs allowed and the tax, penalties, and interest that will be aggregated into the Settlement Payment (as defined in section B.9.).

**Interest**

6. Deficiency interest will be calculated as required by law.

---

[30] Communication by unencrypted email is not secure. Therefore, taxpayers, TMPs, and PRs electing via email should transmit any potentially sensitive information, including personally identifiable information (PII), only via encrypted, password-protected attachments. See IRS User Guide at irs.gov/usingemail for more information on signing and sending documents electronically.

Initials _____

Attachment 1
Dogwood Bluff, ▮▮▮▮▮▮
2207 2nd Ave N
Birmingham, AL 35203-3805

7. IRS will compute interest ending 30 calendar days after the date IRS sends the Form 906, Closing Agreement on Final Determination Covering Specific Matters (Closing Agreement). If Partnership fails to sign the Closing Agreement and pay the Settlement Payment within 30 calendar days of the date the IRS sends the Closing Agreement, additional interest will accrue.

8. Interest suspension under section 6404(g) is not permitted.

**Payment**

9. The Partnership must make one payment (Settlement Payment) for all tax, penalties, and interest due as determined under this settlement agreement.

10. If a partner has made a section 6603 deposit, they can request a refund by following Revenue Procedure 2005-18.

11. A Partnership subject to the centralized partnership audit regime enacted by BBA must agree to be liable for an imputed underpayment equal to the Settlement Payment determined under paragraph B.9. For purposes of this resolution, the term Settlement Payment includes the imputed underpayment described in this paragraph. The Partnership cannot elect modification or push-out.

**General**

12. The Partnership and partners must fully cooperate with the IRS, including meeting stringent deadlines, or face removal from the resolution.

13. In the case of an entity governed by TEFRA, all partners must participate in the resolution.

14. The Partnership and partners agree to fully cooperate with the IRS during the resolution, which includes, but is not limited to, providing additional information if requested by the IRS.

15. If the Partnership or partners take steps inconsistent with facilitating the resolution, the IRS reserves the right to remove the Partnership from the resolution. The removal determination is final.

16. The Partnership and partners agree that they are responsible for their own costs and fees associated with participation in this resolution and section 7430 does not apply.

17. To finalize the settlement:

    a. In the case of an entity governed by TEFRA, Non-TEFRA, and BBA Elect-Outs, the Partnership, and all direct partners, including spouses if married filing joint, will be required to execute a Closing Agreement, consistent with terms and conditions outlined herein. Among other terms, the Closing

        Agreement will provide that the amount paid will not be refundable or deductible for Federal income tax purposes under any circumstance.

Initials _____

Attachment 1
Dogwood Bluff, ████████
2207 2nd Ave N
Birmingham, AL 35203-3805

   b. In the case of an entity governed by BBA, the Partnership will be required to execute a Closing Agreement, consistent with terms and conditions outlined in this term sheet. The Closing Agreement must be signed by the PR for the taxable year at issue as well as an individual with authority under state law to bind the partnership. Among other terms, the Closing Agreement will also provide that the Settlement Payment will not be refundable or deductible for Federal income tax purposes under any circumstance.

18. Neither this resolution, nor any settlement executed therefrom, will have any effect, limitation or prohibition against the IRS asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

19. The deduction allowed under paragraph B.2. cannot be inferred to represent a value of the property and/or the value of the conservation easement.

20. Nothing in this resolution precludes the IRS from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in an SCE transaction for violation of any criminal statute.

21. The terms contained herein do not constitute an interpretation of the law as it applies to SCE transactions.

22. The parties agree that this settlement is limited to this specific case and may not be used in any court proceeding involving the United States and/or the Commissioner of the Internal Revenue Service as a party.

23. Permission to participate in this resolution in no manner indicates, nor should be interpreted as, an opinion as to whether there is fraud with respect to the Partnership's SCE transaction.

_____

Print Name and Title

_____    _____

Signature                                 Date

Initials _____

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



August 29, 2024

**VIA EMAIL ONLY**

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:    **Demand for Coverage Position and Consent or Waiver of Consent for Acceptance IRS Settlement Offer**

|  |  |
|---|---|
| Insured: | Dogwood Bluff Partners, LLC ("Dogwood Partners" or "Named Insured") |
| Insurer: | Fidelis Underwriting Limited |
| Policy No.: | VFP/FL/20627/2021/1 |
| Claimant: | Dogwood Bluff Partners, LLC |

Dear Mr. Stafford:

The undersigned and this firm represent Dogwood Partners as coverage counsel in connection with the above referenced insurance policy. As you know, Dogwood Bluff, LLC ("Dogwood Bluff," and collectively with Dogwood Partners, "Insureds") is in an ongoing dispute with the Internal Revenue Service ("IRS"). Recently, the IRS has offered a settlement to Dogwood Bluff. After consultation with its tax counsel, the Insureds recognize that this settlement offer is reasonable. Please accept this correspondence as the Insureds' formal demand that the Insurers consent to the Insureds' acceptance of the proposed settlement and that the Insurers agree to fund amounts under the Policy, up to the policy limit, that will be due to the IRS. In the event the insurer cannot commit to providing consent or commit to fund the IRS settlement, the Insureds respectfully request that the insurer agree not to raise lack of consent or other related policy provisions as an impediment to coverage. In order to meet the IRS deadline, the Insured requests that the Insurer provide a written response to this correspondence by September 5, 2024.

As you are further aware, Dogwood Partners, Dogwood Bluff, and other entities and individuals, are insureds under the above-referenced Investor 170(h) Liability Insurance Policy issued by Volante Global on behalf of Fidelis Underwriting Limited (collectively, "Insurers"). By letter dated July 11, 2024, the IRS extended a settlement offer to resolve its dispute with Dogwood Bluff in full ("IRS Settlement"). A copy of the IRS Settlement is attached to this letter. The original deadline for accepting and electing into the IRS Settlement was August 10, 2024. The IRS has extended the deadline for considering the IRS Settlement to September 13, 2024.

Under the terms of the policy, an insured cannot enter into any settlement agreement "that would result in a **loss** without [the Insurers] prior written consent, which [the Insurers] agree not

Joseph J. Stafford
Wilson Elser
August 29, 2024
Page 2

to withhold unreasonably."[1]  Dogwood Partners provided the Insurers with notice of the IRS Settlement by email on July 22, 2024, , and requested that the Insurers approve the acceptance of the offer.  The Insurers responded by making several information requests.  Dogwood Partners will be responding to those requests under separate cover.  Dogwood Partners renews its request that the Insurers consent to Dogwood Bluff's acceptance of the IRS Settlement or, in the alternative, waive the provision of the policy requiring the Insurer's consent for Dogwood Bluff to accept the IRS Settlement.

## I.    Background: Conservation Easements and Current IRS Settlement Offer

The Named Insured was created to raise funds through a private placement and use the proceeds from the capital raise to purchase a controlling interest in Dogwood Bluff.  At the time, Dogwood Bluff held a fee simple interest in 255.31 acres in Oglethorpe County, Georgia ("Property").  The Named Insured then solicited investments through a private placement to purchase the interest in Dogwood Bluff with the intention of using the Property in one of three ways: (1) develop it to its "highest and best use" ("HBU") as a granite quarry, producing an income stream for the investors and a valuable asset that could be sold; (2) donate a conservation easement to protect the conservation values of the Property, producing a tax deduction for the investors; or (3) holding the Property for long term appreciation.  The investors voted for the second option, and Dogwood Bluff thereafter donated a conservation easement over the Property ("Conservation Easement") to a qualified organization.

As a result of the donation, Dogwood Bluff claimed a deduction on its 2021 tax return under Section 170(h), which allows a taxpayer to deduct the value of a "qualified real property interest" donated to a "qualified organization" exclusively for a "conservation purpose."  The amount of the deduction was based on the contemporaneous due diligence that Dogwood Bluff commissioned regarding the Property.  The Insurers reviewed this due diligence at the time of binding.  As you are aware, this due diligence indicated that the fair market value ("FMV") of the Property before the donation date was $55,550,000 based on a discounted cash flow ("DCF") analysis of the expected cash flows of a mining operation on the Property.  It further indicated that the FMV value of the Property after the donation of the Conservation Easement was $360,000.  Using the "Before and After" methodology required for the valuation of conservation easements, Dogwood Bluff reported a $55,190,000 deduction for the donation of the Conservation Easement.  Based on its ownership in Dogwood Bluff, a portion of this deduction passed through to the Named Insured to the investors according to their ownership interest in the Named Insured.

The IRS selected Dogwood Bluff's 2021 tax return for examination.  As you are well aware, the IRS has indicated its intent to disallow all noncash charitable contribution deductions arising from what it identifies as a syndicated conservation easement transaction ("SCET") due to alleged failures of the deduction to comply with the Tax Code, including, but not limited to, (i) defects with the donation under Section 170(h), (ii) failure to properly substantiate the deduction,

---

[1] Unless otherwise defined, all terms have the meanings ascribed to them in the policy.  Bolded terms quoted from the policy are bolded in this letter for purposes of consistency.

Joseph J. Stafford
Wilson Elser
August 29, 2024
Page 3

and (iii) inaccuracies in the valuation of the Conservation Easement. In addition to disallowance of the deductions, the IRS also generally asserts various penalties in cases involving SCETs, including the strict liability 40% "gross valuation misstatement" penalty under I.R.C. § 6662(h). The IRS has identified Dogwood Bluff's donation as involving a SCET and it would be unreasonable to believe that the IRS would act any differently in this case. Based on the IRS's consistent pattern and assuming that the IRS does not raise additional issues or alternative positions, the Insureds' exposure for tax, penalties, and interest under the IRS's positions would be approximately $33,705,738 (with interest calculated through September 13, 2024).

While the IRS has not yet issued a notice disallowing the Insureds' deductions, it recently issued the IRS Settlement to Dogwood Bluff and is requiring a response to its offer before it will complete its examination. The offer in this case is as follows: (1) the IRS will disallow the $55,190,000 noncash charitable deduction for the Conservation Easement donation; (2) instead, the IRS will allow an "other deduction" of $10,700,100; (3) the IRS will compute the tax due on the net disallowance of $44,489,900 at a tax rate of 21% instead the 37% highest marginal tax rate that would normally apply, (3) the IRS will reduce the application of the gross valuation misstatement penalty from 40% to 5% , and (4) statutory interest will continue to accrue until the liability is paid in full, as required by law. The Insureds' acceptance of this offer would result in a total liability of tax, penalties, and interest of approximately $11,566,014 (with interest calculated through September 13, 2024). The IRS has further indicated that if the Insureds do not accept its offer, it will move forward with litigating the case to decision.

**II.    Acceptance of the IRS Settlement Would Result in a Loss Under the Policy**

As noted above, Dogwood Bluff and Dogwood Partners are insureds for purposes of the policy. As the Insuring Agreements of the policy make clear, the Insurers promised as follows:

> **We** will indemnify you for **loss** in excess of any applicable **retention** resulting from any **proceeding** against **you** seeking to hold you liable for a **wrongful act**, provided the **loss** results from a **proceeding** first initiated against **you** and reported to **us** during the **policy period**.

Subject to certain exclusions that are not relevant here, a "loss" includes "damages, judgments and settlements incurred by an **insured** as a result of a **wrongful act** by such **insured** causing a reduction in tax savings to an **investor** by reason of an **adjustment**." Acceptance of the IRS Settlement would cause a reduction in the tax savings of all investors as a result of an "adjustment," which is "a reduction in the allowable tax deduction ordered by a **taxing authority** claimed by an **insured** that causes the actual tax deduction allowed by such **taxing authority** multiplied by 41% to be less than the sum of (a) such **insured's** original contribution to a **company** or the **controlled entity** that granted the conservation easement or fee simple donation of real property pursuant to 26 U.S.C. § 170 upon which such tax deduction was based, and (b) penalties

Joseph J. Stafford
Wilson Elser
August 29, 2024
Page 4

and interest where insurable by law imposed by any **taxing authority** due to such a covered reduction in tax savings."[2]

Thus, if Dogwood Bluff accepts the IRS Settlement, the resulting liability would constitute a covered "loss" under the policy.

## III.    Refusal to Consent to the IRS Settlement Would Be Unreasonable

Due to the reasonableness of the IRS Settlement, the Named Insured demands the Insurer grant their consent to the acceptance of this offer or, alternatively, waive their right to consent under the policy. Two factors confirm the reasonableness of the IRS Settlement.

*First*, recent caselaw from the Tax Court regarding the valuation of conservation easements indicate that Dogwood Bluff's deduction was based on a valuation approach that is now disfavored by the Tax Court. As discussed above, in determining the value of the Conservation Easement, Dogwood Bluff valued the Property before the donation using a DCF income approach based on the net present value of future cash flows. Specifically, the appraiser determined the FMV of the Property based on the net present value of the cash flows from the operation of a crushed stone mine on the Property would be $55,550,000.

Over the past year, the Tax Court has issued six opinions addressing the valuation of conservation easements in cases involving what the IRS identifies as SCETs.

- In *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, the Tax Court found in favor of the taxpayer on multiple technical issues. Nevertheless, the Tax Court determined that the FMV of the subject property before the donation of the easement was approximately 10% of the claimed value based on its application of the comparable sales approach and the principle of substitution. This adjustment resulted in the application of a 40% gross valuation misstatement penalty.

- In *Oconee Landing Property, LLC v. Commissioner*, T.C. Memo. 2024-25, the Tax Court found in favor of the IRS on multiple technical issues, which resulted in the complete disallowance of the claimed deduction or, in the alternative, limitation of the deduction to the taxpayer's basis in the subject property. In reaching the value of the conservation easement for penalty purposes, the Tax Court determined that the FMV of the subject property before the donation of the easement could not be more than 25.77% of the claimed before value based on its application of the comparable sales methodology. Notably, the Tax Court did not determine that the FMV of the conservation easement was in fact this amount; rather it determined that the FMV simply could be no more than this amount. Because the FMV of the easement was less

---

[2] The actual deduction allowable under the IRS Settlement would be $10,700,100, instead of $55,190,000 as originally claimed. This number multiplied by 41% is $4,387,041, which is less than the sum of (i) $10,700,100, representing the original capital contribution, and (ii) $2,223,135, representing the penalties and interest to be due under the terms of the IRS Settlement.

Joseph J. Stafford
Wilson Elser
August 29, 2024
Page 5

than 50% of the claimed FMV, the adjustment resulted in the application of a 40% gross valuation misstatement penalty.

- In *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, the Tax Court again found in favor of the taxpayer on multiple technical issues. Once again, however, Tax Court determined that the FMV of the subject property before the donation of the easement was approximately 2.5% of the claimed before value based on its use of the comparable sales approach and its acceptance the IRS's argument regarding the availability of other properties with similar mineral resources. This adjustment also resulted in the application of a 40% gross valuation misstatement penalty. Notably, the *Savannah Shoals* case involved the same HBU (*i.e.*, granite mining) as the HBU identified by the appraiser in the present case.

- In *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, the Tax Court again found in favor of the taxpayer on multiple technical issues. Once again, however, the Tax Court determined that the FMV of the subject property before the donation of the easement was approximately 14.6% of the claimed before value, based on its acceptance of the IRS's comparable sales methodology and its analysis of other transactions involving the subject property. This adjustment resulted in the application of a 40% gross valuation misstatement penalty.

- In *Excelsior Aggregates v. Commissioner*, T.C. Memo. 2024-60, the Tax Court only addressed the value of two conservation easements and fee simple interests in other property. In valuing the conservation easements, the Tax Court determined the FMVs of the subject properties before the donation of the easements were approximately 4.15% and 5.42% of the claimed before values. The Tax Court arrived at these values by placing substantial weight on the most recent transactions involving the subject properties, which it tested using the comparable sales method. It further rejected the taxpayers' proposed valuations through a detailed critique of the DCF analysis performed by the taxpayer's expert for trial.

- In *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, the Tax Court found in favor of the IRS on a technical issue, which resulted in the complete disallowance of the claimed deduction for the donation of a façade easement. In reaching the value of the easement for penalty purposes, the Tax Court determined that the FMV of the subject property before the donation of the easement was, at most, 12.63% of the claimed before value. To arrive at this value, the Tax Court once again placed substantial weight on the most recent transaction involving the property, which it tested using the comparable sales method. In reaching this conclusion, the Tax Court once again rejected the taxpayer's proffered valuation through another detailed critique of the DCF analysis performed by the taxpayer's expert for trial. This adjustment resulted in the application of a 40% gross valuation misstatement penalty.

Joseph J. Stafford
Wilson Elser
August 29, 2024
Page 6

These recent opinions have changed how taxpayers can reasonably expect the Tax Court to value conservation easements, especially SCETs, at trial. The Court has now indicated that it will favor valuing a conservation easement using the comparable sales approach or recent transactions involving the Property. Given this recent line of cases, the Court will likely disfavor any approach to value predicated solely on a DCF income approach. Thus, even assuming that Dogwood Bluff prevails on the technical issues that the IRS may raise, it is reasonable to expect the Tax Court to value Dogwood Bluff's donation under a methodology that would result in a total liability significantly in excess of the Insureds' liability under the IRS Settlement. See Ex 2. Excel Spreadsheet Explaining Liability to Insured by taking settlement and by refusing settlement.

*Second*, while the IRS has made prior settlement offers to other taxpayers, it has structured its current offer in a manner to make it significantly more favorable for taxpayers. As the following table shows, the reduction the effective tax rate to 21% and the applicable penalty rate to 5% greatly reduces the out-of-pocket liability for the Insureds as compared to any other resolution while also limiting partnership's costs to litigate its case:

| Resolution | Taxes, Penalties, & Interest[3] |
|---|---|
| Acceptance of IRS's Expected Position | $33,705,738 |
| IRS Counsel Settlement Offer[4] | $21,348,606[5] |
| Current IRS Settlement | $11,566,014 |

To put the IRS Settlement into perspective, to accomplish a similar result through litigation, Dogwood Bluff would have to (1) prevail on all of the technical arguments that the IRS may raise, (2) achieve a valuation of the Conservation Easement in excess of $28,700,000 (52% of the claimed deduction), and (3) convince the Tax Court that it had reasonable cause for the remaining adjustment to avoid application of a 20% accuracy-related penalty. Alternatively, if the Tax Court does not find that reasonable cause applies, Dogwood Bluff would have to achieve a valuation in excess of $33,100,000 (60% of the claimed deduction). Even then, the additional interest and litigation costs associated with achieving such outcome would likely result in a total liability that would significantly exceed the Insureds' liability under the IRS Settlement.

Dogwood Bluff currently has access to sufficient funds to pay the policy retention of $321,000, the excess liability amount of $545,014, and any additional interest that may accrue after September 13, 2024, provided that the Insurers honor their promises under the policy up to the coverage limit of $10,700,000. In light of the Tax Court's recent opinions, the structure of the IRS's settlement, and the significant time and resources it would take to achieve an equivalent result through litigation (if possible), the IRS Settlement is reasonable. *Johansen v. California*

---

[3] Interest calculated through September 13, 2024.

[4] This settlement offer is only available for certain docketed cases and this calculation is only being offered for demonstrative purposes. Dogwood Bluff has not received this settlement offer and cannot reasonably expect to receive it if it rejects the IRS's current offer.

[5] Calculated assuming disallowance of the noncash charitable contribution, allowance of an "other deduction" equal to $10,700,100, computation of the tax liability using the highest marginal tax rate of 37%, application of a 10% gross valuation misstatement penalty, and interest calculated as required by law.

Joseph J. Stafford
Wilson Elser
August 29, 2024
Page 7

*State Auto. Ass'n Inter-Ins. Bureau*, 15 Cal. 3d 9, 16 (1975) (The touchstone of reasonableness is "whether, in light of the victim's injuries and the probable liability of the insured, [the] ultimate judgment is likely to exceed the amount of the settlement offer."). The Insurers should accordingly consent to Dogwood Bluff's acceptance of the IRS Settlement or waive its right to consent to the same.

**IV.    Conclusion**

Please confirm by the **close of business on September 5, 2024** that the Insurers will consent to Dogwood Bluff's acceptance of the IRS Settlement or, in the alternative, waive the consent requirement in the policy for acceptance of the settlement. To the extent the Insurer requires additional information to evaluate this settlement, the Insureds invites the Insurer to make any additional information requests as soon as possible. Should you have any questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosures



**Department of the Treasury
Internal Revenue Service
Small Business Self Employed**
440 Roper Mountain Rd
Greenville, SC 29615

Date: July 11, 2024

Taxpayer ID number (last 4 digits): ███

Tax years: 202112

*Dogwood Bluff*

Person to contact:
Name: Janice Fair
ID number: 1001353308
Telephone: 864-286-7029

Green Rock Management LLC
Attn: Brian Robbins, DI
2207 2nd Ave N
Birmingham, AL 35203-3805

Dear Green Rock Management LLC:

**Why you're receiving this letter**
This letter is a time-limited offer to resolve the tax consequences related to your syndicated conservation easement transaction. Our proposed resolution is based on the terms outlined in the enclosed Attachment 1, Syndicated Conservation Easement Resolution Terms and Election.

**Why we're proposing this resolution**
We've identified syndicated conservation easement transactions as a significant compliance concern. These transactions have appeared on the IRS "Dirty Dozen" list of tax scams several times.

We've litigated and won syndicated conservation easement cases for failures to meet the requirements of Internal Revenue Code (IRC) Section 170 and overvaluation of the conservation easement. Penalties asserted by the government have been sustained. The U.S. Tax Court and appellate courts have issued opinions favorable to the IRS in syndicated conservation easement cases where the true value of the easement was found to be a small fraction of the claimed value.

We expect we'll continue to prevail in syndicated conservation easement litigation. However, we're offering to resolve your transaction now in the interest of sound tax administration and considering recent legislation.

**What you need to do to accept our offer**
If you wish to accept the terms outlined in Attachment 1 and enter into a resolution for this transaction, please follow the steps outlined in Attachment 1, Section A. **You have 30 days from the date of this letter to confirm your acceptance and to provide the requested documents.**

**What will happen if you don't accept our offer**
We'll continue to examine and litigate the tax consequences of your transaction under our normal procedures.

Examination results may include:

- Full disallowance of your charitable contribution deduction, and
- Imposition of civil penalties, which could include the 40% gross valuation misstatement penalty under IRC Section 6662(h). Some cases may be subject to the 75% fraud penalty under IRC Section 6663.

You will have the right to petition the U.S. Tax Court or file an action in a U.S. District Court or the U.S. Court of Federal Claims if you disagree with the examination results.

We encourage you to speak with a qualified, independent advisor about this settlement offer.

If you have questions, you can call the contact person shown above.

Sincerely,

Stephanie Kratt
Acting Group Manager

Enclosure:
Attachment 1

Attachment 1
Dogwood Bluff, ████████
2207 2nd Ave N
Birmingham, AL 35203-3805

## Syndicated Conservation Easement (Non-Docketed)
## Resolution Terms and Election

Below are the terms of the 2024 Syndicated Conservation Easement (Non-Docketed) Resolution. The Internal Revenue Service (IRS) will not entertain counteroffers to these terms.

This form provides Dogwood Bluff, ████████ (Partnership) an opportunity to elect to participate in a settlement initiative to resolve a transaction described in Section 2 of Notice 2017-10[28], 2017-4 I.R.B. 544, or a substantially similar transaction (collectively, SCE transactions).

This resolution is being offered to the entity listed above and is not available to partners on an individual basis. The terms of the resolution are outlined below.

## A. Election to Participate

1. The election to participate must be received by the IRS within **30 calendar days** of the date of the offer letter.

2. To elect into the resolution:

    a. An Authorized Signer[29] must initial each page and sign the last page of this form in the spaces provided.

    b. Partnership must provide its Form 1065 or, if applicable, the Form 1065 of the entity in which individual investors purchased their interest and from whom the individual investors received a Schedule K-1 (investment-tier partnership) reflecting the claimed charitable contribution deduction.

    c. A Partnership with less than one year remaining on the statute of limitation must sign a consent to extend the statute for no less than one year. A statute extension is enclosed with this letter, if needed, and must be signed and returned within 30 calendar days of this letter to participate in the settlement resolution.

---

[28] A Notice of Proposed Rulemaking (NPRM) was issued on December 8, 2022, providing that certain syndicated conservation easement transactions are listed transactions.

[29] For cases governed by Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982, the Authorized Signer is the Tax Matters Partners (TMP). For cases governed by the Bipartisan Budget Act of 2015 (BBA), the Authorized Signer is the Partnership Representative (PR) (or the Designated Individual of the PR, if the PR is an entity). For Non-TEFRA and BBA elect-out cases, the Authorized Signer is all partners. All partners must sign the supplemental signature page of the form to signal all partners wish to participate. They do not have to initial each page.

Initials _____

Attachment 1
Dogwood Bluff, ███████
2207 2nd Ave N
Birmingham, AL 35203-3805

3. The items listed in A.2.a. through c. must be timely returned to the IRS by email[30] to sce.settlement@irs.gov or faxed to (855) 579-6647. A courtesy copy must be sent to the contact person listed on the offer letter.

4. Please refer any questions regarding the settlement to the contact person listed on the offer letter. Questions or other communications sent to the mailbox will not be addressed.

5. Failure to satisfy any portion of paragraphs A.1 through 3 will be treated as an invalid election.

6. The Authorized Signer's signature will be treated as a non-binding consent to participate in this resolution. Formal agreement will be memorialized as described in paragraph B.17.

## B. Resolution Terms

**Deduction, Tax, and Penalties**

1. <u>Charitable Contribution Deduction</u>: The Partnership is not entitled to a charitable contribution deduction claimed for a conservation easement, donation of a fee simple interest in real property, or other noncash charitable contributions.

2. <u>Allowable Deduction (estimated out-of-pocket costs)</u>: The Partnership is entitled to a deduction for estimated out-of-pocket costs (i.e., the estimated amount the investors paid to either the Partnership or an investment-tier entity for an interest in the SCE transaction) allocable to the SCE transaction being settled. The IRS will calculate this amount. In general, the allowable deduction will be the amount reported on the Partnership's (or investment-tier partnership's) Schedule M-2, Capital Contributed (Cash).

3. <u>Tax Rate</u>: The IRS will calculate the tax due at the partnership level using a tax rate of 21%.

4. <u>Penalties</u>: An accuracy-related penalty for a gross valuation misstatement under section 6662(h) applies at a rate of 5%.

5. <u>Amount Due</u>: Once an election to participate is received, the IRS will provide the Authorized Signer with the necessary computational information, including the disallowed charitable contribution deduction, the estimated out-of-pocket costs allowed and the tax, penalties, and interest that will be aggregated into the Settlement Payment (as defined in section B.9.).

**Interest**

6. Deficiency interest will be calculated as required by law.

---

[30] Communication by unencrypted email is not secure. Therefore, taxpayers, TMPs, and PRs electing via email should transmit any potentially sensitive information, including personally identifiable information (PII), only via encrypted, password-protected attachments. See IRS User Guide at irs.gov/usingemail for more information on signing and sending documents electronically.

Initials _____

Attachment 1
Dogwood Bluff, ████████
2207 2nd Ave N
Birmingham, AL 35203-3805

7. IRS will compute interest ending 30 calendar days after the date IRS sends the Form 906, Closing Agreement on Final Determination Covering Specific Matters (Closing Agreement). If Partnership fails to sign the Closing Agreement and pay the Settlement Payment within 30 calendar days of the date the IRS sends the Closing Agreement, additional interest will accrue.

8. Interest suspension under section 6404(g) is not permitted.

**Payment**

9. The Partnership must make one payment (Settlement Payment) for all tax, penalties, and interest due as determined under this settlement agreement.

10. If a partner has made a section 6603 deposit, they can request a refund by following Revenue Procedure 2005-18.

11. A Partnership subject to the centralized partnership audit regime enacted by BBA must agree to be liable for an imputed underpayment equal to the Settlement Payment determined under paragraph B.9. For purposes of this resolution, the term Settlement Payment includes the imputed underpayment described in this paragraph. The Partnership cannot elect modification or push-out.

**General**

12. The Partnership and partners must fully cooperate with the IRS, including meeting stringent deadlines, or face removal from the resolution.

13. In the case of an entity governed by TEFRA, all partners must participate in the resolution.

14. The Partnership and partners agree to fully cooperate with the IRS during the resolution, which includes, but is not limited to, providing additional information if requested by the IRS.

15. If the Partnership or partners take steps inconsistent with facilitating the resolution, the IRS reserves the right to remove the Partnership from the resolution. The removal determination is final.

16. The Partnership and partners agree that they are responsible for their own costs and fees associated with participation in this resolution and section 7430 does not apply.

17. To finalize the settlement:

    a. In the case of an entity governed by TEFRA, Non-TEFRA, and BBA Elect-Outs, the Partnership, and all direct partners, including spouses if married filing joint, will be required to execute a Closing Agreement, consistent with terms and conditions outlined herein. Among other terms, the Closing

    Agreement will provide that the amount paid will not be refundable or deductible for Federal income tax purposes under any circumstance.

Initials _____

Attachment 1
Dogwood Bluff, ▮▮▮▮▮▮▮
2207 2nd Ave N
Birmingham, AL 35203-3805

    b. In the case of an entity governed by BBA, the Partnership will be required to execute a Closing Agreement, consistent with terms and conditions outlined in this term sheet. The Closing Agreement must be signed by the PR for the taxable year at issue as well as an individual with authority under state law to bind the partnership. Among other terms, the Closing Agreement will also provide that the Settlement Payment will not be refundable or deductible for Federal income tax purposes under any circumstance.

18. Neither this resolution, nor any settlement executed therefrom, will have any effect, limitation or prohibition against the IRS asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

19. The deduction allowed under paragraph B.2. cannot be inferred to represent a value of the property and/or the value of the conservation easement.

20. Nothing in this resolution precludes the IRS from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in an SCE transaction for violation of any criminal statute.

21. The terms contained herein do not constitute an interpretation of the law as it applies to SCE transactions.

22. The parties agree that this settlement is limited to this specific case and may not be used in any court proceeding involving the United States and/or the Commissioner of the Internal Revenue Service as a party.

23. Permission to participate in this resolution in no manner indicates, nor should be interpreted as, an opinion as to whether there is fraud with respect to the Partnership's SCE transaction.

_____

Print Name and Title

_____    _____

Signature                  Date

Initials _____

## Settlement Calculation - 2021 Partnership Donation
### DOGWOOD BLUFF- Non-Docketed Settlement Offer

| | | | | |
|---|---|---|---|---|
| Orig. Deduction | $ | 55,190,000 | Initial Tax Return Due Date: | 4/15/2022 |
| Capital Raise | $ | 10,700,100 | Assumed Payoff Date: | 9/13/2024 |
| | | | Total Interest (est.) | |
| Settlement Tax Rate | | 21% | (per online calculator) | $ 1,755,991 |
| Settlement Penalty Rate | | 5% | | |
| 170(h) Insurance - Deemed Tax Rate | | 41% | | |
| 170(h) Insurance - Policy Limit | $ | 10,700,000 | | |
| 170(h) Insurance - Retention | $ | 321,000 | | |
| | | | | |
| **Settlement Calculation:** | | | | |
| Deduction Allowed | $ | 10,700,100 | | |
| Deduction Disallowed | $ | 44,489,900 | | |
| Tax Owed Now | $ | 9,342,879 | | |
| Penalty Owed Under Settlement | $ | 467,144 | | |
| Interest Owed Under Settlement | $ | 1,755,991 | | |
| **Total Settlement Payment:** | **$** | **11,566,014** | | |

## Settlement Calculation - 2021 Partnership Donation
### DOGWOOD BLUFF - Full Disallowance

| | | | | |
|---|---|---|---|---|
| Orig. Deduction | $ | 55,190,000 | Initial Tax Return Due Date: | 4/15/2022 |
| Capital Raise | $ | 10,700,100 | Assumed Payoff Date: | 9/13/2024 |
| | | | Total Interest (est.) | |
| Settlement Tax Rate | | 37% | (per online calculator) | $ 5,117,318 |
| Settlement Penalty Rate | | 40% | | |
| 170(h) Insurance - Deemed Tax Rate | | 41% | | |
| 170(h) Insurance - Policy Limit | $ | 10,700,000 | | |
| 170(h) Insurance - Retention | $ | 321,000 | | |
| | | | | |
| **Liability Calculation:** | | | | |
| Deduction Allowed | $ | - | | |
| Deduction Disallowed | $ | 55,190,000 | | |
| Tax Owed Now | $ | 20,420,300 | | |
| Penalty Owed | $ | 8,168,120 | | |
| Interest Owed | $ | 5,117,318 | | |
| **Total Settlement Payment:** | **$** | **33,705,738** | | |

| Settlement Calculation - 2021 Partnership Donation | | | | | |
|---|---|---|---|---|---|
| **DOGWOOD BLUFF, LLC - IRS Counsel Settlement** | | | | | |
| Orig. Deduction | $ | 55,190,000 | Initial Tax Return Due Date: | | 4/15/2022 |
| Capital Raise | $ | 10,700,100 | Assumed Payoff Date: | | 9/13/2024 |
| | | | Total Interest (est.) | | |
| Settlement Tax Rate | | 37% | (per online calculator) | $ | 3,241,217 |
| Settlement Penalty Rate | | 10% | | | |
| 170(h) Insurance - Deemed Tax Rate | | 41% | | | |
| 170(h) Insurance - Policy Limit | $ | 10,700,000 | | | |
| 170(h) Insurance - Retention | $ | 321,000 | | | |
| | | | | | |
| **Liability Calculation:** | | | | | |
| Deduction Allowed | $ | 10,700,100 | | | |
| Deduction Disallowed | $ | 44,489,900 | | | |
| Tax Owed Now | $ | 16,461,263 | | | |
| Penalty Owed | $ | 1,646,126 | | | |
| Interest Owed | $ | 3,241,217 | | | |
| **Total Settlement Payment:** | $ | **21,348,606** | | | |

# Exhibit E

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



September 11, 2024

**VIA EMAIL ONLY**

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:    **Response to Information Requests**

       Insured:             Dogwood Bluff Partners, LLC ("Dogwood Partners," or "Named Insured")
       Insurer:            Fidelis Underwriting Limited
       Policy No.:       VFP/FL/20627/2021/1

Dear Mr. Stafford:

       I am writing in furtherance of our ongoing communications regarding our client, Dogwood Partners, the Named Insured under the above-referenced Policy. Specifically, I am writing in response to various emails and information requests from your firm. Please see our responses below. We are further providing the requested documents via an access link that will be sent to you in a separate email.

1.      **The IRS' claims/arguments.**

       The IRS has not yet concluded its examination of Dogwood Bluff's 2021 tax return, and therefore has not yet memorialized its claims/arguments or issued a Notice of Proposed Partnership Adjustments ("NOPPA"). We further do not anticipate that the IRS will issue any such document at this time, as it is requiring the partnership to accept or reject the terms of its settlement offer before it will complete its examination.

       This case, however, involves a transaction that the IRS identifies as syndicated conservation easement transaction ("SCET"). As detailed in my prior letter, the IRS's consistent patten in cases involving an SCET is to disallow the claimed noncash charitable contribution deduction due to alleged failures of the deduction to comply with the Tax Code, including, but not limited to, (i) defects with the donation under Section 170(h), (ii) failure to properly substantiate the deduction, and (iii) inaccuracies in the valuation of the donated easement. In addition to disallowance of the deductions, the IRS also generally asserts various penalties in cases involving SCETs, including the strict liability 40% "gross valuation misstatement" penalty under Section 6662(h). It would be unreasonable to believe that the IRS would act any differently in this case.

Joseph J. Stafford
Wilson Elser
September 11, 2024
Page 2

**2.      The Insureds' defenses/arguments.**

As I previously noted, attorney-client privilege and/or the attorney work product doctrine protects the information and materials responsive to this request from disclosure.  Waiving such protections as to any information or materials would be detrimental to Dogwood Partners and Dogwood Bluff in the ongoing dispute with the IRS.  Please provide any authority you have that supports the contention that providing these materials to you would not constitute a waiver of any applicable privilege. Alternatively, we are happy to help arrange a call with tax counsel to discuss the dispute generally and the reasonableness of the IRS's settlement offer.

**3.      The parties' respective position statements (if any).**

Please see our response to request 2, above.

**4.      Any written reports or recommendations provided by tax counsel.**

Please see our response to request 2, above.

**5.      Copies of the articles of incorporation, bylaws, operating agreement, and partnership agreements for the Named Insured and any entity which the Named Insured controlled or otherwise had the ability to direct the managerial decisions of at any time during the performance of the business giving rise to any IRS proceeding ("Relevant Entities").**

We are providing copies of the requested organizational documents.

**6.      Copies of any information or communications that has been conveyed by the Relevant Entities to the respective investors.**

We are providing a copy of the letter to the partnership's investors regarding the proposed settlement offer.

**7.      Copies of any communications, statements, or indication from the principals of (or anyone at) the Relevant Entities, indicating their belief that the IRS settlement offer is reasonable and should be accepted, including the reasoning supporting such positions.**

Please see my previous letter for a detailed explanation of why the insureds believe the IRS settlement offer is reasonable.

**8.      A listing of each of the investors in connection with each respective transaction, including their equity participation in the any of the Relevant Entities/partnership/conservation easement transaction and whether or not they participated in/paid toward the respective Investor 170(h) Liability insurance policy.**

Joseph J. Stafford
Wilson Elser
September 11, 2024
Page 3

We are providing the requested list of the investors. As Dogwood Partners purchased the policy, all investors participated in the insurance policy.

**9.      When are the investor voting dates scheduled to take place?**

We are waiting for additional information regarding the specifics of the investor vote, which is ongoing.

**10.     What is the manner, process, and procedure by which the voting will take place?**

The investor vote is taking place remotely. Dogwood Partners is using DocuSign to send the ballots and will tally the responses in accordance with each investor's interest.

**11.     A listing of all investors that have inquired regarding the Insurers' coverage positions, including the nature, extent, and substance of their respective inquiries.**

Investors have inquired about the insurance policy and the specifics of the applicable coverage; however, such requests have been ongoing and frequently through oral communications.

**12.     Provide the PPM.**

We are providing a copy of the Private Placement Memorandum.

**13.     Provide a calculation of the IRS Settlement Offer vs. not accepting.**

Please see my prior letter, which included the requested pro forma.

**14.     Copies of any interviews of witnesses, independent expert reports or appraisals obtained, and/or any materials related to the evaluation of the conservation easement property valuation for the transaction.**

Please see our response to request 2, above.

**15.     Advise as to whether any of the Insureds have any other potential insurance coverage, as well as any notice and/or correspondence between such other insurer and Insureds.**

Neither Dogwood Bluff nor Dogwood Partners have any other potential insurance coverage.

Joseph J. Stafford
Wilson Elser
September 11, 2024
Page 4

Should you have any additional questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosures provided by separate link

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



November 11, 2024

**VIA EMAIL ONLY**

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:    **Response to Information Requests**

Insured:        Dogwood Bluff Partners, LLC ("Dogwood Partners," or "Named Insured")
Insurer:        Fidelis Underwriting Limited ("Insurer")
Policy No.:   VFP/FL/20627/2021/1

Dear Mr. Stafford:

I am writing in furtherance of our ongoing communications regarding our client, Dogwood Partners, the Named Insured under the above-referenced Policy. Specifically, I am writing to supplement our prior responses to the various emails and information requests that we have received your firm. Please see our responses below. We are further providing additional requested documents via an access link that will be sent to you in a separate email.

**Prior Request 2: The Insureds' defenses/arguments.**

We understand from Sarah Adam in your office that this request does not seek any information or documents that would be protected by the attorney-client privilege and/or the attorney work product doctrine. As you are aware, waiving such protections as to any information or materials would be detrimental to Dogwood Partners and Dogwood Bluff, LLC ("Dogwood Bluff") in the ongoing dispute with the IRS, and the partnerships are in no way waiving such protections by responding to your requests. At this time, are no Tax Court pleadings or similar documents related to the Insureds' defenses/arguments. We continue to be willing to help arrange a call with tax counsel to discuss this matter and the reasonableness of the IRS's settlement offer.

The foregoing notwithstanding as you are aware, the ultimate issue in this case remains the FMV of the donated conservation easement ("Conservation Easement"). Dogwood Bluff relied on significant due diligence to support the reported fair market value ("FMV") of the donation. The Insurer received and reviewed all such due diligence at the time of binding. This due diligence supported the appraiser's use of the discounted cash flow ("DCF") valuation methodology to determine the FMV of the donated easement, and Dogwood Bluff would have to rely on similar due diligence at trial to prevail on the valuation issue. If Dogwood Bluff does not prevail on the valuation issue, it will be mathematically impossible for it to secure a result that is better than or even equivalent to the IRS's current settlement offer.

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 2

Recent caselaw from the Tax Court regarding the valuation of conservation easements indicates that this valuation approach is now disfavored by the Tax Court. These cases are (i) *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129; (ii) *Oconee Landing Property, LLC v. Commissioner*, T.C. Memo. 2024-25; (iii) *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35; (iv) *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52; (v) *Excelsior Aggregates v. Commissioner*, T.C. Memo. 2024-60; (vi) *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72; and (vii) *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93. We are enclosing copies of these opinions with this letter. As explained below, these cases indicate that the Tax Court is unlikely to accept any valuation of a conservation easement that depends on a DCF/income approach absent unique facts that do not appear to be present in Dogwood Bluff's case. It would thus be unreasonable for the Insurer to refuse to consent to Dogwood Bluff's acceptance of the IRS's settlement offer or waive its right to consent to the same.

     *a.*     ***J L Minerals***

The Tax Court's most recent opinion involving the valuation of a conservation easement is *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93, which it issued on October 8, 2024. In this case, the Honorable Patrick J. Urda joined the growing list of Tax Court judges who have rejected the use of the DCF/income valuation methodology in cases involving SCETs.

To value the easement at issue, the court first looked to prior transactions involving the subject property. Specifically, members of the partnership acquired a tract that included the subject property approximately two years before the deduction. This transaction provided a per-acre before value that was approximately 0.95% of the reported value. The court concluded that this transaction provided "strong evidence of the value of the easement property." *J L Minerals, LLC*, T.C. Memo. 2024-93, at *56–57.

The court next reiterated that the comparable sales methodology remains its preferred approach for valuing vacant land. On this point, the taxpayer's experts did not identify any comparable sale that supported the taxpayer's valuation. It instead relied solely on the underlying due diligence regarding the property's mineral reserve to assert that the property was sufficiently unique to value it using the DCF/income methodology. Rejecting this conclusion, the court stated as follows:

> "In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation.'" *Oconee Landing*, T.C. Memo. 2024-25, at *67 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24); *see also Excelsior Aggregates*, T.C. Memo. 202460, at *38; *Savannah Shoals*, T.C. Memo. 2024-35, at *35. "The comparable sales approach is usually the most reliable indicator of value when sufficient information exists" because "the market place is the best indicator of value, based on the conflicting

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 3

interests of many buyers and sellers." *Corning Place*, T.C. Memo. 2024-72, at \*32 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24).

*J L Minerals, LLC*, T.C. Memo. 2024-93, at \*58. The court thus focused on the comparable sale analysis that the IRS's expert performed, which resulted in a per-acre before FMV of 0.96% of the reported value. The court concluded that this analysis was "persuasive," as it "generally confirm[ed] the results of the actual transactions involving the easement property." *Id.* at \*59–60.

After accepting the comparable sales valuation methodology, the court fully explained why it rejected the partnership's valuation that relied on a DCF/income valuation approach:

"The income capitalization [approach] is most reliable when used to determine the value of an existing business with a track record of income, expenses, profits, and growth rates. A historical track record provides real-world inputs that supply a plausible basis for projecting future revenue." *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*43–44 (citing *Whitehouse III*, 139 T.C. at 325 (noting that the income approach "has been judged an unsatisfactory valuation method for property that does not have a track record of earnings")).

"Income valuation methods are not favored when valuing vacant land with no income-producing history because they are inherently speculative and unreliable." *Savannah Shoals*, T.C. Memo. 2024-35, at \*36; *see also Whitehouse Hotel III*, 139 T.C. at 324–25; *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–44 (1968), aff'd per curiam, 406 F.2d 288 (2d Cir. 1969); *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*33. "The income approach is rarely appropriate when seeking to determine the value of undeveloped property with no existing cashflow." *Corning Place*, T.C. Memo. 2024-72, at \*37; *see Excelsior Aggregates*, T.C. Memo. 2024-60, at \*44 ("[C]ourts have often noted 'the folly of trying to estimate the value of undeveloped property by looking to its anticipated earnings.'" (quoting *Pittsburgh Terminal Corp v. Commissioner*, 60 T.C. 80, 89 (1973), aff'd, 500 F.2d 1400 (3d Cir. 1974) (unpublished table decision))); *see also Chapman Glen*, 140 T.C. at 327; *Whitehouse Hotel III*, 139 T.C. at 324–25; *Ambassador Apartments*, 50 T.C. at 243–44; *Savannah Shoals*, T.C. Memo. 2024-35, at \*36. "Absent a financial track record, every input into the DCF analysis necessarily involves speculation." *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*44; *see also Corning Place*, T.C. Memo. 2024-72, at \*37 ("Lacking reliable data, the appraiser would have to rely on a lengthy series of assumptions, estimates, and guesstimates."). "That problem would be at its apogee here—

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 4

> attempting to predict the future revenues and expenses of a nonexistent business for a 30-year period." *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*44; *see also Corning Place Ohio*, T.C. Memo. 2024-72, at \*37–38.

*J L Minerals, LLC*, T.C. Memo. 2024-93, at \*61–62.

Under such circumstances, the court rejected the taxpayer's DCF/income appraisal as it did "not [value] the property at all, but what a speculative business could do with the property. But a discounted cashflow method geared to what a business could earn is of limited utility in determining what a property is worth." *Id.* at \*63. The court instead concluded that the FMV of the subject property before the donation of the subject easement was 1.04% of the reported before FMV of the subject property. It further offered the following warning for future litigants on the valuation issue in conservation easement cases:

> That is the point: Use of the discounted cashflow method with so few reliable inputs and so many variables and unknowns is simply an exercise in imagination. *As such it is altogether unreliable, and we would ignore the laughable results it generated even if we thought mining were the easement property's highest and best use. We caution taxpayers in the future who choose to use this method without strong support that we will view the income approach and the discounted cashflow method with skepticism, particularly in the conservation easement context.*

*J L Minerals, LLC*, T.C. Memo. 2024-93, at \*64–65 (emphasis added).

### b. *Savannah Shoals*

The Tax Court issued its opinion in *Savannah Shoals, LLC v. Commissioner* on March 26, 2024. Like the taxpayer in *J L Minerals*, the taxpayer's experts in *Savannah Shoals* utilized a DCF/income valuation to support the reported before FMV of the subject property. This case, however, involved a property in northeast Georgia that the taxpayer identified as having an aggregate mining HBU. As you are aware, this HBU is the same HBU that the appraiser determined in this case to measure the FMV of the Conservation Easement.

Unlike *J L Minerals*, there was no recent transaction of the subject property in *Savannah Shoals*. Without this data point, the Tax Court focused its valuation analysis on identifying the subject property's HBU and the price that membership interests in the partnership sold for as part of the transaction. Specifically, it focused on determining the demand for aggregate material from the proposed quarry. While the parties' experts agreed that an aggregate quarry's market area could be as large as 50 miles, the Tax Court indicated that competition from other quarries in the region effectively limited the market area to 25 miles. *Savannah Shoals*, T.C. Memo. 2024-35, at \*38–39. The court then determined this 25-mile market area was relatively rural and would thus

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 5

not support the taxpayer's demand estimates, as other quarries were located closer to nearby population centers. *Id.* at \*40–41. The court concluded that the taxpayer had not established that existing quarries in the market area failed to meet the available demand. *Id.* at \*41–42.

Based on the foregoing, the Tax Court concluded that development of the subject property as an aggregate quarry was not the property's HBU, as it was not financially feasible. *Id.* at 43. Importantly, the court further concluded that, even if it had determined that aggregate mining was the property's HBU, the valuation result would not change. *Id.* at \*45.

The court further agreed with the IRS's expert, who "opined that there were negligible differences (approximately 1.5%) in prices paid for land with known [mineral] deposits . . . . He explained that there is no price premium for land with known aggregate deposits because aggregate is abundant. He testified that the easement property is not unique and that he would consider property to be unique if the market demonstrated a preference for the property." *Id.* at \*46. While the court ultimately did not rely on the IRS expert's mineral property analysis in its valuation, it indicated that the analysis "confirms that New Shoals claimed an exorbitantly high, baseless value for the unencumbered easement property." *Id.* The court instead placed significant weight on the IRS's comparable sale analysis, which resulted in a before FMV of the subject property of approximately 2.08% of the originally reported value.

### c. *Excelsior Aggregates*

The Tax Court issued its opinion in *Excelsior Aggregates* on May 30, 2024. These consolidated cases focused on the valuation of two conservation easements and one fee simple interest in Alabama that the taxpayers had valued using a DCF/income valuation. Specifically, the taxpayer valued the properties based on a sand and gravel mining HBU.

In analyzing the value of the subject properties, the Tax Court first looked at recent transactions involving the properties, recognizing that one of the properties involved sold the same year as the donation for between 3% and 5% of the taxpayers' reported before values. The court concluded that "this is the best available evidence as to the 'before' value of [the] parcels on the valuation date." *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*31–32. The court further determined that the properties lacked sufficient sand and gravel reserves to support a mining HBU. *Id.* at \*41–42. Instead, the court determined the IRS correctly valued the subject properties based on the recent transaction and the IRS expert's comparable sales analyses, which were largely consistent with the prior transactions in the subject property.

The court further rejected the taxpayers' arguments that the sand and gravel resources of the subject properties justified a higher FMV or the taxpayers' use of the DCF/income methodology, stating: "The record is replete with reliable historical evidence of the prices that knowledgeable buyers paid to purchase acreage with potential for commercial [sand and gravel] mining. Petitioner does not contend (and could not plausibly contend) that the . . . parcels had any unique features that made them especially valuable." *Id.* at \*40. The court further agreed with the IRS's expert regarding the unreliability of a DCF/income valuation, stating that the lack of reliable

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 6

data required "the appraiser to . . . rely on a lengthy series of assumptions, estimates, and guesstimates. *Performed under these constraints, the DCF method becomes highly speculative, making it inferior to the sales comparison method, which draws its conclusions from the market.*" *Id.* at \*44 (emphasis added).

### d.    Mill Road; Oconee Landing; Buckelew Farm; Corning Place

*J L Minerals*, *Savannah Shoals*, and *Excelsior Aggregates* have the most direct applicability to the present case, as all three cases involve the Tax Court's analysis of properties with a claimed mining HBU. But, it is important to note that the court in *J L Minerals* also cites its opinions involving easements over vacant properties with proposed development HBUs, including *Mill Road*, *Oconee Landing*, *Buckelew*, and *Corning Place*. These opinions further highlight several of the key principles that the Tax Court has applied in valuing conservation easements.

- First, the Tax Court will focus on prior transactions in the subject property, if available, as it has indicated that it believes such transactions are "the best evidence if a property's FMV." *See Corning Place*, T.C. Memo. 2024-72, at \*28–29; *Buckelew*, T.C. Memo. 2024-52, at \*56.

- Second, the comparable sale methodology is the Tax Court's preferred method for vacant property. *See Corning Place*, T.C. Memo. 2024-72, at \*34–35; *Buckelew*, T.C. Memo. 2024-52, at \*54–56; *Oconee Landing*, T.C. Memo. 2024-25, at \*66–67; *Mill Road*, T.C. Memo. 2023-129, at \*50–52.

- Third, the Tax Court expects a taxpayer to present significant unique facts regarding a conserved property to justify the Tax Court's use of the DCF/income valuation approach. *See Corning Place*, T.C. Memo. 2024-72, at \*38; *Buckelew*, T.C. Memo. 2024-52, at \*55–56; *Oconee Landing*, T.C. Memo. 2024-25, at \*70; *Mill Road*, T.C. Memo. 2023-129, at \*15.

### e.    The IRS's Settlement Offer Remains Reasonable

The foregoing analysis shows why the IRS's offer to settle this case is reasonable. Indeed, the evidence that Dogwood Partners and Dogwood Bluff have provided the Insurer further shows that many facts of this case are substantially similar to facts that the Tax Court identified in its opinions as grounds to refuse to value the Property using a DCF/income methodology. These similarities lead to the reasonable expectation that the Tax Court would reach a similar result in this case. Because of this expectation, the terms of the IRS's settlement offer are reasonable. Moreover, as our prior correspondence confirms, the Insurer's refusal to consent to Dogwood Bluff's acceptance of the offer or waive the requirement under the Policy for consent would significantly increase the investors' exposure to additional tax, penalties, and interest.

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 7

**Prior Request 3: The parties' respective position statements (if any).**

Without waiving attorney-client privilege in any respect, there are no documents responsive to this request.

**Prior Request 4: Any written reports or recommendations provided by tax counsel.**

Without waiving attorney-client privilege in any respect, there are no documents responsive to this request.

**Prior Request 6: Copies of any information or communications that has been conveyed by the Relevant Entities to the respective investors.**

We are providing responsive communications with the respective investors regarding the IRS's proposed settlement offer. As we previously noted, the partnership also hosted a remote meeting for the investors to discuss the IRS's settlement offer.

**Prior Request 7: Copies of any communications, statements, or indication from the principals of (or anyone at) the Relevant Entities, indicating their belief that the IRS settlement offer is reasonable and should be accepted, including the reasoning supporting such positions.**

We are providing responsive communications with the respective investors regarding the IRS's proposed settlement offer. As we previously noted, the partnership also hosted a remote meeting for the investors to discuss the IRS's settlement offer.

**Prior Request 11: A listing of all investors that have inquired regarding the Insurer's coverage positions, including the nature, extent, and substance of their respective inquiries.**

We are providing responsive communications with the respective investors regarding insurance policy in this case. As we previously noted, the partnership also hosted a remote meeting for the investors to discuss the IRS's settlement offer. Multiple investors have inquired regarding the insurance policy and the Insurer's coverage positions during the member call and during other conversations.

**Prior Request 14: Copies of any interviews of witnesses, independent expert reports or appraisals obtained, and/or any materials related to the evaluation of the conservation easement property valuation for the transaction.**

Without waiving attorney-client privilege in any respect, there are no documents responsive to this request.

Joseph J. Stafford
Wilson Elser
November 11, 2024
Page 8

Should you have any additional questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosures provided by separate link

Cc. Sarah Adam (Sarah.Adam@wilsonelser.com)

# Exhibit G

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



September 13, 2024

**VIA EMAIL ONLY**

Joseph J. Stafford
Wilson Elser
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
Email: joseph.stafford@wilsonelser.com

Re:     **Outcome of Member Vote Regarding IRS Settlement**

      Insured:            Dogwood Bluff Partners, LLC ("Dogwood Partners," or "Named Insured")
      Insurer:            Fidelis Underwriting Limited
      Policy No.:        VFP/FL/20627/2021/1

Dear Mr. Stafford:

      I am writing in connection with our ongoing communications regarding our client, Dogwood Partners, and the above-referenced Policy. As stated in our letter dated August 29, 2024, the IRS made an offer to Dogwood Bluff, LLC ("Dogwood Bluff") on July 11, 2024, to resolve its ongoing tax dispute. The letter further informed you that the deadline for Dogwood Bluff to respond to the offer expired on September 13, 2024. Our letter requested that Volante Global and Fidelis Underwriting Limited (collectively, "Insurers") either (i) consent to Dogwood Bluff's election to participate in the IRS's settlement process Paragraph I(b) of the Policy, or (ii) agree not to raise lack of consent or other related policy provisions as an impediment to coverage if Dogwood Bluff so elects. We further responded to your request for additional information in this case on September 11, 2024, and will continue working with you to respond to the Insurers' reasonable requests for information.

      In connection with the IRS's offer, the partnership held an advisory vote regarding the election and a majority of the participating members voted to elect into the IRS's settlement process. We will provide you with a spreadsheet with detailed information about the outcome of the vote upon receipt of the same. Accordingly, Dogwood Bluff is moving forward with the settlement process. While you have not responded to our request for consent or a waiver of the consent provision for this election, we understand from your other communications that the Insurers do not construe the IRS's offer to be a "proposed settlement" that requires prior written consent under Paragraph I(b) of the Policy. Accordingly, we understand that the Insurers will not raise the prior written consent provision of Paragraph I(b) or any other policy provision as a basis for denying any claim based solely on the partnership's election into the settlement process. Stated differently, because the Insurers do not view this offer to be a "settlement offer," no provision of the policy prohibits the partnership's election into the IRS's proposed settlement process. **If you disagree with the foregoing, please contact me immediately to discuss.**

Joseph J. Stafford
Wilson Elser
September 13, 2024
Page 2


While we further recognize that Dogwood Bluff's election to participate IRS's settlement process is not binding at this time, we note that the offer is sufficiently certain in terms, scope, and amount to define the partnership's liability and the terms of the settlement.  It is our understanding at this time that the IRS anticipates issuing a closing agreement within 120 days of a partnership's election into the settlement process and will expect payment of the liability within 30 days.  As a result, and as explained in our prior correspondence, the partnership's decision to elect in the process will lead to a binding settlement agreement.

Should you have any additional questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

| From: | Adam, Sarah <Sarah.Adam@wilsonelser.com> |
|---|---|
| Sent: | Tuesday, October 29, 2024 1:36 PM |
| To: | Bersinger, Austin; Mitchum, Lisa |
| Cc: | Larkin, Peter J.; Stafford, Joseph J. |
| Subject: | RE: Conservation Easements: Dogwood Bluff (Green Rock), 25512.00003 (Fidelis) |
| Attachments: | RE: Green Rock - New Settlement Offers; Call on Conservation Easements: 34 Green Rock matters (Non-Docketed), 25512.00002 (Liberty & Fidelis); 2024-08-09 Dogwood Representation Letter.pdf; 2024-08-17 Dogwood Bluff - Response to Insurer.pdf; 2024-08-28 Dogwood Bluff - Waiver of Consent Letter.pdf; 2024-09-11 Dogwood Bluff - Response to Information Requests.pdf; 2024-09-19 Dogwood Bluff - Supplemental Response.pdf; 2021 Dogwood Bluff - Settlement Votes.pdf; 2024-09-24 Dogwood Bluff - Calculation Rcvd from IRS.pdf; Dogwood Bluff - Settlement Offer - Exhibit.pdf |

Dear Austin,

We are following up on our below and attached correspondence, and our request for documents and information on the Dogwood Bluff matter. Although we have been requesting these materials since July 22, 2024, many of our requests remain outstanding. There have been no documents or information provided in response to requests (1), (2), (3), (4), (11), and (14), and insufficient or incomplete information as to requests (9)-(10). We respectfully reiterate the need for and importance of this information in connection with the insurer's evaluation and analysis of the IRS proposal to Dogwood Bluff. These materials will need to be evaluated before the insurer will be in a position to provide any position as it relates to the Investor 170(h) Liability insurance policy. Further, we continue to note the general assertion of privilege set forth in your letters and continue to reiterate that, to the extent those concerns exist, we would be willing to enter into a confidentiality and common interest agreement that would seemingly respond to any concerns. You have not responded substantively to our repeated overtures and attempts to address your client's concerns.

The assertion of privilege is also problematic because it is not clear what information and documents are actually being withheld. As I am sure you can appreciate, any blanket assertion of a privilege inevitably raises the concern that certain documents are being withheld that may not actually be covered by the privilege. This is particularly concerning where, as here, only a limited quantity of documents have actually been provided. By way of brief example, our requests (1) and (2) seek, *inter alia*, correspondence between the IRS and Dogwood Bluff or the insured (or any person or entity designated or acting on behalf of the taxpayer); given that these would be correspondence between adversaries in a legal proceeding, it is unclear what legitimate privilege claim could apply to prevent their disclosure. To date, it appears we don't have all such correspondence, and your general privilege claim obfuscates whether any additional materials actually exist and are being withheld—or simply do not exist. **Accordingly, we request that you please advise whether documents exist that are responsive to each request that you have responded to with a privilege claim, and if so, please identify the specific documents that are being withheld and the rationale for withholding each.** If any documents were inadvertently withheld, please advise and produce those documents immediately.

As for your requests for the insurer's consent, as we have previously advised, there is no actual "proposed settlement" for the insurer to consider at this time. As you know, the IRS's non-docketed settlement letter offers an invitation to participate in a non-binding process whereby the partnership would, at a future date, receive a settlement offer for consideration. Further, while the IRS has now provided cost calculations in connection with this non-binding process, there is still not actual settlement/closing agreement presented to the partnership for consideration. To the extent you disagree or believe our understanding is inaccurate, please advise immediately and provide an explanation.

Based on our understanding of the IRS's non-docketed settlement process, at this time, the insurer is willing to conditionally waive the lack of consent defense in a limited manner to allow Dogwood Bluff continue to engage in discussions with the IRS, the Named Insured, and the individual partners solely with respect to the proposal sent by the IRS in its letter dated July 11, 2024. This limited waiver is expressly conditioned on the insurer being provided the relevant and necessary information, documents, communications and materials – as well as sufficient time to review and evaluate such materials. The insurer must consider the reasonableness of the IRS non-docketed proposal, confirm the validity of the partnership voting, understand the proposal intended to be discussed with the other insureds, and adequately evaluate and consider the specific terms and amounts associated with any actual proposed settlement/closing agreement offered by the IRS.

To be clear, the insurer is willing to agree to this limited conditional waiver solely to allow Dogwood Bluff to engage in non-binding settlement *discussions* with the IRS in connection with the IRS's July 11, 2024 letter. The insurer is not providing consent to accept any settlement offer or agreement. It is not agreeing not to raise lack of consent as an impediment to coverage for any settlement agreement. It is not waiving (conditionally or otherwise) any consent, voluntary payments, or other related provisions of the Policy as it relates to any actual proposed settlement (or closing) agreement offered or presented by the IRS. It is also not advising as to coverage under the Policy for any settlement. To the extent Dogwood Bluff receives an actual settlement offer/closing agreement from the IRS for consideration, written consent (or waiver) must be separately sought and the insurer must be afforded sufficient time to consider such a request – including sufficient time to adequately review, evaluate, and analyze all relevant information, materials, and documents as to the unique history, attributes, transactions, valuations, and due diligence related to the conservation easement at issue – within a realistic and reasonable timeframe prior to providing any position as to coverage or consent under the Policy.

Please let us know if you have any questions, or if you would like to schedule a call to discuss. Please also keep us timely posted as to any and all developments in this matter. In the interim, the insurer continues to respectfully reserve any and all rights, remedies, and defenses under the policy, at law, and in equity.

Thank you,

Sarah Adam
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
212.915.5371 (Direct)
646.575.8486 (Cell)
212.490.3000 (Main)
212.490.3038 (Fax)
sarah.adam@wilsonelser.com

---

**From:** Adam, Sarah
**Sent:** Monday, September 30, 2024 3:34 PM
**To:** abersinger@bradley.com
**Cc:** Larkin, Peter J. <Peter.Larkin@wilsonelser.com>; Stafford, Joseph J. <Joseph.Stafford@wilsonelser.com>
**Subject:** RE: Conservation Easements: Dogwood Bluff (Green Rock), 25512.00003 (Fidelis)

Dear Austin,
Please allow this to follow up on the below and your letter dated September 25, 2024, in the above matter. As a preliminary matter, your recitation and characterization of our prior correspondence are inaccurate in a number of ways. That said, an email or letter writing campaign addressing each inaccuracy seems unproductive at this time.

We respectfully reserve the right to address each at the appropriate time and in the appropriate manner. As you know, your September 25 letter states:

> [P]lease accept this letter as a formal demand from the insureds that the Insurers consent to the insureds' acceptance of the proposed settlement and that the Insurers agree to fund amounts under the Policy, up to the policy limit, that will be due to the IRS. In the event the Insurers cannot commit to providing consent or commit to fund the IRS settlement payment, the insureds respectfully request that the Insurers agree not to raise lack of consent or other related policy provisions as an impediment to coverage.

The letter also advised that the IRS has requested that Dogwood Bluff respond as to whether it is proceeding with the settlement process by October 4, 2024. Your letter then requested "that the Insurers provide a written response to this correspondence by September 30, 2024"—in other words, within three business days of your letter. Such a timeline is objectively unreasonable, particularly in view of the (lack of) information provided to date.

As you know, we have been requesting documents and information on this matter since at least August 15, 2024. We did not receive any documents at all until September 11th, when your office provided a very limited production that was non-responsive to many of our requests. You have not provided information/documents responsive to requests (2), (3), (4), (14), and have provided incomplete information as to requests (9)-(11). We attach the original requests again for reference. The insurer has endeavored to diligently and adequately review the documents and information provided to date as a matter of urgency. As I am sure you can appreciate, the information we have been provided (and the information that remains outstanding) is highly technical and there is a notable absence of any written recommendations or analysis of any insured or tax counsel evaluation of the IRS's non-docketed settlement letter or as to the reasonableness of the proposal. The insurer has likewise followed up (multiple times) on our requests when the information provided was incomplete or insufficient, as well as suggested a common interest agreement to allay any privilege or confidentiality concerns. We have also agreed to schedule a call with tax counsel to have certain information conveyed orally as opposed to in writing (irrespective of the fact that information provided orally adds another layer of complexity in both the ingest, and the reporting/consideration/evaluation, of this information). We will continue to endeavor to provide a response as promptly as possible once the relevant information is received and reviewed. That said, ultimately, given the amount of outstanding relevant information, the time necessary to adequately and properly evaluate any materials actually provided, and the uncertainty related to this new "IRS deadline" providing "settlement cost calculation," the September 30th deadline set forth in your letter for a response from the insurer is impractical and the insurer will be unable to advise on its position(s) by that date.

Moreover, the September 30th response "deadline" for the insurer is seemingly based on the time required for the partners to vote on whether to continue proceeding with the IRS settlement process and a desire to inform the partners ahead of the IRS deadline for them to decide. That said, as noted in your prior correspondence, you already advised that a majority of the members/partners voted to elect into the IRS's settlement process. To the extent our understanding is inaccurate in any way, please advise immediately. Thus, while we understand that the IRS's settlement process may involve further and future steps, it is unclear whether additional partner/member voting will be required/sought in connection with each step, or whether it will solely be as to whether to accept or reject the final, actual settlement offer by the IRS whenever that is conveyed in the future. We requested clarity on these aspects, but have received no response.

We also note that your September 25th letter is seemingly written and making requests on behalf of "insureds" (plural). Based on your prior representations – including your original letter of August 9, 2024 – it has always been our understanding that you and your firm only represents "Dogwood Bluff Partners, LLC," and that you do not represent any other insureds under the Policy or any of the individual partners/investors. Given the suggestion in your September 25 letter that you are now acting on behalf of multiple insureds, please advise and provide detail as to the scope of your representation.

Please let us know if you have any questions or if you would like to schedule a call to discuss.  In the interim, the insurer continues to respectfully reserve any and all rights, remedies, and defenses at law, in equity and under the Policy.

Thank you,

Sarah Adam
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
212.915.5371 (Direct)
646.575.8486 (Cell)
212.490.3000 (Main)
212.490.3038 (Fax)
sarah.adam@wilsonelser.com

---

**From:** Adam, Sarah <Sarah.Adam@wilsonelser.com>
**Sent:** Thursday, August 15, 2024 11:37 PM
**To:** abersinger@bradley.com
**Cc:** Stafford, Joseph J. <Joseph.Stafford@wilsonelser.com>; Larkin, Peter J. <Peter.Larkin@wilsonelser.com>
**Subject:** Conservation Easements: Dogwood Bluff (Green Rock), 25512.00003 (Fidelis)

Dear Austin,
As you may know, our office has been retained by Fidelis Underwriting Limited as capacity provider for Volante in connection with the IRS settlement proposal received by Dogwood Bluff. Please let us know your availability for a call to discuss this matter. In addition, as a matter of urgency, please provide a copy of the IRS proposal letter and advise as to the partnership's present deadline to respond to the IRS, and whether that deadline is expected to be extended.

Please also advise as to the deadline/date for the partnership members to vote on whether or not to participate in the IRS's non-docketed settlement process. Please be advised that, if the partnership voted/votes to participate, we will also request confirming documentation of the voting process, as well as the below-listed documents and information—which the insurer will need in order to adequately review, evaluate, and analyze prior to providing any position or comment as it relates to the insured's Investor 170(h) Liability insurance policy. If, however, the partnership elected/elects not to participate and the insured is not currently seeking or requesting any response from the insurer, no further information or documents need to be provided at this time.

Please keep us advised as to all further developments on this matter. We look forward to speaking with you. In the interim, the insurer respectfully reserves all rights under the policy, at law, and in equity.

Thank you,

Sarah Adam
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
212.915.5371 (Direct)
646.575.8486 (Cell)
212.490.3000 (Main)
212.490.3038 (Fax)
sarah.adam@wilsonelser.com

List of Additional Documents/Information:

1.     The IRS's claims/arguments, wherever memorialized, including but not limited to any correspondence/ forms/ Notices of Partnership Adjustment sent to the Insureds/taxpayer;
2.     The Insureds' defenses/arguments, wherever memorialized, including but not limited to any correspondence with the IRS;
3.     The parties' respective position statements (if any);
4.     Any written reports or recommendations provided by tax counsel;
5.     Copies of the articles of incorporation, bylaws, operating agreement, and partnership agreements for the Named Insured and any entity which the Named Insured controlled or otherwise had the ability to direct the managerial decisions of at any time during the performance of the business giving rise to any IRS proceeding ("Relevant Entities");
6.     Copies of any information or communications that has been conveyed by the Relevant Entities to the respective investors;
7.     Copies of any communications, statements, or indication from the principals of (or anyone at) the Relevant Entities, indicating their belief that the IRS settlement offer/proposal is reasonable and should be accepted, including the reasoning supporting such positions;
8.     A listing of each of the investors in connection with the transaction, including their equity participation in any of the Relevant Entities/partnership/conservation easement transaction and whether or not they participated in/paid toward the respective Investor 170(h) Liability insurance policy;
9.     The dates that the investor voting is scheduled to take place for consideration of any IRS non-docketed settlement overtures/offers, and when completed, the outcome of the voting, and supporting documentation;
10.    What is the manner, process, and procedure by which the voting will take place;
11.    A listing of all investors that have inquired regarding the Insurers' coverage positions, including the nature, extent, and substance of their respective inquiries;
12.    The PPM or other materials offered to investors;
13.    A pro forma (i.e., calculation of cost of accepting the IRS settlement offer/proposal vs. not accepting);
14.    Copies of any interviews of witnesses, independent expert reports or appraisals obtained, and/or any materials related to the evaluation of the conservation easement property valuation for the transaction;
15.    Advise as to whether any of the Insureds have any other potential insurance coverage, as well as any notice and/or correspondence between such other insurer and Insureds; and
16.    Any other relevant material.

IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser
Moskowitz Edelman & Dicker LLP provides to you either in the body
of this or any email or in an attachment without first speaking
with the attorney in our office who is handling your transaction.
Further, DO NOT accept emailed wire instructions from anyone else
without voice verification. Even if an email looks like it has come
from this office or someone involved in your transaction,
CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE
to verify the information before wiring any money.
Failure to do so is at your own risk.
Be particularly wary of any request to change wire instructions
you have already received.

CONFIDENTIALITY NOTICE: This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed.
It may contain information that is privileged, confidential and
exempt from disclosure under applicable law. Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission. If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have

5

received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman &
Dicker LLP, please see our website at www.wilsonelser.com or refer to
any of our offices.

Thank you.

# Exhibit I

**D. Austin Bersinger**
Partner
abersinger@bradley.com
Direct: 404.868.2042



July 11, 2025

<u>**VIA EMAIL ONLY**</u>

Sarah Adam
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
Email: sarah.adam@wilsonelser.com

Re:     **Form 906 and Demand for Payment**

Insured:        Dogwood Bluff Partners, LLC ("Dogwood Partners")
Insurer:        Volante Global, LTD, Volante Specialty Risk LTD, Fidelis Underwriting
                Limited ("Insurers")
Policy No.:     VFP/FL/ 20627/2021/1

Dear Ms. Adam:

I am writing regarding the above-referenced Policy. As you are aware, the IRS extended an offer to Dogwood Bluff, LLC ("Dogwood Bluff") on July 11, 2024, to resolve its ongoing tax dispute. Dogwood Bluff recently received the enclosed Form 906 (Closing Agreement on Final Determination Covering Specific Matters) for the non-docketed settlement process. Dogwood Bluff has received confirmation that its deadline for responding to this Form 906 has been extended to October 2025, and we will provide the specific date of the deadline upon receipt of the same.

This correspondence serves as Dogwood Partners' formal demand, as the Named Insured under the Policy, that the Insurers (i) consent to Dogwood Bluff's acceptance of the IRS settlement offer or waive the consent requirement under the Policy with respect to the same, and (ii) agree to fund amounts due as a result of Dogwood Bluff's acceptance of the IRS settlement, up to the policy limit. We request that you provide a written response to this correspondence within 30 days, or by August 11, 2025. Dogwood Partners and Dogwood Bluff will accept full payment of this demand in lieu of a written response.

**I.      Demand for Consent or Waiver and Coverage**

Since the issuance of the IRS's offer nearly a year ago, we have repeatedly requested that the Insurers (i) either consent to Dogwood Bluff's acceptance of the IRS's offer or waive the consent requirement under the Policy, and (ii) provide their coverage position with respect to the IRS settlement offer. The Insurers have not responded to the insureds request with respect to either of these requests.

Sarah Adam
Wilson Elser
July 11, 2025
Page 2

At this time, Dogwood Bluff has sufficient funds to pay the Policy retainer and any liability due under the IRS settlement in excess of the aggregate limit of the Policy. The IRS settlement accordingly represents an in-limits settlement opportunity. Dogwood Partners, as the Named Insured under the Policy, demands that the Insurers agree to consent to Dogwood Bluff's acceptance of the IRS settlement offer. To the extent that Insurers cannot commit to giving such consent, Dogwood Partners demands that Insurers agree not to raise lack of consent or other related policy provisions as an impediment to coverage, as such an agreement does not negatively affect the Insurers' rights. *See, e.g., Homeland Ins. Co. of New York v. Health Care Serv. Corp.*, 2022 WL 2828752, at *4–6 (N.D. Ill. July 19, 2022) (allegations of harm from waiver of consent clause are illusory). Finally, Dogwood Partners demands that the Insurers agree to fund amounts due, up to the policy limit, resulting from Dogwood Bluff's acceptance of the IRS settlement.

An insurer's right to withhold consent to settlement is constrained by its duty to act reasonably and in good faith. Even where a policy includes a consent-to-settle provision, the insurer must exercise that right in a manner consistent with the covenant of good faith and fair dealing implied in every insurance contract. *See, e.g., Piedmont Office Realty Trust, Inc. v. XL Specialty Ins. Co.*, 297 Ga. 38, 43 (2015); *Waters v. American Cas. Co. of Reading, PA*, 261 Ala. 252, 260–61 (1953). Courts evaluate the insurer's decision by asking whether it gave equal consideration to the interests of the insured and acted as a reasonably prudent insurer would under the circumstances. *See Piedmont Office*, 297 Ga. at 43*; see also Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 685 (2003); *First Acceptance Ins. Co. of Ga., Inc. v. Hughes*, 305 Ga. 489, 497 (2019); *State Farm Mut. Auto. Ins. Co. v. Hollis*, 554 So.2d 387, 391–92 (Ala. 1989). That reasonableness standard applies regardless of whether the insurer ultimately consents to or denies coverage; it must respond to requests for consent in a timely and informed manner based on the information available at the time. *See Geico Indemn. Co. v. Whiteside*, 311 Ga. 346, 352 (2021) (reasonableness of an insurer is determined based on information available at the time of the decision).

As we have repeatedly explained in our prior correspondence, Dogwood Partners and Dogwood Bluff recognize that the IRS's settlement offer remains reasonable, particularly in light of the Tax Court's uniform rejection of taxpayer valuations in similar cases over its past 13 opinions involving conservation easements. In these opinions, even where the taxpayer prevailed on all technical issues, The taxpayer nevertheless suffered significant losses of between 86.64% and 99.44% of the claimed deduction, the imposition of the strict liability 40% gross valuation misstatement penalty, and the continued accrual of interest through the litigation process.[1] The following table confirms the ultimate result in cases where the taxpayer prevailed on all technical issues at trial:

---

[1] In cases where the Tax Court disallowed the claimed deduction based on technical issues, including *Oconee Landing, Corning Place*, and *Green Valley Investors*, the taxpayer received no deduction and was liable for a 40% penalty.

Sarah Adam
Wilson Elser
July 11, 2025
Page 3

| Case Name | Original Value | Determined Value | Reduction in Value | Penalty Percentage |
|---|---|---|---|---|
| *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129 | $8,935,000.00 | $900,000.00 | 89.93% | 40% |
| *Carter v. Commissioner*, T.C. Memo. 2023-133 | $14,175,000.00 | $1,000,000.00 | 92.95% | 40% |
| *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35 | $23,000,000.00 | $480,000.00 | 97.91% | 40% |
| *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52 | $47,570,000.00 | $4,595,000.00 | 90.34% | 40% |
| *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60[2] | $16,700,000.00 $14,950,000.00 | $693,000.00 $810,000.00 | 95.85% 94.58% | 40% 40% |
| *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93 | $16,745,000.00 | $93,690.00 | 99.44% | 40% |
| *Jackson Crossroads, LLC v. Commissioner*, T.C. Memo. 2024-111[3] | $23,142,421.00 $13,830,000.00 | $1,169,797.00 $1,571,226.00 | 94.95% 88.64% | 40% 40% |
| *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6 | $35,850,000.00 | $4,718,000.00 | 86.64% | 40% |
| *Ranch Springs, LLC v. Commissioner*, 164 T.C. No. 6 (2025) | $25,814,000.00 | $335,500.00 | 98.70% | 40% |
| *Beaverdam Creek Holdings, LLC v. Commissioner*, T.C. Memo. 2025-53 | $21,972,000 | $193,250 | 99.12% | 40% |

The Insurers have not rebutted the foregoing or pointed to any fact or set of facts that would lead a reasonably prudent person to refuse to settle this matter pursuant to the terms of the IRS settlement. *See Cotton States*, 276 G.A. at 685 ("Judged by the standard of the ordinarily prudent insurer, the insurer is negligent in failing to settle if the ordinarily prudent insurer would consider choosing to try the case created an unreasonable risk."); *Waters*, 261 Ala. at 261. Using the Tax

---

[2] *Excelsior Aggregates* involved five donations: (i) conservation easement over tract 1, (ii) fee simple donation of tract 1, (iii) conservation easement over tract 2, (iv) fee simple donation of tract 2, and (v) fee simple donation of various tracts. The amounts reflected in this chart reflect the combined reported and determined values on tracts 1 and 2.

[3] *Jackson Crossroads* involved two consolidated cases: *Jackson Crossroads, LLC v. Commissioner* and *Long Branch Investments, LLC*.

Sarah Adam
Wilson Elser
July 11, 2025
Page 4

Court's recent decisions as a guide, the best valuation that Dogwood Bluff could expect at trial would be approximately $7,373,394 (13.36% of the claimed deduction)[4] and the imposition of a 40% strict liability penalty on the resulting underpayment. This scenario does not account for the significant downside risk that the insureds would bear of the Tax Court determining a lower value for the Dogwood Bluff donation. By contrast, the IRS settlement guarantees Dogwood Bluff a deduction of $10,700,100, or 19.39% of the claimed contribution, and a reduced penalty rate of 5%. The reduction of the tax rate from a presumed 37% to 21% further allows Dogwood Bluff to significantly reduce its losses in a manner that is otherwise impossible under the Tax Code if the Insurers refuse to consent to the IRS settlement. Finally, the settlement offer gives Dogwood Bluff the ability to further limit its losses by stopping the accrual of interest and avoiding legal fees and litigation costs.

In short, the IRS settlement is reasonable based on all available facts and circumstances. Dogwood Bluff's acceptance of the IRS settlement further significantly reduces the insureds' exposure to losses in this matter. The Insurers accordingly do not have any reasonable basis for (i) refusing to consent to Dogwood Bluff's acceptance of the IRS settlement or waive the consent requirement with respect to the same, or (ii) refusing to fund the amounts due as a result of such acceptance.

## II.    Common Interest Agreement

As we have previously informed you in other matters, Dogwood Bluff and Dogwood Partners are unable to enter into the draft common interest agreement that your firm provided for consideration. This draft agreement confirms the concerns that we have repeatedly raised on this issue. Specifically, the Insurers' express reservation of the right to disclose received information to third parties and to use received information in litigation against the insureds indicates that the parties likely do not have a sufficiently common interest to preserve attorney-client privilege and similar other protections following a voluntary disclosure. *See McKesson Corp. v. Green*, 597 S.E.2d 447, 451 (Ga. App. 2004) (voluntary disclosure of work product to third party regulator with potential adversarial relationship constituted waiver).

Notwithstanding this fact, we reiterate that no information has been withheld from the Insurers based on claims of privilege or other protection. Moreover, as evidenced by your discussions with tax counsel in similarly situated cases, the lack of a common interest agreement is not a barrier to the Insurers' actually conducting an appropriate investigation into the reasonableness of an IRS settlement offer and providing their position with respect to the same. We accordingly reiterate our offer to assist in scheduling a time for you to speak with tax counsel in this matter to discuss the case, the current state of the law, and the reasonableness of the IRS settlement. Please provide dates over the next two weeks that would work for this call.

---

[4] The taxpayer in *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6, received a deduction for its donation that was 13.36% of the deduction reported for the donation.

Sarah Adam
Wilson Elser
July 11, 2025
Page 5

**III.     Demand Regarding Notices and Policy Documents**

We have repeatedly requested for confirmation that Volante Global, LTD, Volante International, LTD and Volante Specialty Risk, LLC (collectively, "Volante") provided notice to all Insurers regarding the start of the IRS proceeding and the issuance of the IRS settlement. We have further requested copies of any underlying policy in this matter that purport to affect the obligations of any Insurer. To date, we have not received a substantive response to these requests. This refusal is unreasonable, particularly considering Volante's representations. We accordingly reiterate the insureds' demands that the Insurers (i) confirm that each Insurer received notice of the IRS proceeding and the IRS settlement as required under the Policy, and (ii) provide copies of each underlying policy in this matter.

As stated above, the insureds demand that that the Insurers provide a written response to this letter or payment pursuant to the terms of the Policy by the close of business on August 11, 2025. Should you have any questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

Enclosure

CC:    Larkin, Peter J. (Peter.Larkin@wilsonelser.com)
       Michael O'Malley (Michael.O'Malley@wilsonelser.com)
       John Nail (jnail@bradley.com)

**Department of the Treasury**
**Internal Revenue Service**
**IRS Small Business and Self Employed**
440 Roper Mountain Rd
Suite E
Greenville, SC 29615

Date:
6/24/2025

Taxpayer ID number (last 4 digits):
▄▄▄▄▄

Taxpayer name:
Dogwood Bluff LLC

Form number:
1065

Years:
202112

Person to contact:
Janice Fair

Employee ID number:
1353308

Contact telephone number:
864-286-7029

Contact fax number:
877-931-4248

Dear Attorney Levitt,

We are sending the enclosed material under the provisions of your power of attorney or other authorization we have on file. For your convenience, we have listed the name of the taxpayer to whom this material relates in the heading above.

If you have any questions, please call the contact person at the telephone number shown in the heading of this letter.

Thank you for your cooperation.

Sincerely,

*Janice Fair*

Digitally signed by Janice Fair
Date: 2025.06.24 11:30:19
-04'00'

Janice Fair
Revenue Agent

Enclosures:
☐ Letters
☐ Reports
☐ Copy of Determination Letter
☐ Other

Letter 937 (Rev. 3-2017)
Catalog Number 30760X



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

SMALL BUSINESS/SELF-EMPLOYED DIVISION

**Small Business/Self-Employed Division**
**440 Roper Mountain Road, Suite E**
**Greenville, SC 29615**

**Date:**
June 24, 2025

**Person to contact:**
Janice Fair

**Contact telephone number:**
(864) 286-7029

Green Rock Management
ATTN: Brian Robbins, DI
2207 2nd Ave N
Birmingham, AL 35203

**Taxpayer name:**
Dogwood Bluff LLC

**Last date to respond to this letter:**
July 28, 2025

Dear Taxpayer:

Enclosed are three copies of Form 906, Closing Agreement on Final Determination Covering Specific Matters, reflecting agreement under the terms of the Syndicated Conservation Easement Resolution Initiative (SCERI). This report was prepared in response to your election to participate in the SCERI and is only for purposes of the SCERI. The Form 906 and payment must be signed and returned within 30 calendar days of the date of this letter. Please sign, date and return all three copies of the Form 906 to the address shown above.

According to the terms of SCERI, Taxpayers must full pay the tax liability prior to IRS executing the Form 906. Include payment for the full amount you owe when you return the signed Forms 906. Make your check or money order payable to the United States Treasury.

If you have any questions, please contact me at the telephone number shown above.

Sincerely,

*Janice Fair*

Digitally signed by
Janice Fair
Date: 2025.06.24
16:11:42 -04'00'

Janice Fair
Internal Revenue Agent

Enclosures:
Form 906 (3)
Form 14791
Form 872-M

Closing Agreement With Dogwood Bluff LLC ████████

Form **906**
(Rev. Aug. 1994)
Department of the Treasury—Internal Revenue Service

## CLOSING AGREEMENT ON FINAL DETERMINATION
## COVERING SPECIFIC MATTERS

Under section 7121 of the Internal Revenue Code ("I.R.C." or "Code"), Dogwood Bluff LLC (EIN: ████████) (the "Partnership"), 2207 2nd Ave N, Birmingham, AL 35203-3805, and the Commissioner of Internal Revenue (the "Commissioner") (the Commissioner and the Partnership, collectively, the "Parties") make the following Closing Agreement (the "Closing Agreement"):

WHEREAS, the Partnership filed a Form 1065, U.S. Return of Partnership Income, for the partnership year beginning August 23, 2021, and ending December 31, 2021 (the "2021 Partnership Year").

WHEREAS, the Partnership is subject to the centralized partnership provisions of the Bipartisan Budget Act of 2015, codified at I.R.C. §§ 6221 through 6241 ("BBA") as in effect for tax years beginning on or after January 1, 2018, for the 2021 Partnership Year.

WHEREAS, Green Rock Management LLC (the "PR") is the partnership representative (as defined in I.R.C. § 6223) of the Partnership for the 2021 Partnership Year. Brian Robbins is the designated individual of the PR for the 2021 Partnership Year.

WHEREAS, Brian Robbins of Green Rock Management LLC is authorized under Georgia law as the State Law Signatory to act for the Partnership at the time of signature.

WHEREAS, on December 29, 2021, the Partnership donated a conservation easement (the "Easement") on the property located in Oglethorpe County, Georgia more particularly described in Exhibits A and B (the "Property") to Natural Resources Conservancy, Inc. (the "Donee").

WHEREAS, the Partnership claimed a non-cash charitable contribution deduction of $55,190,000 for the Easement donation on its Form 1065 for the 2021 Partnership Year;

WHEREAS, the Partnership also made a payment of cash of $100,000 to the Donee for which it claimed an additional charitable contribution deduction on its Form 1065 for the 2021 Partnership Year.

WHEREAS, the Partnership's donation of the Easement described herein for the 2021 Partnership Year is collectively defined as the "Transaction."

1 of 6

Closing Agreement With Dogwood Bluff LLC ▮▮▮▮▮▮▮▮

WHEREAS, the Commissioner examined the Partnership's Form 1065 for the 2021 Partnership Year under the BBA partnership procedures.

WHEREAS, the Parties desire to resolve with finality their dispute involving the federal income tax treatment of the Transaction.

NOW THEREFORE THE PARTIES HEREBY DETERMINE AND AGREE for federal income tax purposes that:

1. The charitable contribution deduction(s) and all other items related to the Transaction are adjusted as follows (the "Adjustments"):

    a. Except as provided herein, no deduction, loss, or other tax benefit arising from or in connection with the Transaction, including the deduction claimed for a non-cash charitable contribution of $55,190,000 for the 2021 Partnership Year, is allowed to the Partnership or its Partners for any taxable years.

    b. The Partnership is allowed a deduction for out-of-pocket costs of $10,700,100 for the 2021 Partnership Year.

2. The Partnership is liable for an imputed underpayment under I.R.C.§ 6225 in the amount of $9,342,879 for the 2025 Partnership Year as a result of the Adjustments in determination clause 1 herein.

3. For the 2025 Partnership Year, the Partnership, pursuant to I.R.C. § 6233, is liable for a penalty under I.R.C. § 6662(h) in the amount of $467,144.

4. Prior to the execution of this Agreement, the Partnership made a lump sum payment of $12,556,888 (the "Settlement Payment") to the U.S. Department of the Treasury ("Treasury") in full settlement of the tax, penalties, and interest that could be assessed and collected against the Partnership as a result of the Adjustments in determination clause 1 herein.

5. The Settlement Payment is not refundable or subject to credit, refund, offset, or otherwise reimbursable by the Partnership or the Partners under any circumstances and may be retained by the Treasury regardless of whether it is assessed.

6. No part of the Settlement Payment is deductible, amortizable, or otherwise recoverable for tax purposes by the Partnership or the Partners for any taxable year.

7. Other than the Settlement Payment described in determination clause 4, no additional tax, penalties or interest shall be due from the Partnership or the Partners regarding adjustments in Paragraph 1.

8. The Partnership waives all restrictions on assessment, including the restrictions under I.R.C. § 6232(b), and collection of the imputed underpayment and penalties (and interest on such amounts) determined under this Closing Agreement.

Closing Agreement With Dogwood Bluff LLC ▮▮▮▮▮▮

9. Except as otherwise expressly provided by the Internal Revenue Code, any of the following amounts received by the Partnership after the execution of this Closing Agreement are reportable as ordinary income for the taxable year of receipt:

   a. Amounts paid from third-party tax-gap or tax result or tax liability [insurance] policies, audit insurance policies, or similar funds or investments purchased by the Partnership in connection with the Transaction;
   b. Amounts received from promoters, appraisers, legal or tax professionals, donees, or any other person associated with the creation, marketing, execution, or implementation of the Transaction, regardless of whether a civil action is filed against those persons; or
   c. Amounts received from any other third party that is paid as a result of participation in the Transaction and the disallowance of non-cash charitable contribution deduction arising from the Transaction.

10. Pursuant to I.R.C. §§ 6031(b) and 6227(c), the Partnership and Partners are not permitted to file amended returns or Administrative Adjustment Requests for the transactions covered by this agreement.

11. An inspection of records during the consideration of this Closing Agreement does not preclude or impede, pursuant to I.R.C. § 7605(b), Rev. Proc. 2005-32, 2005-1 C.B. 1206, or any administrative provisions adopted by the Commissioner, a later examination of a return or inspection of records with respect to any tax year needed to resolve any issue outside the scope of this Closing Agreement.

12. Execution of this Closing Agreement does not preclude the Commissioner from asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

13. Execution of this Closing Agreement does not preclude the Commissioner from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in transactions for violation of any criminal statute.

14. Nothing in this Closing Agreement offers any protection against criminal investigation or prosecution.

Closing Agreement With Dogwood Bluff LLC ███████

15. This Closing Agreement is effective upon execution by the Commissioner or his delegate.

THIS AGREEMENT IS FINAL AND CONCLUSIVE EXCEPT:

(1) The matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of a material fact;

(2) it is subject to the Code sections that expressly provide that effect be given to their provisions (including any stated exception for I.R.C. § 7122) notwithstanding any other law or rule of law; and

(3) if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.

For the BBA Partnership:

Dogwood Bluff LLC

By: _____     Date Signed: _____
    Brian Robbins, Designated Individual of Green Rock Management LLC, Partnership
    Representative of Dogwood Bluff LLC

By: _____     Date Signed: _____
    Brian Robbins of Green Rock Management LLC, State Law Signatory

Closing Agreement With Dogwood Bluff LLC ▓▓▓▓▓

Commissioner of Internal Revenue

By: _____    Date Signed: _____
       Name and Title:

| I have examined the specific matters and recommend the acceptance of the proposed agreement. | I have examined the specific matters and recommend the acceptance of the proposed agreement. |
|---|---|
| _____ <br> (Receiving Officer)          (Date) <br> _____ <br> (Title) | _____ <br> (Reviewing Officer)          (Date) <br> _____ <br> (Title) |

Closing Agreement With Dogwood Bluff LLC ▮▮▮▮▮▮▮

## Instructions

This agreement must be signed and filed in triplicate. (All copies must have original signatures.) The original and copies of the agreement must be identical. The name of the taxpayer must be stated accurately. The agreement may relate to one or more years.

If an attorney or agent signs the agreement for the taxpayer, the power of attorney (or a copy) authorizing that person to sign must be attached to the agreement. If the agreement is made for a year when a joint income tax return was filed by a husband and wife, it should be signed by or for both spouses. One spouse may sign as agent for the other if the document (or a copy) specifically authorizing that spouse to sign is attached to the agreement.

If the fiduciary signs the agreement for a decedent or an estate, an attested copy of the letters testamentary or the court order authorizing the fiduciary to sign, and a certificate of recent date that the authority remains in full force and effect must be attached to the agreement. If a trustee signs, a certified copy of the trust instrument or a certified copy of extracts from that instrument must be attached showing:

(1) the date of the instrument;

(2) that it is or is not of record in any court;

(3) the names of the beneficiaries;

(4) the appointment of the trustee, the authority granted, and other information necessary to show that the authority extends to federal tax matters; and

(5) that the trust has not been terminated, and that the trustee appointed is still acting. If a fiduciary is a party, Form 56, Notice Concerning Fiduciary Relationship, is ordinarily required.

If the taxpayer is a corporation, the agreement must be dated and signed with the name of the corporation, the signature and title of an authorized officer or officers, or the signature of an authorized attorney or agent. It is not necessary that a copy of an enabling corporate resolution be attached.

Use additional pages if necessary and identify them as part of this agreement.

Please see Revenue Procedure 68-16, C.B. 1968-1, page 770, for a detailed description of practices and procedures applicable to most closing agreements.

Closing Agreement With Dogwood Bluff LLC 

Form **906**
(Rev. Aug. 1994)
Department of the Treasury—Internal Revenue Service

## CLOSING AGREEMENT ON FINAL DETERMINATION
## COVERING SPECIFIC MATTERS

Under section 7121 of the Internal Revenue Code ("I.R.C." or "Code"), Dogwood Bluff LLC (EIN: ⬛⬛⬛⬛⬛⬛) (the "Partnership"), 2207 2nd Ave N, Birmingham, AL 35203-3805, and the Commissioner of Internal Revenue (the "Commissioner") (the Commissioner and the Partnership, collectively, the "Parties") make the following Closing Agreement (the "Closing Agreement"):

WHEREAS, the Partnership filed a Form 1065, U.S. Return of Partnership Income, for the partnership year beginning August 23, 2021, and ending December 31, 2021 (the "2021 Partnership Year").

WHEREAS, the Partnership is subject to the centralized partnership provisions of the Bipartisan Budget Act of 2015, codified at I.R.C. §§ 6221 through 6241 ("BBA") as in effect for tax years beginning on or after January 1, 2018, for the 2021 Partnership Year.

WHEREAS, Green Rock Management LLC (the "PR") is the partnership representative (as defined in I.R.C. § 6223) of the Partnership for the 2021 Partnership Year. Brian Robbins is the designated individual of the PR for the 2021 Partnership Year.

WHEREAS, Brian Robbins of Green Rock Management LLC is authorized under Georgia law as the State Law Signatory to act for the Partnership at the time of signature.

WHEREAS, on December 29, 2021, the Partnership donated a conservation easement (the "Easement") on the property located in Oglethorpe County, Georgia more particularly described in Exhibits A and B (the "Property") to Natural Resources Conservancy, Inc. (the "Donee").

WHEREAS, the Partnership claimed a non-cash charitable contribution deduction of $55,190,000 for the Easement donation on its Form 1065 for the 2021 Partnership Year;

WHEREAS, the Partnership also made a payment of cash of $100,000 to the Donee for which it claimed an additional charitable contribution deduction on its Form 1065 for the 2021 Partnership Year.

WHEREAS, the Partnership's donation of the Easement described herein for the 2021 Partnership Year is collectively defined as the "Transaction."

Closing Agreement With Dogwood Bluff LLC ██████

WHEREAS, the Commissioner examined the Partnership's Form 1065 for the 2021 Partnership Year under the BBA partnership procedures.

WHEREAS, the Parties desire to resolve with finality their dispute involving the federal income tax treatment of the Transaction.

NOW THEREFORE THE PARTIES HEREBY DETERMINE AND AGREE for federal income tax purposes that:

1. The charitable contribution deduction(s) and all other items related to the Transaction are adjusted as follows (the "Adjustments"):

    a. Except as provided herein, no deduction, loss, or other tax benefit arising from or in connection with the Transaction, including the deduction claimed for a non-cash charitable contribution of $55,190,000 for the 2021 Partnership Year, is allowed to the Partnership or its Partners for any taxable years.

    b. The Partnership is allowed a deduction for out-of-pocket costs of $10,700,100 for the 2021 Partnership Year.

2. The Partnership is liable for an imputed underpayment under I.R.C. § 6225 in the amount of $9,342,879 for the 2025 Partnership Year as a result of the Adjustments in determination clause 1 herein.

3. For the 2025 Partnership Year, the Partnership, pursuant to I.R.C. § 6233, is liable for a penalty under I.R.C. § 6662(h) in the amount of $467,144.

4. Prior to the execution of this Agreement, the Partnership made a lump sum payment of $12,556,888 (the "Settlement Payment") to the U.S. Department of the Treasury ("Treasury") in full settlement of the tax, penalties, and interest that could be assessed and collected against the Partnership as a result of the Adjustments in determination clause 1 herein.

5. The Settlement Payment is not refundable or subject to credit, refund, offset, or otherwise reimbursable by the Partnership or the Partners under any circumstances and may be retained by the Treasury regardless of whether it is assessed.

6. No part of the Settlement Payment is deductible, amortizable, or otherwise recoverable for tax purposes by the Partnership or the Partners for any taxable year.

7. Other than the Settlement Payment described in determination clause 4, no additional tax, penalties or interest shall be due from the Partnership or the Partners regarding adjustments in Paragraph 1.

8. The Partnership waives all restrictions on assessment, including the restrictions under I.R.C. § 6232(b), and collection of the imputed underpayment and penalties (and interest on such amounts) determined under this Closing Agreement.

Closing Agreement With Dogwood Bluff LLC ████████

9. Except as otherwise expressly provided by the Internal Revenue Code, any of the following amounts received by the Partnership after the execution of this Closing Agreement are reportable as ordinary income for the taxable year of receipt:

    a. Amounts paid from third-party tax-gap or tax result or tax liability [insurance] policies, audit insurance policies, or similar funds or investments purchased by the Partnership in connection with the Transaction;

    b. Amounts received from promoters, appraisers, legal or tax professionals, donees, or any other person associated with the creation, marketing, execution, or implementation of the Transaction, regardless of whether a civil action is filed against those persons; or

    c. Amounts received from any other third party that is paid as a result of participation in the Transaction and the disallowance of non-cash charitable contribution deduction arising from the Transaction.

10. Pursuant to I.R.C. §§ 6031(b) and 6227(c), the Partnership and Partners are not permitted to file amended returns or Administrative Adjustment Requests for the transactions covered by this agreement.

11. An inspection of records during the consideration of this Closing Agreement does not preclude or impede, pursuant to I.R.C. § 7605(b), Rev. Proc. 2005-32, 2005-1 C.B. 1206, or any administrative provisions adopted by the Commissioner, a later examination of a return or inspection of records with respect to any tax year needed to resolve any issue outside the scope of this Closing Agreement.

12. Execution of this Closing Agreement does not preclude the Commissioner from asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

13. Execution of this Closing Agreement does not preclude the Commissioner from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted or advised others in participating in transactions for violation of any criminal statute.

14. Nothing in this Closing Agreement offers any protection against criminal investigation or prosecution.

Closing Agreement With Dogwood Bluff LLC ▮▮▮▮▮▮

15. This Closing Agreement is effective upon execution by the Commissioner or his delegate.

THIS AGREEMENT IS FINAL AND CONCLUSIVE EXCEPT:

(1) The matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of a material fact;

(2) it is subject to the Code sections that expressly provide that effect be given to their provisions (including any stated exception for I.R.C. § 7122) notwithstanding any other law or rule of law; and

(3) if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.

For the BBA Partnership:

Dogwood Bluff LLC

By: _____    Date Signed: _____
    Brian Robbins, Designated Individual of Green Rock Management LLC, Partnership
    Representative of Dogwood Bluff LLC

By: _____    Date Signed: _____
    Brian Robbins of Green Rock Management LLC, State Law Signatory

Closing Agreement With Dogwood Bluff LLC ███████

Commissioner of Internal Revenue

By: _____        Date Signed: _____
     Name and Title:

| I have examined the specific matters and recommend the acceptance of the proposed agreement. | I have examined the specific matters and recommend the acceptance of the proposed agreement. |
|---|---|
| _____ <br> (Receiving Officer)　　　(Date) <br> _____ <br> (Title) | _____ <br> (Reviewing Officer)　　　(Date) <br> _____ <br> (Title) |

Closing Agreement With Dogwood Bluff LLC█████████

## Instructions

This agreement must be signed and filed in triplicate. (All copies must have original signatures.) The original and copies of the agreement must be identical. The name of the taxpayer must be stated accurately. The agreement may relate to one or more years.

If an attorney or agent signs the agreement for the taxpayer, the power of attorney (or a copy) authorizing that person to sign must be attached to the agreement. If the agreement is made for a year when a joint income tax return was filed by a husband and wife, it should be signed by or for both spouses. One spouse may sign as agent for the other if the document (or a copy) specifically authorizing that spouse to sign is attached to the agreement.

If the fiduciary signs the agreement for a decedent or an estate, an attested copy of the letters testamentary or the court order authorizing the fiduciary to sign, and a certificate of recent date that the authority remains in full force and effect must be attached to the agreement. If a trustee signs, a certified copy of the trust instrument or a certified copy of extracts from that instrument must be attached showing:

(1) the date of the instrument;

(2) that it is or is not of record in any court;

(3) the names of the beneficiaries;

(4) the appointment of the trustee, the authority granted, and other information necessary to show that the authority extends to federal tax matters; and

(5) that the trust has not been terminated, and that the trustee appointed is still acting. If a fiduciary is a party, Form 56, Notice Concerning Fiduciary Relationship, is ordinarily required.

If the taxpayer is a corporation, the agreement must be dated and signed with the name of the corporation, the signature and title of an authorized officer or officers, or the signature of an authorized attorney or agent. It is not necessary that a copy of an enabling corporate resolution be attached.

Use additional pages if necessary and identify them as part of this agreement.

Please see Revenue Procedure 68-16, C.B. 1968-1, page 770, for a detailed description of practices and procedures applicable to most closing agreements.

Closing Agreement With Dogwood Bluff LLC ▮▮▮▮▮▮

Form **906**
(Rev. Aug. 1994)
Department of the Treasury—Internal Revenue Service

## CLOSING AGREEMENT ON FINAL DETERMINATION
## COVERING SPECIFIC MATTERS

Under section 7121 of the Internal Revenue Code ("I.R.C." or "Code"), Dogwood Bluff LLC (EIN: ▮▮▮▮▮▮▮) (the "Partnership"), 2207 2nd Ave N, Birmingham, AL 35203-3805, and the Commissioner of Internal Revenue (the "Commissioner") (the Commissioner and the Partnership, collectively, the "Parties") make the following Closing Agreement (the "Closing Agreement"):

WHEREAS, the Partnership filed a Form 1065, U.S. Return of Partnership Income, for the partnership year beginning August 23, 2021, and ending December 31, 2021 (the "2021 Partnership Year").

WHEREAS, the Partnership is subject to the centralized partnership provisions of the Bipartisan Budget Act of 2015, codified at I.R.C. §§ 6221 through 6241 ("BBA") as in effect for tax years beginning on or after January 1, 2018, for the 2021 Partnership Year.

WHEREAS, Green Rock Management LLC (the "PR") is the partnership representative (as defined in I.R.C. § 6223) of the Partnership for the 2021 Partnership Year. Brian Robbins is the designated individual of the PR for the 2021 Partnership Year.

WHEREAS, Brian Robbins of Green Rock Management LLC is authorized under Georgia law as the State Law Signatory to act for the Partnership at the time of signature.

WHEREAS, on December 29, 2021, the Partnership donated a conservation easement (the "Easement") on the property located in Oglethorpe County, Georgia more particularly described in Exhibits A and B (the "Property") to Natural Resources Conservancy, Inc. (the "Donee").

WHEREAS, the Partnership claimed a non-cash charitable contribution deduction of $55,190,000 for the Easement donation on its Form 1065 for the 2021 Partnership Year;

WHEREAS, the Partnership also made a payment of cash of $100,000 to the Donee for which it claimed an additional charitable contribution deduction on its Form 1065 for the 2021 Partnership Year.

WHEREAS, the Partnership's donation of the Easement described herein for the 2021 Partnership Year is collectively defined as the "Transaction."

Closing Agreement With Dogwood Bluff LLC ▮▮▮▮▮▮▮

WHEREAS, the Commissioner examined the Partnership's Form 1065 for the 2021 Partnership Year under the BBA partnership procedures.

WHEREAS, the Parties desire to resolve with finality their dispute involving the federal income tax treatment of the Transaction.

NOW THEREFORE THE PARTIES HEREBY DETERMINE AND AGREE for federal income tax purposes that:

1. The charitable contribution deduction(s) and all other items related to the Transaction are adjusted as follows (the "Adjustments"):

    a. Except as provided herein, no deduction, loss, or other tax benefit arising from or in connection with the Transaction, including the deduction claimed for a non-cash charitable contribution of $55,190,000 for the 2021 Partnership Year, is allowed to the Partnership or its Partners for any taxable years.

    b. The Partnership is allowed a deduction for out-of-pocket costs of $10,700,100 for the 2021 Partnership Year.

2. The Partnership is liable for an imputed underpayment under I.R.C.§ 6225 in the amount of $9,342,879 for the 2025 Partnership Year as a result of the Adjustments in determination clause 1 herein.

3. For the 2025 Partnership Year, the Partnership, pursuant to I.R.C. § 6233, is liable for a penalty under I.R.C. § 6662(h) in the amount of $467,144.

4. Prior to the execution of this Agreement, the Partnership made a lump sum payment of $12,556,888 (the "Settlement Payment") to the U.S. Department of the Treasury ("Treasury") in full settlement of the tax, penalties, and interest that could be assessed and collected against the Partnership as a result of the Adjustments in determination clause 1 herein.

5. The Settlement Payment is not refundable or subject to credit, refund, offset, or otherwise reimbursable by the Partnership or the Partners under any circumstances and may be retained by the Treasury regardless of whether it is assessed.

6. No part of the Settlement Payment is deductible, amortizable, or otherwise recoverable for tax purposes by the Partnership or the Partners for any taxable year.

7. Other than the Settlement Payment described in determination clause 4, no additional tax, penalties or interest shall be due from the Partnership or the Partners regarding adjustments in Paragraph 1.

8. The Partnership waives all restrictions on assessment, including the restrictions under I.R.C. § 6232(b), and collection of the imputed underpayment and penalties (and interest on such amounts) determined under this Closing Agreement.

Closing Agreement With Dogwood Bluff LLC ▮▮▮▮▮▮

9. Except as otherwise expressly provided by the Internal Revenue Code, any of the following amounts received by the Partnership after the execution of this Closing Agreement are reportable as ordinary income for the taxable year of receipt:

    a. Amounts paid from third-party tax-gap or tax result or tax liability [insurance] policies, audit insurance policies, or similar funds or investments purchased by the Partnership in connection with the Transaction;

    b. Amounts received from promoters, appraisers, legal or tax professionals, donees, or any other person associated with the creation, marketing, execution, or implementation of the Transaction, regardless of whether a civil action is filed against those persons; or

    c. Amounts received from any other third party that is paid as a result of participation in the Transaction and the disallowance of non-cash charitable contribution deduction arising from the Transaction.

10. Pursuant to I.R.C. §§ 6031(b) and 6227(c), the Partnership and Partners are not permitted to file amended returns or Administrative Adjustment Requests for the transactions covered by this agreement.

11. An inspection of records during the consideration of this Closing Agreement does not preclude or impede, pursuant to I.R.C. § 7605(b), Rev. Proc. 2005-32, 2005-1 C.B. 1206, or any administrative provisions adopted by the Commissioner, a later examination of a return or inspection of records with respect to any tax year needed to resolve any issue outside the scope of this Closing Agreement.

12. Execution of this Closing Agreement does not preclude the Commissioner from asserting promoter, appraiser, or return preparer penalties or pursuing discipline under Circular 230.

13. Execution of this Closing Agreement does not preclude the Commissioner from investigating any associated criminal conduct or recommending prosecution of any individual or entity that participated in or assisted others in participating in transactions for violation of any criminal statute.

14. Nothing in this Closing Agreement offers any protection against criminal investigation or prosecution.

Closing Agreement With Dogwood Bluff LLC <span style="background:black">████████</span>

15. This Closing Agreement is effective upon execution by the Commissioner or his delegate.

THIS AGREEMENT IS FINAL AND CONCLUSIVE EXCEPT:

(1) The matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of a material fact;

(2) it is subject to the Code sections that expressly provide that effect be given to their provisions (including any stated exception for I.R.C. § 7122) notwithstanding any other law or rule of law; and

(3) if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.


For the BBA Partnership:

Dogwood Bluff LLC

By: _____     Date Signed: _____
    Brian Robbins, Designated Individual of Green Rock Management LLC, Partnership Representative of Dogwood Bluff LLC


By: _____     Date Signed: _____
    Brian Robbins of Green Rock Management LLC, State Law Signatory

Closing Agreement With Dogwood Bluff LLC ████████

Commissioner of Internal Revenue

By: _____    Date Signed: _____

Name and Title:

| I have examined the specific matters and recommend the acceptance of the proposed agreement. | I have examined the specific matters and recommend the acceptance of the proposed agreement. |
|---|---|
| _____ (Receiving Officer)          (Date) | _____ (Reviewing Officer)          (Date) |
| _____ (Title) | _____ (Title) |

Closing Agreement With Dogwood Bluff LLC ███████

## Instructions

This agreement must be signed and filed in triplicate. (All copies must have original signatures.) The original and copies of the agreement must be identical. The name of the taxpayer must be stated accurately. The agreement may relate to one or more years.

If an attorney or agent signs the agreement for the taxpayer, the power of attorney (or a copy) authorizing that person to sign must be attached to the agreement. If the agreement is made for a year when a joint income tax return was filed by a husband and wife, it should be signed by or for both spouses. One spouse may sign as agent for the other if the document (or a copy) specifically authorizing that spouse to sign is attached to the agreement.

If the fiduciary signs the agreement for a decedent or an estate, an attested copy of the letters testamentary or the court order authorizing the fiduciary to sign, and a certificate of recent date that the authority remains in full force and effect must be attached to the agreement. If a trustee signs, a certified copy of the trust instrument or a certified copy of extracts from that instrument must be attached showing:

(1) the date of the instrument;

(2) that it is or is not of record in any court;

(3) the names of the beneficiaries;

(4) the appointment of the trustee, the authority granted, and other information necessary to show that the authority extends to federal tax matters; and

(5) that the trust has not been terminated, and that the trustee appointed is still acting. If a fiduciary is a party, Form 56, Notice Concerning Fiduciary Relationship, is ordinarily required.

If the taxpayer is a corporation, the agreement must be dated and signed with the name of the corporation, the signature and title of an authorized officer or officers, or the signature of an authorized attorney or agent. It is not necessary that a copy of an enabling corporate resolution be attached.

Use additional pages if necessary and identify them as part of this agreement.

Please see Revenue Procedure 68-16, C.B. 1968-1, page 770, for a detailed description of practices and procedures applicable to most closing agreements.

6 of 6

Do Not Process-Used for Computational Purposes Only/ Do not process - This Form 14791 is for computational purposes under Syndicated Conservation Easement Resolution Initiative only

# Preliminary Partnership Examination Changes, Imputed Underpayment Computation and Partnership Level Determinations as to Penalties, Additions to Tax and Additional Amounts

| Audit control number | Tax year ended: (mm/dd/yyyy) |
|---|---|
| 2112010619 | 12/31/2021 |

## Partnership Information

| Name | | Taxpayer ID Number (TIN) |
|---|---|---|
| DOGWOOD BLUFF LLC | | ███████ |

| Street address (including apartment no.) | City or town | State | ZIP code |
|---|---|---|---|
| 2207 2ND AVE N | BIRMINGHAM | AL | 35203-3805 |

## Person with Whom the Changes Were Discussed

| Name | Title |
|---|---|
| Ronald Levitt | POA |

## General Imputed Underpayment

| 1. Reallocation Grouping | Subgroup | Positive Adjustment | Negative Adjustment |
|---|---|---|---|
| A. | ☒ | | |
| i. | | | |
| Subtotal for subgroup | | | |
| 2. Sum of all net positive Reallocation Grouping adjustments (only include net positive adjustments in the total. See Line 3 for net negative adjustments) | | | |
| 3. Sum of all net negative Reallocation Grouping Adjustments (only include net negative adjustments in the total. See Line 2 for net positive adjustments) | | | |
| 4. Residual Grouping | | | |
| A. SCE - NonCash Contribution Disallowed | ☐ | 55,190,000 | |
| B. SCE - Investment Costs Allowed | ☐ | (10,700,100) | |
| 5. Sum of all net positive Residual Grouping adjustments (only include net positive adjustments in the total. See Line 6 for net negative adjustments) | | 44,489,900 | |
| 6. Sum of all net negative Residual Grouping adjustments (only include net negative adjustments in the total. See Line 5 for net positive adjustments) | | | |
| 7. Sum of all net positive adjustments from Reallocation and Residual Groupings (add Lines 2 and 5). Total netted partnership adjustments | | 44,489,900 | |
| 8. Sum of all net negative adjustments from Reallocation and Residual Groupings (add Lines 3 and 6). This amount is ignored for calculating the imputed underpayment | | | |
| 9. Highest effective tax rate for the tax year ended | | 21% | |
| 10. Imputed Underpayment before Creditable Expenditures and Credit Groupings (multiply Line 7 by Line 9) | | 9,342,879 | |
| 11. Creditable Expenditures Grouping (decreases to creditable expenditures are positive adjustments and increases are negative adjustments) | | | |
| A. | ☒ | | |
| i. | | | |
| Subtotal for subgroup | | | |
| 12. Sum of all net positive adjustments in the Creditable Expenditure Grouping (only include net positive adjustments in the total. See Line 13 for net negative adjustments) | | | |
| 13. Sum of all net negative adjustments in the Creditable Expenditure Grouping (only include net negative adjustments in the total. See Line 12 for net positive adjustments) | | | |

| Name of partnership | | Taxpayer ID Number (TIN) | Tax year ended | Audit control number |
|---|---|---|---|---|
| DOGWOOD BLUFF LLC | | ███████ | 12/31/2021 | 211201061919 |

| 14. Credit Grouping *(decreases to credits are positive adjustments and increases are negative adjustments)* | Subgroup | Positive Adjustment | Negative Adjustment |
|---|---|---|---|
| A. | ☒ | | |
| i. | | | |
| Subtotal for subgroup | | | |
| 15. Sum of all net positive adjustments in the Credit Grouping *(only include net positive adjustments in the total. See Line 16 for net negative adjustments)* | | | |
| 16. Sum of all net negative adjustments in the Credit Grouping *(only include net negative adjustments in the total. See Line 15 for net positive adjustments)* | | | |

| | | | | |
|---|---|---|---|---|
| 17. Imputed Underpayment *(add Lines 10, 12 and 15)* | | | | 9,342,879 |
| 18. Penalties | | | Code Section | Penalty Amount |
| A. IRC 6662(h) – Accuracy Related Penalty reduced to 5% | | | 6662(h) | 467,144 |
| B. | | | | |
| C. | | | | |
| 19. Total Penalties with respect to the Imputed Underpayment *(add all lines in 18)* | | | | 467,144 |
| 20. Estimated interest | | | | |

| Interest *(IRC § 6233(a)(2))* estimated and computed to *(mm/dd/yyyy)* 10/21/2025 | Amount of interest: 2,746,865 |
|---|---|

Other Information

Do Not Process-Used for Computational Purposes Only

| Form **872-M** (April 2019) | Department of the Treasury - Internal Revenue Service<br>**Consent to Extend the Time to Make Partnership Adjustments** | In reply refer to<br>Janice Fair<br><br>Taxpayer ID Number (TIN) |
|---|---|---|

Dogwood Bluff, LLC

_____
(Name)

a partnership at     2207 2nd Ave N
_____

Birmingham, AL 35203-3805
_____
(number, street, city or town, state, and ZIP code)

and the Commissioner of Internal Revenue consent and agree as provided by IRC section 6235(b), to the following:
Partnership Adjustments on any returns made by or for the above partnership for the period(s) ended
December 31, 2021

_____

may be made at any time on or before     December 31, 2026 .
                                          (Expiration date).

Pursuant to IRC 6235(b), this agreement extends the time period under Internal Revenue Code section: 6235(a)(1)
                                                                                                      (Applicable IRC Section)

---

**Your Rights as a Taxpayer**

The taxpayer has the right to refuse to extend the period of limitations or limit this extension to a mutually agreed-upon issue(s) or mutually agreed-upon period of time. Signing this consent will not deprive the taxpayer of any appeal rights to which the taxpayer would otherwise be entitled.

(Signature instructions and space for signature are on back of this form.)

Catalog Number 70561Q                    www.irs.gov                    Form **872-M** (4-2019)

| TIN | Expiration date<br>December 31, 2026 | Agreement extends the time period under IRC section<br>6235(a)(1) |
|---|---|---|

Period ending:

December 31, 2021

### Signing This Consent Will Not Deprive the Partnership of Any Appeal Rights to Which It Would Otherwise Be Entitled

Under penalties of perjury, I declare that I am the partnership representative/designated individual.

| Name of Partnership Representative<br>Green Rock Management LLC | Name of Designated Individual, *(if applicable)*<br>Brian Robbins | |
|---|---|---|
| Sign here (*If being signed by an individual partnership representative, the individual partnership representative should sign.<br>If being signed on behalf of an entity partnership representative, the designated individual should sign*) | | Date signed |

Name and title of the person (*either "partnership representative" or "designated individual" as applicable*) signing this form

Brian Robbins, Designated Individual of Green Rock Management, LLC

I am aware that I have the right to refuse to sign this consent or to limit the extension to mutually agreed-upon issues and/or period of time.

### Internal Revenue Service Signature and Title

| IRS Official's name (*see instructions*)<br>Joseph Piedmont | IRS Official's title (*see instructions*)<br>Supervisory Internal Revenue Agent | |
|---|---|---|
| IRS Official's signature (*see instructions*) | | Date signed |

### Instructions for Signing Form 872-M

1. This consent generally applies to partnership returns filed for partnership tax years beginning after December 31, 2017 or for partnership returns filed for partnership tax years beginning after November 2, 2015 and before January 1, 2018 where the partnership made an election pursuant to the provisions of § 1101(g)(4) of the Bipartisan Budget Act of 2015 (BBA).

2. This document must be signed and dated by the partnership representative for the partnership. If the partnership representative is an entity, the designated individual must sign and date on behalf of the partnership representative. The signature and title of the signer is required.

### Instructions for Internal Revenue Service Employees

Complete the delegated IRS official's name and title of the employee who is signing the form on behalf of the IRS.

Catalog Number 70561Q                www.irs.gov                Form **872-M** (4-2019)

**D. Austin Bersinger**
Partner
ABersinger@bradley.com
404.868.2042 direct

Bradley

August 8, 2025

**VIA EMAIL ONLY**

Sarah Adam
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
Email: sarah.adam@wilsonelser.com

**Re: Insurer Requested Discussion with Tax Counsel**

| | |
|---|---|
| Insured: | Dogwood Bluff Partners, LLC ("Dogwood Partners") |
| Insurer: | Volante Global, LTD, Volante Specialty Risk LTD, Fidelis Underwriting Limited ("Insurers") |
| Policy No.: | VFP/FL/20627/2021/1 |

Dear Ms. Adam:

Please accept this correspondence as a follow up to the discussions the Insurers requested and conducted with lead tax counsel for various partnerships that are considering the nondocketed settlement offer from the IRS. Specifically, these calls occurred on July 22, 2025 and July 23, 2025 with John Hackney of Chamberlain Hrdlika White Williams & Aughtry, Ronald Levitt and Michelle Levin of Dentons Sirote, and Jeff Luechtefeld with our firm. As it relates to the above referenced insurance policy, Mr. Levitt and Ms. Levin are tax counsel for Dogwood Bluff, LLC ("Dogwood Bluff").

Our understanding is that the Insurers requested calls with tax counsel to learn tax counsels' opinions and recommendations regarding the available IRS settlement as well as their professional opinions on the current state of tax court jurisprudence. In response to the Insurers' request, the partnership worked quickly and diligently to cooperate and make tax counsel available to the Insurers and its counsel. During these calls, Mr. Hackney, Mr. Levitt, Ms. Levin, and Mr. Luechtefeld each (i) answered all the Insurers' questions, (ii) opined on the reasonableness of the IRS's settlement offer due to the Tax Court's recent decisions involving conservation easements, and (iii) came to the same independent conclusion that, based on each counsel's respective experience and expertise, it was their recommendation that their clients accept the IRS's settlement offer.

Each discussion between tax counsel and the Insurers' counsel reached the same conclusion. Tax counsel believes that the IRS settlement is reasonable and that failure to accept the settlement will ultimately harm the partnerships and the partners. To date, the Insurers have refused to give consent to the IRS settlement or waive the consent requirement under the Policy. This untenable position prejudices the insureds and appears unreasonable as matter of law. As previously communicated, an insurer's right to withhold consent to settlement is constrained by

Sarah Adam
Wilson Elser
August 8, 2025
Page 2

its duty to act reasonably and in good faith. Even where a policy includes a consent-to-settle provision, the insurer must exercise that right in a manner consistent with the covenant of good faith and fair dealing implied in every insurance contract. *See, e.g., Piedmont Office Realty Trust, Inc. v. XL Specialty Ins. Co.*, 297 Ga. 38, 43 (2015); *Waters v. American Cas. Co. of Reading, PA*, 261 Ala. 252, 260–61 (1953). Courts evaluate the insurer's decision by asking whether it gave equal consideration to the interests of the insured and acted as a reasonably prudent insurer would under the circumstances. *See Piedmont Office*, 297 Ga. at 43; *see also Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 685 (2003); *First Acceptance Ins. Co. of Ga., Inc. v. Hughes*, 305 Ga. 489, 497 (2019); *State Farm Mut. Auto. Ins. Co. v. Hollis*, 554 So.2d 387, 391–92 (Ala. 1989). That reasonableness standard applies regardless of whether the insurer ultimately consents to or denies coverage; it must respond to requests for consent in a timely and informed manner based on the information available at the time. *See Geico Indemn. Co. v. Whiteside*, 311 Ga. 346, 352 (2021) (reasonableness of an insurer is determined based on information available at the time of the decision).

Notably, tax counsel communicated the following to the Insurers:

- The Tax Court's recent opinions, specifically including the Court's fully reviewed opinion in *Ranch Springs, LLC v. Commissioner*, 164 T.C. No. 6 (2025), cannot be read narrowly to apply only to the cases at issue. Instead, the Court's decisions are broadly applicable to cases involving the valuation of conservation easements with no wiggle room for similarly situated taxpayers, like Dogwood Bluff. Moreover, due to the Court's approach to valuation, factual discovery and the engagement of new or additional experts is unnecessary to assess the reasonableness of the IRS's settlement offer.

- As evidenced by *Beaverdam Creek Holdings, LLC v. Commissioner,* T.C. Memo. 2025-53, the Tax Court's valuation determinations are not turning on the Court's refusal to adopt a taxpayer's proposed highest and best use ("HBU"). Instead, even where the Court adopts the taxpayer's HBU, it is still rejecting the taxpayer's use of the discounted cash flow ("DCF") valuation approach. *Beaverdam*, T.C. Memo. 2025-53, at *25 ("We note here that it does not flow from our highest and best use ruling that we should determine the before value of the easement property using the income method."). This is because the Court has repeatedly found that the DCF approach "is a speculative valuation method most often used to value the projected cashflows of a business." *Id.* (citing *J L Minerals*, T.C. Memo. 2024-93, at *63 (stating that the income "method [does] not valu[e] the property at all, but what a speculative business could do with the property")).

- As evidenced by *Ranch Springs*, 164 T.C. No. 6 (2025), and *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6, the Tax Court's comparable sale analysis puts significant weight on recent transactions involving interests in the subject property. This analysis includes not only recent transactions in the protected property but also

Sarah Adam
Wilson Elser
August 8, 2025
Page 3

transactions in the interests of the entity holding such property, like the sale of the interests in Dogwood Bluff to Dogwood Partners.

- The Tax Court's valuation approach has rendered the due diligence that a taxpayer performed prior to granting the conservation easement irrelevant; the Court is not giving any weight to this prior work. Moreover, as evidenced by the Court's recent order in *Ivey Branch Holdings, LLC v. Commissioner*, Docket 19189-19, there is a risk that the Court may begin excluding expert reports that utilize a DCF valuation approach based on such prior due diligence.

- Any hope that the taxpayers in the recently decided cases can prevail on appeal before the Eleventh Circuit would be purely speculative. Specifically, due to the factual nature of the Tax Court's valuation determinations, the Eleventh Circuit is unlikely to go behind the Tax Court's findings regarding valuation. This is consistent with decisions from other circuits reviewing Tax Court determinations regarding the valuation of conservation easements. *See Brooks v. Commissioner*, 109 F.4th 205, 221 (4th Cir. 2024) ("[Taxpayers] face a substantial burden in challenging these factual findings of value. Like most factual determinations, determinations of fair market value are subject to review only for clear error.").

- The Tax Court's recent decision in *Veribest Vesta, LLC v. Commissioner*, Docket No. 9158-23 (Order July 15, 2025), creates a new risk for taxpayers and their counsel, as the Court raised the issue of potential sanctions under I.R.C. § 6673 for parties that continue to make valuation arguments based on the DCF approach.

As you know, the reasonableness of an insurer's behavior, claims handling, and coverage decisions is determined based on the information available at the time of the decision. *See Geico Indemn. Co. v. Whiteside*, 311 Ga. 346, 352 (2021). Insurers must act reasonably and in good faith when responding to settlement opportunities. *See S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 268–69 (1992); *Cotton States*, 276 Ga. at 684–85. That duty of good faith and fair dealing includes not only evaluating the terms of a proposed settlement, **but also clearly and timely communicating the insurer's position to the insured—particularly where the insurer's position will affect the insured's ability to protect itself in the face of a claim**.

To date, the Insurers have offered no authority or realistic theory that contradicts tax counsels' opinions regarding (i) the effect of recent Tax Court precedent in Dogwood Bluff's case, (ii) the reasonableness of the IRS settlement offer, or (iii) the potential for Dogwood Bluff to get a better outcome than the IRS settlement offer at trial. The Insurers have not identified any tax expert or tax practitioner to support any such theory. Nor have the Insurers communicated to its insured the existence or findings of any tax expert or practitioner that would support the Insurers' decision to withhold consent based on the reasonableness of the proposed IRS settlement.

At present, it appears that in spite of countless tax attorneys, including the tax counsel in this case, directly communicating the reasonableness of the IRS settlement as well as the

Sarah Adam
Wilson Elser
August 8, 2025
Page 4

significant downside risk awaiting the partnership at trial, the Insurers intend to refuse to allow its insured to protect its interest through accepting the IRS settlement.  Given the peril the Insurers are seeking to cause its insured, Dogwood Partners is entitled to know the basis and supporting documentation on which the Insurers currently rely  in support of the Insurers' position that the IRS settlement is not reasonable. Dogwood Partners demands that the Insurers identify any supporting documentation, tax authority, consulting expert, or tax practitioner the Insurers are relying on for the same in your response to our July 11, 2025 correspondence.  A decision by the Insurers to either refuse to provide a written coverage position, despite full knowledge of the material facts and repeated requests from the insureds with respect to the same, or to refuse to identify reasonable grounds for ignoring the facts and circumstances of this case and the expertise of Dogwood Bluff's tax counsel will be cited as further evidence of the Insurers' bad faith and unreasonable delay.

Should you have any questions, please do not hesitate to call.

Sincerely,

D. Austin Bersinger

CC:    Larkin, Peter J. (Peter.Larkin@wilsonelser.com)
Michael O'Malley (Michael.O'Malley@wilsonelser.com)
John Nail (jnail@bradley.com)

## IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1693-2**

Judge David L. Dickinson
SEP 21, 2025 12:36 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

CIVIL ACTION NUMBER  25CV-1693-2

Dogwood Bluff Partners, LLC
Dogwood Bluff, LLC

_____

**PLAINTIFF**

**VS.**

Fidelis Underwriting Limited
Volante Specialty Risk, LLC

_____

**DEFENDANTS**

### SUMMONS

TO: FIDELIS UNDERWRITING LIMITED

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> **D. Austin Bersinger**
> **Bradley Arant Boult Cummings LLP**
> **Promenade Tower**
> **1230 Peachtree Street NE, Suite 2100**
> **Atlanta, Georgia 30309**
> **abersinger@bradley.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 21st day of September, 2025.**

Clerk of Superior Court

_____
Greg G. Allen, Clerk
Forsyth County, Georgia

## IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

⊕ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1693-2**

**Judge David L. Dickinson**
**SEP 21, 2025 12:36 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

CIVIL ACTION NUMBER  25CV-1693-2

Dogwood Bluff Partners, LLC
Dogwood Bluff, LLC

_____

**PLAINTIFF**

**VS.**

Fidelis Underwriting Limited
Volante Specialty Risk, LLC

_____

**DEFENDANTS**

### SUMMONS

TO: VOLANTE SPECIALTY RISK, LLC

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> **D. Austin Bersinger**
> **Bradley Arant Boult Cummings LLP**
> **Promenade Tower**
> **1230 Peachtree Street NE, Suite 2100**
> **Atlanta, Georgia 30309**
> **abersinger@bradley.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 21st day of September, 2025.**

Clerk of Superior Court

_____
Greg G. Allen, Clerk
Forsyth County, Georgia

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

📧 **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**25CV-1693-2**

Judge David L. Dickinson
OCT 06, 2025 10:46 AM

Greg G. Allen, Clerk
Forsyth County, Georgia

Dogwood Bluff Partners, LLC,
Dogwood Bluff, LLC

        Plaintiff,

                                    CIVIL ACTION
                                      FILE NO.: 25CV-1693-2

v.

Fidelis Underwriting Limited,
Volante Specialty Risk, LLC,

        Defendants.

## AFFIDAVIT JEFF DOLBIER

On Wednesday September 24, 2025 at 12:15 p.m., I served true and correct copies of the SUMMONS and COMPLAINT upon Defendant Volante Specialty Risk, LLC's Registered Agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092. Ms. Alisha Smith, a CSC representative, accepted service.

This 25 day of September, 2025

                                              Jeff Dolbier
                                              President, Flash Delivery Inc.

Sworn and Subscribed before
me this 25 day of September, 2025

My Commission Expires: 06/26/2029